UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

          Plaintiff,

                                  Case No. 12-CR-20287

v.

                                  HON. MARK A. GOLDSMITH

ALEXANDRA NORWOOD, et al.,

          Defendants.

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO PRECLUDE THE GOVERNMENT'S PROPOSED EXPERTS (Dkts. 211 and 263)

### I. INTRODUCTION

This matter is before the Court on Defendants' motions to exclude the Government's proposed experts (Dkts. 211 and 263). Defendants challenge two proposed expert witnesses disclosed by the Government: DEA Special Agent Scott Nedoff and FBI Special Agent Robert Bornstein. The Government proposes to call Nedoff to provide expert testimony on the sale and distribution of drugs, and Bornstein is to provide expert testimony on gangs. For the reasons set forth below, the Court grants in part Defendants' motions, to the extent they seek to bar Bornstein from testifying at trial, and denies in part Defendants' motions, so as to permit Nedoff to offer expert testimony at trial.

### II. BACKGROUND[1]

According to the governing indictment, Defendants were members of the Howard Boys, a "criminal organization" that "engaged in murders, attempted murders, drug trafficking, weapons

_____

[1] The Court has previously provided a full recitation of the background of this case and the scope of the Amended First Superseding Indictment in an Opinion and Order denying Defendant Alexandra Norwood's motion to dismiss. See 11/8/13 Opinion and Order (Dkt. 328).

trafficking, and other crimes."   Am. First Superseding Indictment at 2 (Dkt. 191).   The indictment alleges that the Howard Boys constituted an "enterprise" that was engaged in interstate commerce and that "constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise." Id. at 3. This forms the basis for the charge of conspiracy under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, et seq., leveled against each of the Defendants. Id. at 2.   The indictment also contains specific counts against each Defendant for actions taken in furtherance of the conspiracy.

According to the indictment, the Howard Boys identified themselves and demarcated their territory through the use of graffiti, tattoos, hand signs, handshakes, and social networking sites. Id. at 5-6.   The indictment further claims that the Howard Boys' territory, referred to as "Murda Villa," "Howard Block," or "The Bricks," is the Howard Estates public housing complex in Flint, Michigan. Id. at 4-5.   Howard Boys members sought to be the sole distributors of drugs operating within this territory.   The Howard Boys protected their territory through "intimidation, fear and violence." Id. at 5.

The catalyst for the motions under consideration was the Government's initial expert witness disclosure, in which the Government provided notice that it would call seventeen expert witnesses.   Gov't Disclosure (Dkt. 138) (listing experts in forensics, sale and distribution of controlled substances, fingerprint analysis, firearms/ballistics, cause of death, DNA, firearms identification, and gangs).   In pertinent part, this disclosure summarized the testimony that Nedoff and Bornstein would provide. Id. at 2-4, 15-16.   The Government also attached to the disclosure the curriculum vitae of all its proposed experts, including Nedoff's and Bornstein's. See Nedoff CV (Dkt. 138-7), Bornstein CV (Dkt. 138-18).

2

After making these disclosures, Defendant Norwood filed his "Motion to Exclude or Limit Expert Testimony, and, in the Alternative, for Additional Discovery." Norwood Mot. (Dkt. 211). Defendant Jonathan Oldham filed his "Motion for Rule 16 Disclosure and to Limit Testimony." Oldham Mot. (Dk. 263).[2] After the Government filed its initial response (Dkt. 291), the Court ordered additional briefing and ordered the Government twice to supplement its expert disclosures to provide more specificity with respect to Nedoff's and Bornstein's proposed testimony. The Court ultimately conducted an evidentiary hearing regarding Bornstein, and ordered one last round of supplemental briefing.[3]

### III. ANALYSIS

Whether the Court will permit the proffered expert testimony by Nedoff and Bornstein turns upon Federal Rule of Evidence 702 and applicable case law. Under Rule 702, a "witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" if the following criteria are met:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

---

[2] Defendants Jamil Cureton, Leon Gills, Jatimothy Walker, and Jonathan Walker joined Norwood's motion. See Dkts. 217, 231, 245, 274. Defendants Gills and Jonathan Walker also joined Oldham's motion. See Dkts. 268 and 274. For purposes of deciding the instant motions, the Court refers to "Defendants" generally, unless specifically referencing a particular Defendant.

[3] The parties agreed that no evidentiary hearing was required regarding Nedoff. 3/26/14 Tr. at 141.

Rule 702 places a special obligation on the trial court to be a gatekeeper, ensuring that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589, 597 (1993). In Kumho Tire Company v. Carmichael, 526 U.S. 137 (1999), the Supreme Court clarified that the "gatekeeping obligation" is not limited to "scientific" expert testimony, but applies to all expert testimony. In other words, Rule 702 requires a district court to satisfy itself that the proposed expert testimony will assist the jury, before permitting the jury to assess such testimony. Id. at 148-149. The proponent of the expert must establish admissibility by a preponderance of the evidence. Nelson v. Tenn. Gas Pipeline, Co., 243 F.3d 244, 251 (6th Cir. 2001). These same principles are used to analyze whether a law enforcement officer may testify in the criminal context. United States v. Harris, 192 F.3d 580, 588 (6th Cir. 1999).

With these principles at hand, the Court first proceeds to examine whether Nedoff's proposed testimony concerning the sale and distribution of narcotics is admissible, and concludes that it is. The Court then examines Bornstein's proposed testimony regarding gangs, and determines that it is not admissible.

**A. Agent Nedoff**

### 1. The Proposed Testimony of Agent Nedoff

The Government proposes that Nedoff testify as a drug-trafficking expert regarding "the common practices employed by individuals who sell illegal narcotics and conduct that would be consistent with distribution and/or an intent to distribute." Gov't Supp. Disclosure (Dkt. 333). The Government further states that Nedoff will provide the following specific opinions:

- cocaine is distributed from source countries to "mid-level" and "low-level" dealers;
- "low-level" and "street-level" drug dealers coordinate their activities;
- powder cocaine is turned into crack cocaine;

- "low-level" dealers distribute narcotics in plastic baggies;
- drug dealers almost always conduct their transactions in cash;
- it is common for drug dealers to possess scales, packaging materials, and firearms;
- it is common for drug users, but not drug dealers, to possess drug paraphernalia, "which facilitates the use of the respective drug such as pipes, filters, straws, rolling papers, and blunts"; and
- drug dealers employ various means to evade law enforcement, such as using other people's vehicles.

Gov't Am. Disclosure at 2-4 (Dkt. 382).  Nedoff will formulate his opinions by drawing from his DEA training, investigative experience, and training of other law enforcement officers.  Id. at 4-6.  Nedoff has testified three times as an expert on narcotics.  Id. at 6-7.

## 2.  The Parties' Arguments

In attacking the Government's proposed use of Nedoff, Defendants assert that the authority cited by the Government does not support the Government's proffered testimony of Nedoff regarding drug trafficking in general.  Gills Supp. Br. at 6-9 (Dkt. 345).  Defendants demand that the Government provide more appropriate legal authority and/or more facts to substantiate Nedoff's training and experience to qualify him as an expert.  Id. at 9.  Defendants argue that Nedoff lacks the specialized knowledge or reliable methods of analysis to qualify him as an expert under Federal Rule of Evidence 702.  Id. at 10-12.  Defendants state that Nedoff should be prevented from opining that firearms are commonly associated with drug trafficking, unless the Court finds that "something more than assumptions and suppositions" supports that opinion.  Id. at 12.  Defendants further argue that Nedoff's proposed testimony would be unhelpful to a jury because fact witnesses will testify about controlled drug purchases, and because the distinction between distribution and personal use of narcotics is not an issue in the case.  Oldham Supp. Br. at 4 (Dkt. 347).  According to Defendants, the practices of dealing drugs are not so unusual as to warrant expert testimony for a jury.  Id. at 4-5.  In other words,

Defendants claim that popular culture is awash with drug-trafficking information, so that the practices of drug dealing, as testified to by an expert, will be cumulative for the jury.  Id.

The Government argues that Nedoff qualifies under Rule 702 and Daubert and will assist the jury.  Gov't Br. at 2 (Dkt. 364).  The Government asserts that Rule 702 allows for opinion testimony from experts qualified by their "specialized knowledge."  Id.  The Government explains that, because Nedoff will not offer scientific testimony, the analysis demanded by Daubert has limited application.  Id.  The Government claims that, under Sixth Circuit precedent, non-science experts with specialized knowledge can testify from their practical experience, and that the kind of testimony that Nedoff would provide is routinely admitted because his specialized knowledge will assist the jury in understanding street-level drug dealing.  Id. at 4-5.

The Court agrees with the Government and will permit Nedoff to testify as an expert on drug trafficking.

### 3.  Discussion[4]

As the Government notes, see id. at 4-5, the Sixth Circuit has applied the Daubert standard to law enforcement officers testifying as experts on drug trafficking.  See, e.g., United States v. Lopez–Medina, 461 F.3d 724, 742 (6th Cir. 2006).  Courts have consistently held that a police officer's expert testimony is admissible where such testimony "will aid the jury's understanding of an area, such as drug dealing, not within the experience of the average juror."

---

[4] Defendants' arguments concerning Nedoff were made prior to the Government filing its respective response and amended supplemental witness disclosure, which provide additional legal authority, specific opinions to be offered by Nedoff, and the bases for those opinions.  See Gov't Resp. (Dkt. 364) (providing authority); Gov't Am. Disclosure (Dkt. 382) (providing opinions and bases).  Defendants have not presented new arguments after these disclosures, nor did they elaborate on their objections to Nedoff at the Daubert hearing on Bornstein, although they did not withdraw their objections.  3/26/14 Tr. at 141.  Therefore, to the extent that Defendants argue that the Government needs to provide further authority or to make further disclosures regarding Nedoff, see Gills Br. at 6-9 (Dkt. 345), the Court finds that the Government has done so.

United States v. Jemison, 310 F. App'x. 866, 875 (6th Cir. 2009) (quotation marks omitted). "Courts generally have permitted police officers to testify as experts regarding drug trafficking as long as the testimony is relevant and reliable."  United States v. Johnson, 488 F.3d 690, 698 (6th Cir. 2007).[5]

After reviewing the Government's disclosures (Dkts. 138, 333, and 382), the Court concludes that Nedoff may provide expert opinions on drug trafficking.  The Government has satisfied the Court that Nedoff's opinions will be based upon his extensive experience of 15 years with the DEA in investigating hundreds of cases of drug trafficking.  Further, Nedoff's specialized knowledge regarding drug trafficking is admissible because it will assist the jury on a subject that is beyond the general knowledge of an average person.  Jemison, 310 F. App'x. at 875; Fed. R. Evid. 702.

---

[5]  Defendants argue that the cases cited by the Government, United States v. White, 563 F.3d 184 (6th Cir. 2009), and United States v. Quinn, 230 F.3d 862 (6th Cir. 2000), are inapposite. Gills Br. at 6-9.  According to Defendants, White is limited to drug evidence seized during traffic stops, and does not extend to the general conduct of drug trafficking involved in the present case. As for Quinn, Defendants claim that the case relates only to the quantity of drugs relevant to distribution (as opposed to personal consumption), not general drug trafficking.  However, Defendants read these cases too narrowly.  In both cases, the court of appeals held that the district court did not err in admitting expert drug-trafficking opinions, even though the Government had failed to provide notice of such experts under Rule 16.  White, 563 F.3d at 190; Quinn, 230 F.3d at 866.  In White, the court noted that the defendant had failed to demonstrate prejudice because "testimony regarding tools of the trade has become utterly routine in drug distribution cases."  White, 563 F.3d at 190-191.  In Quinn, the court held that there were "reasonable grounds" to admit the drug expert's testimony regarding quantities.  Quinn, 230 F.3d at 866.  The Court concludes that these cases indirectly support the Government's position that Nedoff can testify to methods and quantities by which drug dealers conduct their business. Furthermore, the authority cited in the Government's supplemental response further establishes that Nedoff's proffered testimony is permissible and would assist the jury.  Gov't Resp. at 2 (Dkt. 364) (citing United States v. Thomas, 74 F.3d 676, 682 (6th Cir. 1996) (stating that "without expert testimony, the average juror is unlikely to understand the significance of drug paraphernalia, quantities, and prices or appreciate the difference between 'street level' drug dealers and other types of distribution operations") abrogated on other grounds by Morales v. Am. Honda Motor Co., 151 F.3d 500, 515 (6th Cir. 1998)).

7

The Court will also permit Nedoff to testify that firearms are commonly associated with drug trafficking.  In the Sixth Circuit, courts have taken "a very tolerant view of the admissibility of expert testimony linking the presence of firearms to drug trafficking activities."  United States v. Swafford, 385 F.3d 1026, 1030 (6th Cir. 2004).  Defendants have failed to recognize this authority, and offer no rebuttal to the "utterly routine" introduction of testimony regarding "tools of the [drug] trade" from experts.  United States v. White, 563 F.3d 184, 190-191 (6th Cir. 2009).

Likewise, the Court rejects Defendants' argument that allowing Nedoff to testify will be cumulative because fact witnesses will testify at trial regarding drug trafficking and because drug references in popular culture are commonplace.  Based on his specialized knowledge, Nedoff's opinions may assist the jury in understanding the fact-based evidence presented at trial concerning drug trafficking, which courts have long-determined to be "beyond the understanding" of an average person.  Swafford, 385 F.3d at 1030.  The Court also rejects the argument that expert testimony regarding distribution is unnecessary because Defendants are not claiming drugs were possessed strictly for personal consumption.  Even in the absence of such a defense, the Government is entitled to explain the indicia of drug trafficking, given the trafficking's alleged central role as the raison d'etre of the Howard Boys.

Accordingly, the Court denies Defendants' motions to the extent they seek to exclude Nedoff from providing expert testimony.

**B.  Agent Bornstein**

### 1.  The Government's Disclosures Regarding Agent Bornstein

With respect to Bornstein, the Government proposes that he would provide opinions on "the organization and operation of neighborhood-based street gangs."  Gov't Supp. Disclosure at 3.  "Specifically, Agent Bornstein will render an opinion regarding the common features and

attributes of neighborhood-based street gangs." <u>Id.</u>  According to the Government, Bornstein can

opine on the following relevant features of neighborhood-based street gangs in general:

- a street gang is an association of three or more individuals who collectively identify themselves by adopting a group identity;
- neighborhood-based street gangs are loosely organized gangs commonly associated with the pooling of resources and a geographic location, which they defend and within which they conduct their criminal activity;
- neighborhood-based street gangs have a less formalized structure than national street gangs;
- members of neighborhood-based street gangs often grow up together and defend a specific geographic location;
- neighborhood-based street gangs generally do not align themselves with national street gangs, but it is common for them to claim affiliation with a national gang to garner increased respect and stature;
- individuals join neighborhood-based street gangs to make money through criminal activity;
- if threatened, members of neighborhood-based street gangs "rally together" to defend themselves or their territory;
- gangs commonly promote/project a violent attitude to protect their territory;
- gangs commonly have codes and rules of operation;
- the territory of neighborhood-based street gangs is commonly limited to their neighborhood, which is often identified by the use of graffiti;
- gang members also use graffiti to declare their allegiance to the gang, advertise a gang's status or power, and to challenge rivals;
- gangs produce music and use social media to enhance the gang's reputation;
- gangs have tattoos, hand signs, and handshakes to further establish their identity;
- gang members commonly possess firearms to facilitate their criminal activities, such as the distribution of narcotics;
- neighborhood-based street gangs commonly have a horizontal structure, unlike national gangs, and operate like a cooperative or "co-op," where a group of individuals voluntarily cooperate with each other for their mutual benefit;
- gang members commonly provide financial assistance to incarcerated members;
- gang members commonly take group photographs with other members, displaying hand signs and/or posing with weapons;
- gang members gain status within their gang by demonstrating their willingness to commit acts of violence and demonstrating success in their respective role of criminal activity;
- members of neighborhood-based gangs who distribute narcotics collaborate together to ensure the continuous operation of their criminal activity;
- gang members pay homage to other deceased or incarcerated members with T-shirts, web postings, or music;
- cliques or subgroups based on age or familial connections commonly exist within gangs;

- neighborhood-based street gangs commonly have disputes with other neighborhood-based street gangs; and
- gang members often share weapons and modes of transportation, such as their drug customers' vehicles.

Gov't Am. Disclosure at 7-12.

The Government states that Bornstein's testimony will be based on his experiences as a case agent — when he investigated gangs located in Oklahoma City, Oklahoma, and Hartford and New Haven, Connecticut — and his experience and knowledge from his time as a supervisory special agent of the FBI's "Safe Streets and Gang Unit." Id. at 12-14. The Government represents that Bornstein has developed an understanding of gang culture through his analysis of conversations intercepted by wiretaps in investigations involving gangs, and his debriefing of cooperating witnesses. Id. at 14-15. Lastly, the Government discloses that Bornstein has testified as a "narcotics/gang expert" in three cases in the District of Connecticut. Id. at 15.

### 2. Agent Bornstein's Evidentiary Hearing Testimony

#### a. Agent Bornstein's Education, Training, and Experience

At the evidentiary hearing, Bornstein testified to his background, experience, knowledge, and opinions. Bornstein testified that he has a bachelor's degree in geology from DePauw University and a master's degree in geochemistry from the University of Missouri at Rolla. Tr. at 7. Bornstein first began his career in law enforcement in 1993 with the Environmental Protection Agency, but then transferred to the Department of Interior's Bureau of Land Management in 1995. Id. at 7. Bornstein then joined the FBI in 1996. Currently, Bornstein is the unit chief of the cellular analysis survey team at the FBI's national headquarters in Washington, D.C. Id. at 6.

Bornstein provided an overview of his FBI career. Upon graduating from the FBI academy, Bornstein was initially assigned to the FBI field office in Oklahoma City, Oklahoma. There, Bornstein first worked on environmental crimes, but ultimately moved to drug/gang investigations, focusing on gangs in Oklahoma City. Id. at 19. The first gang Bornstein focused on was the "James Crew," which distributed crack cocaine. Id. at 20. The investigation of the James Crew involved cooperating witnesses, PIN registers of cell phones, and wiretaps. Id. In addition to the James Crew, Bornstein stated that he investigated other organizations in Oklahoma involved in methamphetamine distribution that he considered to be gangs. Id. at 21-22. In 2000, Bornstein transferred to El Centro, California to work on narcotics and public corruption matters in relation to Mexican cartels. Id. at 22. This stint did not focus on American street gangs. Id.

In 2001, Bornstein transferred to the Meriden Resident Agency of the FBI's New Haven, Connecticut division. Id. Bornstein worked in Connecticut until 2012, discounting an 18-month interval from 2008-2010, when he was temporarily assigned to Washington, D.C. During his tenure in Connecticut, Bornstein initially was a task-force coordinator for the Northern Connecticut Violent Crime Gang Task Force. Id. at 23. In this position, Bornstein primarily investigated "neighborhood-based street gangs." Bornstein's duties in Connecticut from 2001-2008 involved several investigations into local or neighborhood-based gangs, including the Five Corners Street Crew, the Jamaican Posse crew, the Lower Edgewood Street Crew, the Nelton Court Crew, the Savage Nomads, the South Marshal Street Crew, and the Tres Blood gang. Id. at 26-30. Bornstein stated that the investigations into each of these gangs were similar — "like baking cakes almost," id. at 30 — involving the use of confidential informants, controlled purchases of narcotics, and the running of wiretaps. Id. at 30-31. During the course of these

11

investigations, Bornstein listened to conversations of gang members through the wiretaps, spoke with cooperating witnesses — including gang members — and interviewed victims of gang violence.  Id. at 31-32.  Bornstein estimated that he spoke to "hundreds" of gang members during this time frame.  Id. at 33.

Bornstein then took an 18-month break from working in Connecticut (September 2008 – May 2010), so that he could work as supervisory special agent for the FBI's Safe Streets and Gang Unit in Washington, D.C.  Id. at 33.  According to Bornstein, working at FBI headquarters gave him a national perspective on gangs.  Id.  Bornstein stated that he saw parallels among neighborhood-based street gangs around the country, such as the use of "gangsta" rap music and social media.  Id. at 34.  During this time at headquarters, Bornstein would receive "significant activity reports" and "intelligence information reports" that would appraise him of gang activity across the nation.  Id. at 34-35.  Bornstein stated that the review of those reports led him and others to change the FBI's strategy in combating gangs.  Id. at 36.

However, Bornstein's area of concentration at the time he was working for the Safe Streets and Gang Unit was the "west region," which is not defined in the record.  Id. at 35.  Moreover, the record is devoid of any information concerning the particulars of the reports he received, i.e., the types and level of detail of information contained therein, how detailed they were concerning the subject gangs, what types of gangs were most prominent in the reports, how the reports led to changes in the FBI's strategy, or what these changes in strategy were.

In addition to his participation in investigations and coordinating FBI strategy, Bornstein attended trainings that addressed gangs.  Bornstein stated that his training at the FBI academy included programming "associated with the strategies and understandings of street gangs."  Id. at 8.  While stationed in El Centro, California from 2000–2001, Bornstein attended the Southern

California Gang Conference, which he believed was presented by the National Gang Association.  Id. at 9.  Bornstein testified that the conference focused on national gangs.  Id. at 10.  In 2009, Bornstein also audited a course with the Los Angeles county sheriff's department regarding national gangs.  Id. at 10-11.  Bornstein also helped organize training for the FBI Safe Streets Initiative, also in 2009.  Id. at 11-12.  This training focused on regional and national gang trends, best practices, FBI strategies in combating gangs, new legal requirements, and investigative techniques.  Id.  Bornstein explained that the FBI Safe Streets Initiative was an FBI-led effort to support local law enforcement partners around the nation in combating violent crime, including the emerging threat of gang violence.  Id. at 12.

Regarding his prior service as an expert witness, Bornstein stated that he had testified as an expert witness four times in cases relating to drug trafficking, three times in Connecticut and once in Oklahoma.  Id. at 36-37.  In those cases, Bornstein testified as to the distribution of narcotics and the use of firearms as a tool of drug traffickers, but not about a specific gang or gang practices in general.  Id.

### b.  Agent Bornstein's Testimony Regarding Gangs

Bornstein testified that "the Department of Justice has defined a gang as being three or more individuals that collectively identify themselves within a group and this group utilizes fear and intimidation by employing various . . . techniques or various forms of culture to express their group."  Id. at 24.  National gangs are "multi-jurisdictional" and "usually have more of a hierarchy structure.''  Id.  A neighborhood-based street gang, in contrast, operates only in a small area, perhaps "born through housing project developments, individuals that grow up together that form an alliance, that share blocks in where they could distribute narcotics."  Id. at 25-26.  According to Bornstein, although a neighborhood-based street gang would adopt some outward

signs aligned with a national gang, such as clothing or colors, the neighborhood-based street gang would not actually owe allegiance to the national gang.  Id. at 26.

Bornstein also testified concerning some of the common practices, attributes, and traits of gangs.  Id. at 37-50.  Bornstein stated that "the commonality" between neighborhood-based street gangs is how they are formed, usually drawing gang members from a particular housing project or community.  Id. at 37.  Furthermore, individuals join gangs in order to distribute narcotics.  Id. at 38.  In doing so, gangs "defend territory" from other gangs to secure the profit margins from the gang's drug trafficking.  Id.  In order to defend their territory, Bornstein stated that gangs use violence, id., which serves as a deterrent to other gangs or individuals who would encroach upon a gang's territory, and as a method to enhance a gang's or gang member's credibility.  Id. at 39.

In addition to territory and violence, Bornstein testified that gangs generally make use of internal codes or rules, graffiti, rap music, social media, tattoos, handshakes, and hand signs to define or differentiate themselves.  Id. at 40-46.  Gangs also, as stated by Bornstein, use weapons to promote their endeavors, such as coordinating a supply of narcotics.  Id. at 46-47, 48-49. Gangs commonly support incarcerated members and pay homage to deceased members.  Id. at 47-48.  Lastly, Bornstein stated that gangs can have subgroups, which can lead to infighting, "just like with any other organization."  Id. at 49-50.

On cross-examination, Bornstein provided more details regarding his experience and the bases for his opinions.  Bornstein testified that he had never been to Flint, Michigan prior to the evidentiary hearing, and had not participated in the investigation of the instant case or even knew of the Howard Boys before this case.  Id. at 51, 82-83.  Bornstein explained that he only became involved in the case when attorneys for the Government contacted him about being an expert witness.  Id. at 51.

With respect to RICO, Bornstein stated that he was familiar with the statute and recognized it as one of the FBI's "tools." Id. at 15. Bornstein agreed that for there to be a RICO charge, there "must be an allegation of the existence of some kind of an enterprise." Id. at 60. Furthermore, in answer to cross-examination, Bornstein stated that he understood that his testimony regarding gangs went "to that part of the case that deals with the allegation of the existence of an enterprise." Id. 60-61. In other words, Bornstein affirmed that his purpose "was to give testimony about gangs because it related to the allegation the government has brought, an indictment that an enterprise exists." [6] Id. at 61. Regarding Bornstein's previous investigations, he testified that he had not participated in a RICO case that went to court, nor had he testified in a case involving a RICO charge, although he had testified as an expert in other cases. Id. at 63-64.

Queried about the terms "gang" and "neighborhood-based street gangs," Bornstein explained that he drew from the totality of his FBI experience in defining and understanding those terms. For the term "gang," Bornstein stated that his opinion regarding the definition of what constitutes a gang, as set forth in the Government's Amended Expert Disclosure (Dkt. 382), is the DOJ definition of a gang.[7] Id. at 68-69. Bornstein testified that there are other definitions

---

[6] Although Bornstein stated that this is how he understood his role, the Government's attorney stated, in response to questioning by defense counsel about the information Bornstein had reviewed prior to the evidentiary hearing, that Bornstein "will not be giving expert opinion as to any specific member or the criminal enterprise." 3/26/14 Tr. at 55-56.

[7] The amended disclosure contains the following opinion:

> A street gang is an association of three or more individuals who collectively identify themselves by adopting a group identity. This group identity is commonly used to create an atmosphere of fear or intimidation, frequently by employing one or more of the following: a common name, slogan, identifying sign, symbol, tattoo or other physical marking, style or color of clothing, hairstyle, hand sign or graffiti.

of gangs, some promulgated by states, and that these definitions have "slight variations" from the DOJ definition.  Id. at 70.

For the term "neighborhood-based street gangs," Bornstein testified that the term was used by the FBI and law enforcement agencies as a way to distinguish such gangs from national gangs.  Id. at 63-64.  Bornstein stated that the way he defined a "neighborhood-based street gang" was based upon his "personal experience of being a case agent" and his "national experience."  Id. at 81.  In essence, Bornstein testified that he was "giving an opinion of what a neighborhood-based gang is by our definition at the FBI."  Id.  When asked whether his understanding of what a gang is had a degree of subjectivity, Bornstein disagreed.  He stated that his understanding was "[n]ot necessarily" subjective because, "at least in the Bureau world[,] we have a good sense of what is a gang in the sense of three or more individuals that have a common identity, purpose of committing criminal acts."  Id. at 94.  He believed that the FBI has "a fairly decent definition of a gang or a violent street crew."  Id.

### 3.  The Parties' Arguments[8]

---

Gov't Am. Disclosure at 7 (Dkt. 382).  This definition closely tracks, in pertinent part, the DOJ's definition of a gang:

> (1) an association of three or more individuals; (2) whose members collectively identify themselves by adopting a group identity which they use to create an atmosphere of fear or intimidation frequently by employing one or more of the following: a common name, slogan, identifying sign, symbol, tattoo or other physical marking, style or color of clothing, hairstyle, hand sign or graffiti.

DOJ "Definition of Gangs," available at http://www.justice.gov/criminal/ocgs/gangs/.

[8] The Court takes the parties' arguments concerning Bornstein from their several briefs in connection with the instant motions (Dkts. 344, 345, 347, 364, 370, 397, 403, 500, 503, 517, 520, and 522).  Because the Court ordered the Government to provide supplemental disclosure and held a Daubert hearing on Bornstein, Defendants' arguments concerning the need for more disclosures or an evidentiary hearing have been mooted, and the Court does not refer to them in this Opinion and Order.  Furthermore, because the Government submitted a comprehensive post-

Defendants challenge the use of Bornstein on several grounds. Defendants criticize Bornstein's experience, stating that his knowledge is anecdotal and has no connection to the case or Flint. Oldham Br. at 5 (Dkt. 347). According to Defendants, Bornstein's opinions are "nebulous," Norwood Br. at 1-2 (Dkt. 370), or "one size fits all," Gills Br. at 2 (Dkt. 500). Consequently, under <u>Daubert</u>, Defendants claim this kind of general testimony should not be allowed. Gills Br. at 2 (Dkt. 500). To hammer home this point, Defendants attempt to distinguish the authority cited by the Government in support of Bornstein. <u>Id.</u> at 2-6. Defendants argue that, in the Government's cited cases, the proffered expert (i) had been qualified as a fact witness and as an expert witness and/or (ii) had investigated, in some capacity, a particular gang that was being prosecuted. <u>Id.</u>

Defendants also argue that Bornstein's actual purpose will be to establish "the RICO enterprise element" of Count I of the indictment, which is improper because the Government should not be allowed to "shortcut" its proof of facts "by presentation of a sophisticated expert witness." Norwood Br. at 4 (Dkt. 344). Defendants observe that Bornstein's opinions are unnecessary because establishing the elements of the purported RICO enterprise does not require "specialized police witnesses." Norwood Br. at 4 (Dkt. 503). Defendants claim Bornstein's testimony would shift the "jury's responsibility for assessing fact evidence to the police"; this would "allow[] the expert to do the prosecutor's job reserved for summation in closing argument." <u>Id.</u>

In addition, Defendants raise concerns that Bornstein's testimony is not reliable or credible. Defendants question how Bornstein can offer any insight by drawing only from his own experience, without any connection to the facts of this case. Norwood Br. at 5-10 (Dkt.

<u>Daubert</u> supplemental brief (Dkt. 517), the Court focuses on that brief in reviewing the Government's arguments in support of Bornstein.

503).  Defendants also assert that Bornstein lacks credibility because he has never been qualified as a "gang expert."  Gills Br. at 8 (Dkt. 500).

Lastly, Defendants claim that Bornstein should not be allowed to testify because it would be unfairly prejudicial under Federal Rule of Evidence 403.  Norwood Br. at 10-11 (Dkt. 503).  Defendants point out that Bornstein is a senior FBI official who will be called to give opinions that closely track the indictment.  This is unfair, according to Defendants, because Bornstein will draw upon his collective, general, gang experience and state that Defendants are in a gang.  Id.

The Government responds to each argument made by Defendants.  The Government asserts that Bornstein's testimony is "highly relevant" because it will aid the jury in understanding something outside the experience of the average juror.  Gov't Br. at 2-3 (Dkt. 517).  In particular, Bornstein will be able to assist the jury in understanding the meaning of graffiti, tattoos, hand signs, the distinction between national and neighborhood-based street gangs, gang codes and mores, promotion within gangs, and the projection of violence by gangs.  Id.  The Government claims that street gangs are not within the area of expertise of the average juror, and that courts have allowed similar testimony in other cases, especially cases involving drug trafficking.

The Government also notes that Bornstein's testimony is relevant, even though he did not investigate the case, because he can educate the jury on gangs in general.  Id. at 4-6.  Acknowledging cases where courts have rejected using law enforcement officers who participated in the investigation as a fact and expert witness, the Government states that it has tried to avoid this issue by using Bornstein, who has no connection to the case.  The Government also remarks that any concerns about Bornstein's lack of involvement in the investigation are more appropriate for cross-examination.  Id.

18

In addition, the Government maintains that rigid application of the <u>Daubert</u> standard is inappropriate here because Bornstein's expertise is derived from his personal knowledge and experience. <u>Id.</u> at 4. The Government contends that Bornstein's testimony is reliable because he derives his opinions from his career at the FBI combating gangs, including the development of strategies for law enforcement. <u>Id.</u> at 6-7. Furthermore, the Government asserts that Bornstein has a methodology: "the application of his extensive experience to analyze the common traits, attributes, and practices of street gangs." <u>Id.</u> at 8. Even though Bornstein has never been qualified as a gang expert before, the Government states that all experts have to be qualified for the first time. The Government also argues that Bornstein's credibility or his testimony should not be undermined or deemed unreliable just because he misunderstood that he was qualified as a narcotics expert, not a gang expert, in previous cases. <u>Id.</u> at 9.

Lastly, the Government argues that Bornstein's testimony will not be unfairly prejudicial. Gov't Br. 9-11.

### 4. Discussion

Courts have permitted law enforcement officers to testify as expert witnesses with respect to organized criminal activity, including gangs, where such expert testimony meets the required standards of relevance and reliability. <u>United States v. Tocco</u>, 200 F.3d 401, 419 (6th Cir. 2000). But no court has sanctioned expert testimony of a gang expert in a context similar to the context of our case.

Typically, law enforcement officers testify to the "inner workings" of a particular gang or organized criminal group, <u>id.</u> (relating to the Detroit branch of the Cosa Nostra), and provide a "broader context" of a particular gang's "origins and history," <u>United States v. Archuleta</u>, 737 F.3d 1287, 1296 (10th Cir. 2013) (permitting expert testimony regarding the Sureños, a gang in

New Mexico).  Gang experts can also add details about the structure, purpose, and activities of a particular gang.  Archuleta, 737 F.3d at 1296; see also United States v. Kamahele, --- F.3d ---, 2014 WL 1378269, at *5 (10th Cir. Apr. 8, 2014) (holding that district court properly exercised discretion in allowing gang-expert testimony because such testimony about the Tongan Crip Gang's structure, insignia, and history would be beyond the knowledge of a typical juror).

Similarly, courts have permitted gang experts to provide opinion evidence regarding a particular gang's slang, signifying colors, and other indicia of membership.  See United States v. Hankey, 203 F.3d 1160, 1169 (9th Cir. 2000) (upholding admission of police expert testimony on gang colors, signs, and activities).  "Gang-related" items have also been recognized as a topic worthy of expert testimony "if the jury could not understand the significance of possession of these items."  United States v. Robinson, 978 F.2d 1554, 1563 (10th Cir. 1992).

Such expertise usually arises from the officer's significant experience investigating a particular gang.  See Tocco, 200 F.3d at 419 (organized crime expert had "22 years with the FBI, 17 of which were spent in organized crime investigations, and his role since 1990 as the Cosa Nostra coordinator for the Detroit division, and as liaison with other FBI offices and FBI headquarters"); Montoya v. United States, Nos. 1:09CR247 and 1:12CV1110, 2013 WL 633586 (E.D. Va. Feb. 19, 2013) (denying habeas petition based, in part, on claim of ineffective assistance where defense counsel did not object to gang expert; expert was a police officer who had investigated the MS-13 gang for 6 years).

On the other hand, expert testimony has been rejected when the proposed expert witness lacked relevant experience with a particular group.  See, e.g., United States v. Stone, 279 F.R.D. 434, 441-442 (E.D. Mich. 2012) (precluding Government's proposed "academic expert" on

conspiracy theories from testifying by concluding, in part, that the expert lacked "experience and familiarity" with the group in question — the Hutaree, an anti-government militia).

In light of the cases involving gang experts and the evidence adduced at the evidentiary hearing, the Court concludes that Bornstein's proposed testimony is unreliable and irrelevant, and that his opinions would not aid the jury.

The Court first determines that Bornstein's opinions are not sufficiently reliable for them to be placed before a jury. Bornstein's opinions concerning gangs arise from the totality of his experience in Oklahoma, California, and Connecticut, and from a national perspective while he was in Washington, D.C. This case, however, concerns the Howard Boys and their alleged territory in Flint, Michigan. Bornstein has never investigated the Howard Boys or other gangs in Michigan, let alone Southeast Michigan or Flint. Given Bornstein's lack of knowledge of the Howard Boys and the region, there is no way for the Court to know whether the gangs with which Bornstein is familiar, such as the Nelton Court Crew, are sufficiently similar to the Howard Boys as to make his generalized opinions reliable for this case. Simply put, Bornstein's lack of familiarity with the particular gang or locale at issue in this case makes his opinions unreliable to be placed before the jury.

Thus, this case is much like Stone, where an expert without specific knowledge of the subject group was barred from testifying. Compare Tocco, 200 F.3d at 419 (expert had extensive experience with the Mafia); Kamahele, 2014 WL 1378269 (expert had years of experience with the Tongan Crips and testified as to Tongan culture); Montoya, 2013 WL 633586 (expert had interviewed over 50 members of the MS-13 gang). Indeed, the Court is aware of no case — and

the Government identifies none — in which a generalized gang expert, without knowledge of the specific gang in question, was permitted to testify.[9]

It is not clear from the record that Bornstein's career at the FBI focused extensively on how gangs operated throughout the United States. During his stint as a supervisory special agent for the Safe Streets and Gang Unit at FBI Headquarters — which lasted only 18 months — Bornstein helped change the FBI's strategy in combating gangs, particularly neighborhood-based street gangs. But he also worked on several other projects — the management, budgeting, and oversight of law enforcement task forces operating in the western United States — which did not necessarily bear on gang issues. Bornstein CV (Dkt. 138-18). It is true that Bornstein testified that he would receive reports about gang investigations from western region law enforcement task forces, and that these reports showed "commonalities" to what Bornstein had experienced in his investigations in Connecticut. 3/26/14 Tr. at 35-36. The record, however, does not disclose in general or with specificity what these commonalities were. In short, while Bornstein's FBI experience touched on gang matters in different parts of the country, there is insufficient evidence that the experience was comprehensive enough to conclude that what he learned has application to the Howard Boys in Flint, Michigan.

---

[9] The Government argues that it should not be faulted for selecting an expert who has no familiarity with the particular gang that is the subject of the prosecution because it was trying to avoid running afoul of United States v. Mejia, 545 F.3d 179 (2nd Cir. 2008). See Gov't Br. at 4-5 (Dkt. 517). In Mejia, the court addressed the possible prejudice that can arise when an officer who participated in the investigation of a gang is used by the Government to testify as an expert witness. Because of the officer's role in the investigation, the officer's opinion testimony effectively instructs "the jury on the existence of the facts needed to satisfy the elements of the charged offense." Id. at 191. Mejia teaches that a member of the investigative team should not also be presenting expert opinions. But it does not bar an investigator from providing factual testimony; nor does it bar the Government from presenting an expert with knowledge of a particular gang who is not part of the investigative team. The problem with Bornstein is that, while he was not a member of the investigative team, he does not have the requisite familiarity with the Howard Boys or a sufficiently comprehensive nation-wide experience from which the Court could conclude that his opinions could be reliably applied to the Howard Boys.

Nothing in Bornstein's history as an expert witness would establish that he has comprehensive nation-wide expertise that could be reliably applied to the Howard Boys. Bornstein's CV and testimony at the evidentiary hearing reveal that he believed he had been qualified as a "narcotics/gang" expert four times.   Bornstein CV at 2; 3/26/14 Tr. at 132. However, Bornstein clarified that only one case involved gangs and, in that single instance, the subject of his testimony addressed the use of weapons by gangs in drug trafficking.  Id. at 132-137.  Such limited testimony is a far cry from the opinions the Government wants to elicit regarding a generalized variety of gang practices and activities.

The Government contends that Bornstein's proposed testimony would be reliable because "the law enforcement gang expert" is analogous "to the law enforcement drug trafficking expert."  Gov't Br. at 7 (citing United States v. Ham, 628 F.3d 801 (6th Cir. 2011)).  Because of this similarity, the Government reasons that Bornstein's opinions are sufficiently reliable, deriving from his career at the FBI combating gangs and involving a methodology consisting of "the application of his extensive experience to analyze the common traits, attributes, and practices of street gangs."  Id. at 8.

The Court is not persuaded, however, that a drug-trafficking expert is sufficiently analogous to an expert offering testimony regarding the general practices of gangs.  While the Sixth Circuit permits generalized drug sale and distribution testimony, see United States v. Combs, 369 F.3d 925 (6th 2005), the cases allowing gang experts regularly discuss the expert's familiarity with the subject gang, see, e.g., Kamahele, 2014 WL 1378269, at *5 (Tongan Crips); Tocco, 200 F.3d at 419 (La Cosa Nostra); Montoya, 2013 WL 633586 (MS-13).

The difference in treatment may well derive from the fact that drug traffickers are individuals who engage in more or less routinized operations.   Gangs, however, are

organizations, which may display idiosyncratic behaviors based on culture, historic origins, and geographic considerations.   See Jordan Blair Woods, Systemic Racial Bias and RICO's Application to Criminal Street and Prison Gangs, 17 Mich. J. of Race & L. 303, 336-339 (2012) (noting "wide regional variability in gang activity"); see also Benitez Ramos v. Holder, 589 F.3d 426, 430 (7th Cir. 2009) (recognizing, in case arising from review of a decision of the Board of Immigration Appeals, that there is "ambiguity about what constitutes a 'gang'"; that there is a "variety of activities, not all criminal, that some 'gangs' engage in"; and that some gang activity is "innocuous").   There may well be similarities in conduct among gangs in the United States on par with the similarities in conduct among drug traffickers, but no court has so found.   And the Government has not developed a record here that would allow this Court to draw any such conclusion.   In the absence of such a record, the traditional judicial receptivity to expert testimony regarding drug traffickers cannot be accorded to expert testimony regarding gangs.

There is another issue of reliability regarding Bornstein's proposed testimony, which, although not mentioned by Defendants, the Court highlights in its role as gatekeeper under Rule 702.   United States v. Stafford, 721 F.3d 380, 393-394 (6th Cir. 2013).   This concern relates to Bornstein's opinion of what constitutes a gang.   Bornstein agreed that his opinion of what constitutes a gang tracks, almost verbatim, DOJ's definition of what constitutes a gang.   3/26/14 Tr. at 69-70.   But Bornstein also acknowledged that the definition of a gang is not universal, and that different definitions exist — although these other definitions are not in the record.   Id. at 70.

The Court has no indication why Bornstein's opinion of what is a gang is a reliable definition.   As "the trial court's gatekeeping function requires more than simply 'taking the expert's word for it,'" Fed. R. Evid. 702, 2000 Advisory Committee Notes, Bornstein's acknowledgment of other definitions, and the lack of any evidence of the extent to which his

definition has been accepted or used by others, deprives the Court of the ability to assess the reliability of his opinion of what constitutes a gang. See Jack Henry & Assocs. v. BSC, Inc., 487 F. App'x 246, 256 (6th Cir. 2012) (holding that definition of "defect" used by expert in breach-of-contract case was unreliable because it had not been subject to peer review, tested, or widely accepted in the scientific community).

The unreliability of Bornstein's testimony is compounded by its irrelevance. The Government has offered no explanation why the finding of a gang in this case is relevant to a RICO enterprise determination. A RICO charge requires the Government to prove four elements: (i) conduct, (ii) of an enterprise, (iii) through a pattern (iv) of racketeering activity. See Ouwinga v. Benistar 419 Plan Servs. Inc., 694 F.3d 783, 791 (6th Cir. 2012). To establish the enterprise element, the Government must prove "three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." United States v. Boyle, 556 U.S. 938, 946 (2009).

The Government, as the proponent of Bornstein, has not explained how the expert gang testimony would bear on the enterprise issue in this case. Bornstein himself will not link his views to the enterprise issue because the Government has expressly stated that Bornstein would not be giving an expert opinion regarding the criminal enterprise. 3/26/14 Tr. at 55-56. It appears, then, that the Government's unarticulated theory of relevance may rest on the simple conflation of street gangs with RICO enterprises. However, the Government has not set forth any clear argument why a jury's conclusion that the Howard Boys are a gang should lead it, without more, to conclude that the Howard Boys are a RICO enterprise. The Government's failure to properly develop its relevance argument does not require the Court to construct one for

it.  See Rivet v. Stat Farm Mut. Auto. Ins. Co., 316 F. App'x 440, 449 (6th Cir. 2009) (refusing

to address "arguments that . . . are unsupported or undeveloped").

Even assuming that Bornstein's testimony was somehow relevant, the Court alternatively

excludes his testimony under Federal Rule of Evidence 403 because of the risk his testimony

would confuse or mislead the jury.  United States v. Beverly, 369 F.3d 516, 528 (6th Cir. 2004)

(citing Daubert, 509 U.S. at 595 (directing that "a judge assessing a proffer of expert . . .

testimony under Rule 702 should also be mindful of other applicable rules[,]" such as Rule

403)).  Courts may exclude relevant evidence under Rule 403 if the evidence's probative value is

substantially outweighed by the danger of confusion of the issues or misleading the jury, among

other bases.  Fed. R. Evid. 403; see also United States v. Cosgrove, 637 F.3d 646, 660-661 (6th

Cir. 2011) (holding that exclusion of defense expert-witness testimony due to confusion and

potential to mislead the jury was proper under Rule 403).

In this case, the jury will be required to decide whether a RICO enterprise exists.  As the

Government has apparently conflated the concept of a gang with the concept of a RICO

enterprise, a similar muddling of the concepts of gang and RICO enterprise by the jury may

occur if Bornstein is permitted to testify.  Bornstein's testimony, although ostensibly about

gangs, could be mistaken as establishing — without more — the existence of a RICO enterprise.

In other words, the jury might easily conclude that the Government has met its burden of

establishing the enterprise element simply by establishing that the Howard Boys are a gang.

Exclusion of Bornstein's testimony under Rule 403 is proper to avoid confusing or misleading

the jury.

Finally, Bornstein's testimony will not be helpful to the jury.  The topic of gangs in

general is not particularly complicated, nor is it outside the understanding of the average juror.

Indeed, courts have recognized that "[m]ost jurors are aware that gang members deal drugs, commit violent acts, and react unfavorably when their misdeeds are reported to authorities." United States v. McGee, 408 F.3d 966, 978 (7th Cir. 2005) (affirming rejection of defendant's proposed gang expert because, in part, substance of testimony was not "beyond the ken of the average juror").   Bornstein's proposed opinions address relatively simple matters that a layperson can understand without an expert's assistance, i.e. what constitutes a gang, and how gangs control a particular geographic region and engage in criminal activity, such as violence and drug trafficking.  And these are matters that can be presented through fact witnesses relating specific facts relevant to the Howard Boys — not generalized opinions based on gangs in far off regions of the country.  In such circumstances, an expert is neither necessary nor helpful.

## IV. CONCLUSION

For the reasons stated above, Defendants' motions are denied in part and granted in part. The Court shall permit Nedoff to testify as an expert witness on the sale and distribution of narcotics at trial.  The Court, however, excludes Bornstein from testifying at trial because his opinions are unreliable, irrelevant, and unhelpful to the jury.

SO ORDERED.

Dated:  April 29, 2014                      s/Mark A. Goldsmith
    Flint, Michigan                      MARK A. GOLDSMITH
                                United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on April 29, 2014.

                              s/Deborah J. Goltz
                              DEBORAH J. GOLTZ
                              Case Manager