UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                         Plaintiff,                    HON. MARK A. GOLDSMITH
v.                                                     Case No. 12-CR-20287

D-1 ALEXANDRA L. NORWOOD,
D-2 JATIMOTHY E. WALKER,
D-3 JONATHAN E. WALKER,
D-4 JOHNATHAN L. OLDHAM, and
D-8 LEON GILLS,

                         Defendants.
_____/

## MEMORANDUM OPINION GRANTING THE GOVERNMENT'S MOTION FOR THE ADMISSION OF COCONSPIRATOR STATEMENTS (Dkt. 694)

### I. INTRODUCTION

Before trial began in this matter, Defendant Jonathan Walker filed a motion requesting a hearing to determine the admissibility of coconspirator statements under Federal Rule of Evidence 801(d)(2)(E), pursuant to United States v. Enright, 579 F.2d 980, 985 (6th Cir. 1978). Jonathan Walker Mot. for Enright Hr'g (Dkt. 404). The purpose of such a hearing is to determine, before trial, whether the Government has met its burden in proving by a preponderance of the evidence the prerequisite factors for admitting a statement under Rule 801(d)(2)(E). United States v. Vinson, 606 F.2d 149, 152 (6th Cir. 1979).

Rather than holding a "time-consuming and uneconomic" pre-trial Enright hearing, however, the Sixth Circuit permits trial courts to conditionally admit the statements at trial, "subject to [a] later demonstration of their admissibility by a preponderance of the evidence." Id. at 153. The Court opted to use this method in this case. See 5/6/2014 Op. and Order (Dkt. 556). The Court, therefore, conditionally allowed the introduction of coconspirator statements during

1

trial, subject to a decision on their admissibility before the case was given to the jury for deliberation. The Court required the Government to submit a memorandum at the close of its case-in-chief identifying all of the statements it introduced under Rule 801(d)(2)(E), without regard to whether that rule was the sole basis for admission advanced by the Government. See 5/15/2014 Order at 3-4 (Dkt. 586). The Government filed its "motion for the admission of coconspirator statements" on July 14, 2014, Gov't Mot. (Dkt. 694), and identified five statements that it believes were admissible under this rule:

> (1)  A purported statement by Defendant Johnathan Oldham to Defendant Leon Gills (and conveyed to the jury through the testimony of Rodney Harden) that Oldham and Shawn Gardner had located Malachi Wilson;
>
> (2)  A rap video of Gills entitled "Murder on My Mind," which was posted on his Facebook account from jail in March 2014;
>
> (3)  A rap video of Gills entitled "Rats," which was posted on his Facebook account from jail in March 2014;
>
> (4)  A recorded telephone conversation between Gills and Oldham, in which Oldham states that he has no money in his jail account, and Gills responds by telling Oldham to send his mother "to the Bricks and get a couple dollars"; and
>
> (5)  A recorded telephone conversation between Gills and Bertha White — Gills's grandmother — in which Gills tells Ms. White that "if any of my niggas need something just let me know bird alright cause I'm gonna hold my niggas down with me." [1]

---

[1]  At trial, the Government also introduced a January 2, 2012 recording of a telephone conversation between Oldham (from jail) and a woman identified as Chevette Claiborne. On the recording, Oldham suggests that he is going to "send out a letter" to his Hot Boys to make "something . . . happen" to another individual because the individual was "fixing to get touched." The Government sought to introduce this statement against all Defendants under Rule 801(d)(2)(E). On July 17, 2014, outside the presence of the jury, the Government explained its position as to how this statement was admissible. See 7/17/2014 (Rough Tr.) at 2. The Court asked whether Defendants had any response, but no Defendant responded. Id. In addition to the findings below regarding whether a conspiracy existed and whether Defendants were members of the conspiracy, the Court finds that this statement also was made during and in furtherance of the conspiracy.

The Court gave Defendants an opportunity to file a written response to the Government's motion. <u>See</u> 7/15/2014 Order (Dkt. 696). Only Defendant Alexandra Norwood did so. Norwood Resp. (Dkt. 697). The Court granted the Government's motion on the record on July 17, 2014, <u>see</u> 7/17/2014 (Rough Tr.) at 11-12, and now issues this Opinion to thoroughly explain its decision.

## II.  ANALYSIS

Federal Rule of Evidence 801(d)(2)(E) provides that "[a] statement . . . is not hearsay" if the statement is "offered against an opposing party and . . . was made by the party's coconspirator during and in furtherance of the conspiracy." The Sixth Circuit has explained that "if it is more likely than not that the declarant and the defendant were members of a conspiracy when the . . . statement was made, and that the statement was in furtherance of the conspiracy, the [statement] is admissible." <u>Enright</u>, 579 F.2d at 985 (citation omitted). In other words, to admit the statements under Rule 801(d)(2)(E), the Government must prove by a preponderance of the evidence "(1) that a conspiracy existed, (2) that the defendant against whom the [statement] is offered was a member of the conspiracy, and (3) that the hearsay statement was made in the course and in furtherance of the conspiracy." <u>Vinson</u>, 606 F.2d at 152.

## A.  A CONSPIRACY EXISTED.

The Court first finds that the Government has proven by a preponderance of the evidence that a conspiracy existed. Over the course of the nearly two-month trial, numerous coconspirators — including Darryl Scott, Xavier Turner, Jonathan Wilson, Carvell Gordon, Charles Orr, Roderick Dudley, and Brandon Marshall — testified to having belonged to or identified with a group known by various names, including Hot Boys, Howard Boys, MV-HB, Howard Estate Hustlers (858), and Murda Ville. X. Turner Vol. I at 9, 11-12; B. Marshall Vol. I

at 6; B. Marshall Vol. II at 7; D. Scott Vol. I at 7-8, 10; D. Scott Vol. II at 78-79; C. Orr at 65; J. Wilson at 5; R. Dudley Vol. I at 6, 9; R. Dudley Vol. II at 124; C. Gordon, 7/8/2014 (Rough Tr.) at 108-109.  The coconspirators testified that the group was first formed in the early 2000s.  X. Turner Vol. I at 9, 133; D. Scott Vol. I at 7-8.  They also explained that the above monikers were names for the same group.  X. Turner Vol. I at 11-14, 76-77; B. Marshall Vol. II at 8; D. Scott Vol. I at 12, 27.

In addition to coconspirator testimony, significant physical evidence also revealed that such a group existed, including photographs of individuals holding weapons and forming an "M" and a "V" with their hands (signifying "Murda Ville"), graffiti of the group's initials, recorded statements in which various individuals — including some of the Defendants — described themselves as members of the group, and tattoos on various members' bodies reading "Howard Block," "Murda Ville," "Hot Boys," "858," or some variant thereof.  All of this evidence leads the Court to conclude that the Government has shown, by a preponderance of the evidence, that such a group existed.

The Court also finds that the Government has shown, by a preponderance of the evidence, that the group's members conspired to maintain an exclusive territory within which they could sell drugs.  There was substantial testimony by both coconspirators and others that individuals who were not associated with the group were not permitted to sell drugs in the group's neighborhood.  X. Turner Vol. I at 93-96; D. Scott Vol. I at 24-25; J. Wilson at 6; R. Dudley Vol. I at 6-7; C. Orr at 146; E. Williams Vol. I at 9 (testifying that the area became a less open place to sell drugs in the early 2000s); R. Dudley Vol. II at 123 (testifying that a person would have to be accepted by the group to sell drugs in the area); see also A. Golfin at 11-13 (testifying that Howard Boys had territory for selling drugs, and that he would not sell drugs in

the territory because he did not feel comfortable there).  Indeed, the Court notes that Defendants Norwood and Jonathan Walker expressly told Sergeant Angus (in separate statements admitted only against them, respectively) that only members of the group were permitted to sell drugs within the group's territory.  Angus Vol. II at 9 (Norwood); Angus Vol. I at 15 (Jonathan Walker).

There also was evidence of acts of violence directed against purported outsiders who were thought to have been trying to sell drugs in the area.  For example, the Government introduced evidence that Alonzo Golfin was shot on February 7, 2010, because a member of the group thought he was selling drugs within the territory.  Angus Vol. I at 14-15 (admitted only against Jonathan Walker); A. Golfin at 23-24; R. Dudley Vol. II at 36-38.  Similarly, witnesses testified that members of the group agreed to protect the territory from outside drug sellers, including members of T-Hood, a rival gang.  X. Turner Vol. I at 94-96; R. Dudley Vol. I at 7-8; C. Orr at 146.

Furthermore, there was testimony by unindicted coconspirators that members of the group worked together to sell drugs.  Even though profits were typically kept by each individual seller, X. Turner Vol. I at 106, there was testimony that members would: (i) take turns selling drugs so as not to flood the market, X. Turner Vol. I at 114; (ii) share customers and drugs (for a fee) when other members ran out of drugs (also known as "five off the dub"), id. at 106-107, 111; D. Scott Vol. II at 80-82; J. Wilson at 6; (iii) lend drugs to each other, X. Turner Vol. I 111-112; and (iv) warn other sellers of the presence of law enforcement in the area, X. Turner Vol. I at 110, 114; B. Marshall Vol. II at 14; D. Scott Vol. I at 40; A. Patrick, 6/3/2014 (Rough Tr.) at 76-77.[2]

---

[2]  Although at trial Defendants cross-examined witnesses and made arguments to the jury in an effort to establish that there was no conspiracy, no such argument was expressly made in

Accordingly, the Court concludes that the Government has proven, by a preponderance of the evidence, that a conspiracy existed, with the goals of evading law enforcement and protecting the neighborhood territory for purposes of being the exclusive drug dealers within that area.

## B. DEFENDANTS WERE MEMBERS OF THE CONSPIRACY.

The Court also finds that the Government has shown by a preponderance of the evidence that each of the Defendants was a member of the conspiracy.[3]  First, some of the unindicted coconspirators expressly identified the Defendants as members.  X. Turner Vol. I at 23; 42-48.  Second, witnesses testified that the Defendants sold drugs in the neighborhood after the group was formed in the early 2000s, which Defendants would not have been permitted to do but for being members or associates of the conspiracy.  X. Turner Vol. I at 104-106; R. Dudley Vol. II at 49-50; C. Orr at 65, 146.  Finally, evidence at trial specific to each Defendant further established that each was more likely than not a member of the group:

- *Alexandra Norwood:*  Norwood gave a statement to Sergeant Angus and Special Agent Sondgeroth in which he admitted being a member of the Howard Boys, stated that he sold drugs in the area, and maintained that only members of the Howard Boys could sell drugs

---

opposition to the instant motion.  In any case, the contention that all of the undertakings were unilateral and unconcerted is belied by the evidence recited above.

[3] The Court notes that the evidence also established that there were other members of the conspiracy aside from Defendants.  As described earlier, some of these members, such as Xavier Turner and Brandon Marshall, were unindicted coconspirators who testified at trial about their membership.  Other individuals, such as Carvell Gordon, were indicted members who pled guilty before trial.  Still other individuals, such as Shawn Gardner, were unindicted coconspirators who did not testify at trial.  Indeed, as described in the Court's Opinion and Order denying Oldham's motion to exclude statements, granting the Government's penal-interest motion, and denying Gills's motion for limiting instruction, issued today, the Court finds that testimony and evidence at trial established, by a preponderance of the evidence, that Gardner was a member of the group.  See X. Turner Vol. II at 13 (Gardner sold drugs in the territory); id. at 74 (Gardner was an original member of the group); R. Harden Vol. II at 30-31 (Gardner participated in shooting of Malachi Wilson in retaliation for Jonathan Wilson's disrespect of Gills); C. Orr 82-83 (Gardner shot Orr for Orr's killing of Matthew Oldham); Exhibit 57-1 to 57-4 (Gardner's tattoos).  These other coconspirators are significant, either because their testimony at trial established elements of the Government's case or to admit a coconspirator's out-of-court statement against the Defendants.

in the territory.  Angus Vol. II at 7-10.  Xavier Turner also testified that he did "five off the dub" transactions with Norwood.  X. Turner Vol. I at 107.

- *Jatimothy Walker:*  Jatimothy Walker is seen in a photograph flashing the hand signs of "MV."  Jatimothy Walker also described himself as the "boss" of Howard Estates.  In addition, Jatimothy Walker supplied drugs to others in the Howard Estates and did "five off the dub" transactions with Xavier Turner.  X. Turner Vol. I at 107-108.

- *Jonathan Walker:*  Jonathan Walker is seen in a photograph flashing the hand signs of "MV."  There was testimony at trial that Jonathan Walker shot Alonzo Golfin because Walker believed Golfin — a rival gang member — was selling drugs in the group's territory.  R. Dudley Vol. II at 37-38.  Testimony also showed that Jonathan Walker committed acts of violence in retaliation for acts of disrespect committed against coconspirators.  B. Marshall Vol. II at 27-30.

- *Johnathan Oldham:*  Oldham identified himself in recorded conversations as a Hot Boy.  Oldham also has tattoos identifying him as such, and there were photographs of Oldham flashing "MV" hand signs.  Evidence at trial also established, by a preponderance of the evidence, that Oldham sold drugs in or near the 12th lot, an area within the group's territory.  D. Harris, 7/3/2014 (Rough Tr.) at 79-101; Ex. 431.  Xavier Turner also testified that he did "five off the dub" transactions with Oldham.  X. Turner Vol. I at 108.  Testimony and evidence at trial also showed that Oldham committed acts of violence in retaliation for acts of disrespect committed against coconspirators.  R. Harden Vol. II at 31-32; Ex. 367.

- *Leon Gills:*  Gills has repeatedly identified himself in rap songs as a member of Murda Ville, and he has tattoos identifying him as such.  Gills also is seen in photographs flashing the "MV" hand signs.  He also described the 12th lot — an area in the Howard Estates where drugs were often sold — as "his lot."  Xavier Turner also testified about various drug selling arrangements he had with Leon Gills, X. Turner Vol. I at 111, 114, and Eric Pringle described buying drugs from Gills in the group's designated area, E. Pringle, 6/26/2014 (Rough Tr.) at 71-74.  Testimony and evidence at trial also showed that Gills committed acts of violence, and encouraged coconspirators to commit acts of violence, in retaliation for acts of disrespect committed against him and other members.  B. Marshall Vol. II at 27-30; R. Harden Vol. II at 31-32.

- *Jamil Cureton:*  Testimony at trial demonstrated that Cureton has supplied drugs to members of the conspiracy, including Xavier Turner; he also participated in "five off the dub" transactions with Turner.  X. Turner Vol. I at 108-109, 116-117.  Cureton admitted selling drugs in the territory until his incarceration in 2003.  T. Sondgeroth, 6/18/2014 (Rough Tr.) at 34-35.  Cureton also has a tattoo of "858" — which evidence at trial suggested means "Howard Estates Hustler" — and pictures found in his apartment during a search reveal his affiliation with the group, see Exs. 355, 565.  Xavier Turner also

testified that Cureton carried a firearm because of a dispute with the group's rival gang from Atherton Terrace.  X. Turner Vol. I at 103.[4]

## C.  THE STATEMENTS WERE MADE IN THE COURSE OF THE CONSPIRACY.

Under Rule 801(d)(2)(E), the statement also must be made "during . . . the conspiracy" to be admissible.  Under this rule, a statement generally is inadmissible under the coconspirator hearsay exclusion when it is made after the conspiracy has ended.  Krulewitch v. United States, 336 U.S. 440, 442-444 (1949).  On the other hand, "[s]tatements designed to conceal an ongoing conspiracy are made in furtherance of the conspiracy for purposes of Rule 801(d)(2)(E)."  United States v. Payne, 437 F.3d 540, 546 (6th Cir. 2006) (emphasis added).

The approximate dates of the five statements at issue are as follows:  (1) June 15, 2009; (2) March 9, 2014; (3) March 11, 2014; (4) June 25, 2011; and (5) June 8, 2012.  See Gov't Mot. at 6-7.

The Court finds that the Government has shown, by a preponderance of the evidence, that the statements were made at a time when the conspiracy was continuing.  Indeed, evidence exists that the conspiracy was still ongoing despite members' incarceration, including: (i) threatening conduct toward witnesses; (ii) a fight in the jail in April 2013 between members of the group and members of their rival (T Hood), see 7/9/2014 (Rough Tr.) at 2-15; see also Ex. 604; (iii) a rap video in which Gills said that he would "beat trial I'm not changing"; (iv) statements by Gills (admitted solely against him) that he was "recruiting members" to the "front line" because members of the conspiracy had been incarcerated, Ex. 82; and (v) statements by Oldham (admitted solely against him) suggesting that he was going to send a letter from jail to his Hot

---

[4]  Although the jury acquitted Cureton of the RICO-Conspiracy count at trial, the acquittal came about under a different legal standard.  For Rule 801(d)(2)(E) purposes, the Court's analysis of whether Cureton was a member of the conspiracy focuses on the preponderance of the evidence standard.  The Court finds that the Government met this standard with respect to Cureton.

Boys to harm someone, Ex. 82.  Furthermore, there has been no suggestion that the conspiracy contemplated a temporal limit or a purpose defined by a specific act, nor that evidence exists showing that the objectives of the conspiracy have been completed or that the conspiracy has concluded.  See United States v. Lacey, 857 F.2d 1475 (Table), 1988 WL 96578, at *5 (6th Cir. 1988) ("Where a conspiracy contemplates a continuity of purpose and a continued performance of acts, it is presumed to exist until there has been an affirmative showing that it has terminated; and its members continue to be conspirators until there has been an affirmative showing that they have withdrawn." (quotation marks and citation omitted)).  As such, the Court finds that the statements were made at a time when the conspiracy was ongoing.

In earlier briefing, Defendants argued that any statements made after incarceration should not be admissible.  For example, in his "motion regarding co-defendant's statements"— which addressed the rap videos and online postings by Gills — Oldham argued that the statements were not admissible under Rule 801(d)(2)(E) because they were made: (i) from jail; (ii) after the Defendants had been incarcerated; and (iii) after the indictment alleges that the enterprise ended, i.e., 2012.  Oldham Br. at 4-5 (Dkt. 624).  Oldham asserted that the statements, "which occur[ed] nearly two years after the Indictment and after all of the defendants ha[d] been detained, are clearly after the conclusion of the conspiracy."  Id. at 5.

The Court rejected these arguments in an earlier decision, see 7/2/2014 Op. and Order at 3 n.1 (Dkt. 670), and does so again here.  With respect to the argument that the declarants were in jail at the time the statements were made, and thus could not have made the statements during the course and in furtherance of the conspiracy, the Sixth Circuit has explained that, while a coconspirator's "participation in a conspiracy ordinarily ends with his arrest for his role in the offense[,] . . . [t]hat is not necessarily [always] true . . . because an arrested coconspirator does

not always terminate his involvement in an ongoing conspiracy." United States v. Martinez, 430 F.3d 317, 327 (6th Cir. 2005). Thus, there is no per se rule that a coconspirator's incarceration automatically means any further statements by him or her cannot qualify for admission under Rule 801(d)(2)(E). Rather, the question is whether the declarant continued his or her involvement in the ongoing conspiracy once incarcerated.

Defendants suggest that because Gills posted his rap videos from jail, this could not have been done in the course and in furtherance of the conspiracy. But as discussed below, Gills's rap videos furthered the ongoing conspiracy by threatening witnesses who were expected to testify in the Government's case. The Government has shown that these videos were intended to — and may have had the actual effect of — discouraging at least some of these witnesses from testifying, a conspiratorial objective. And, as discussed more fully below (see Section II.D.2, infra), there is no evidence that Gills stopped participating in the conspiracy prior to making the statements; to the contrary, the statements themselves, along with the other evidence at trial (including a fight in the jail in April 2013), suggest that he continued to view himself as an active member/protector of the group while incarcerated. This same reasoning also holds true with respect to the statements about putting money in other members' jail accounts. Therefore, just because these statements were made from jail does not preclude their admission. Martinez, 430 F.3d at 327 (affirming admission of letter under Rule 801(d)(2)(E), even though it was written from jail); United States v. Madrigal, 152 F.3d 777, 781 (8th Cir. 1998) (rejecting claim that statements could not be during or in furtherance of conspiracy because coconspirator was incarcerated at the time of the statement).

Similarly, with respect to Defendants' argument that the statements should not be admissible against them because the Defendants were in jail at the time the statements were

made, the Sixth Circuit has held that, even if a coconspirator is "no longer an active participant in the conspiracy . . ., he is nonetheless presumed to be a continuing member, and is chargeable for subsequent acts of co-conspirators, so long as the conspiracy was ongoing and [the defendant] did not establish his affirmative withdrawal from the conspiracy." United States v. Robinson, 390 F.3d 853, 882 (6th Cir. 2004) (affirming admission of statements under Rule 801(d)(2)(E) against incarcerated defendant). To that end, "[m]ere cessation of activity is not sufficient to establish withdrawal from a conspiracy[,] . . . and a defendant's arrest or incarceration does not qualify as an affirmative, volitional act of withdrawal." Id. (internal citations and quotation marks omitted).

Here, Defendants — with the exception of Norwood, as discussed below — point to no affirmative acts of withdrawal other than their incarceration, nor was there evidence at trial of any such withdrawal. And, as discussed above, the Government has introduced sufficient evidence that the conspiracy was ongoing. Therefore, the statements were admissible against Defendants. See Robinson, 390 F.3d at 882; United States v. Blake-Saldivar, 505 F. App'x 400, 410 (6th Cir. 2012) (holding that coconspirator statements may be admissible under Rule 801(d)(2)(E) even if defendant was incarcerated at the time the statement was made).

As for Defendants' last argument, the Court concludes that the indictment's alleged end date for the conspiracy is not determinative for purposes of Rule 801(d)(2)(E). The Sixth Circuit addressed this exact situation in Blake-Saldivar, 505 F. App'x at 410. The defendant in that case argued that (i) because the indictment charged that the events of the conspiracy took place up to November 12, 2008, and (ii) because the defendant had been arrested in January 2009, any statements made by a purported coconspirator thereafter could not have been made during and in furtherance of the conspiracy for purposes of Rule 801(d)(2)(E). Id. at 409-410.

The Sixth Circuit rejected this argument, noting that the defendant was "mistaken about the relationship between the conspiracy's end date as set forth in the indictment and the conspiracy's end date for purposes of Rule 801(d)(2)(E)." Id. at 410. The Sixth Circuit — citing Robinson — held that "an arrest or incarceration is not an affirmative, volitional act of withdrawal from the conspiracy and the scope of the indictment's charged conspiracy is not necessarily coterminous with the scope of the conspiracy for purposes of 801(d)(2)(E)." Id. Therefore, in line with Blake-Saldivar, the Court rejects Defendants' argument that any statements made post-2012 (the date of the original indictment) could not have been made in the course and in furtherance of the conspiracy.

In the sole response filed to the Government's motion, Defendant Norwood argues that the statements should not be admissible against him because he was no longer part of the conspiracy as of 2005. Norwood Resp. (Dkt. 697). In support of this argument, Norwood highlights testimony by some witnesses that, due to Norwood's cousin — Charles Orr — killing Shawn Gardner's friend — Matthew Oldham — in 2005, Norwood was not permitted in the neighborhood after that date. While Norwood recognizes that the "defense of withdrawal requires the defendant to prove that he took affirmative action to defeat or disavow the purpose of the conspiracy," he maintains that Gardner's "rule that Alexandra Norwood was no longer allowed in the area" effectively excommunicated Norwood from the group. Id. at 2. Accordingly, Norwood claims that, because Gardner purportedly tried to keep Norwood out of the neighborhood, he (Norwood) was no longer a member of the conspiracy after 2005.

As explained earlier, even if a coconspirator is "no longer an active participant in the conspiracy . . ., he is nonetheless presumed to be a continuing member, . . . so long as the conspiracy was ongoing and [the defendant] did not establish his affirmative withdrawal from

12

the conspiracy." Robinson, 390 F.3d at 882. "Mere cessation of activity is not sufficient to establish withdrawal from a conspiracy." Id. (quotation marks and citation omitted). Instead, to legally withdraw, "a person must take an affirmative action to defeat or disavow the purpose of the conspiracy." United States v. York, No. 04-20038, 2007 WL 1343801, at *4 n.2 (E.D. Mich. May 7, 2007) (citing United States v. Lash, 937 F.2d 1077, 1084 (6th Cir. 1991)); see also United States v. Randall, Jr., 661 F.3d 1291, 1294-1295 (10th Cir. 2011) (discussing the high threshold for showing withdrawal from a conspiracy, and noting that "[g]etting involved in a conspiracy, particularly a gang, is a risky endeavor because of the difficulty of getting out").

Here, the Court finds that the Government has shown, by a preponderance of the evidence, that Norwood's participation in the conspiracy continued beyond the death of Matthew Oldham. For example, Sergeant Angus testified that Norwood told him that he sold crack cocaine from 2001 to 2006 at a market within the defined territory. Angus Vol. II at 8-9. Norwood also told Sergeant Angus that only he and others in the group were permitted to sell drugs within this defined area. Id. at 9. Therefore, Norwood's own statements defy his claim that he did not return to the defined territory after the shooting of Matthew Oldham.

Furthermore, Norwood continued to associate with the group after the shooting. Xavier Turner testified that he saw Norwood after 2005; that he continued to refer to Norwood as "HB"; and that he never heard Norwood say that he was quitting the group. X. Turner Vol. III at 100-101. Indeed, in his statement to Special Agent Sondgeroth and Sergeant Angus, Norwood never stated that he had been "ex-communicated" from the group, that he was not allowed in the territory due to Shawn Gardner, or that he was done with the Howard Boys. Nor does Norwood argue here that he personally took any "affirmative action to defeat or disavow the purpose of the

conspiracy," York, 2007 WL 1343801, at *4 n.2, other than simply staying out of the area from which he was allegedly banished.[5]

Furthermore, the Court notes that Norwood was arrested in August 2006, and subsequently pled guilty to possessing a sawed-off shot gun. This arrest occurred at the Arena East apartments, which is less than one-half mile from the boundaries to which numerous witnesses testified defined the group's territory. See 6/24/2014 (Rough Tr.) at 127-128, 130, 144, 175. Therefore, the evidence suggests that Norwood continued to go near the neighborhood, despite the claimed threats by Gardner. Norwood has also been incarcerated since 2006 or 2007, further undermining his claim that he stayed away from the group's territory because of an alleged excommunication, rather than simply being confined in custody.

Finally, the Court notes that, in speaking with Special Agent Sondgeroth and Sergeant Angus in 2011, Norwood refused to provide the names of the purported shooters of the homicides he discussed, despite claiming to know this information. See Angus Vol. II at 12-13; T. Sondgeroth, 6/16/2014 (Rough Tr.) at 111-112. Norwood's refusal conforms to testimony — and statements by Norwood himself — that a "no snitching" code to evade law enforcement existed. Norwood thus continued to support the conspiracy by significantly limiting any cooperation with law enforcement.

Therefore, the Court finds, by a preponderance of the evidence, that Norwood did not affirmatively withdraw from the conspiracy in 2005. See United States v. Walls, Sr., 70 F.3d 1323, 1327 (D.C. Cir. 1995) (admitting statements under Rule 801(d)(2)(E) because, "even if the other co-conspirators had considered expelling [the declarant] from the conspiracy, she remained

---

[5] Notably, none of the Defendants — including Norwood — raised the defense of withdrawal, or requested an instruction on this defense at trial. See 7/17/2014 (Rough Tr.) at 8-9.

a member because she remained loyal to the conspiracy and made no affirmative attempt to withdraw").

## D.  THE STATEMENTS WERE IN FURTHERANCE OF THE CONSPIRACY.

To be admissible, the subject statements also must have been "in furtherance of the conspiracy."  FRE 801(d)(2)(E).  "A statement is made in furtherance of a conspiracy if it was intended to promote conspiratorial objectives; it need not actually further the conspiracy." United States v. Zertuche, 565 F. App'x 377, 384 (6th Cir. 2014) (quotation marks and citation omitted).  Courts have set forth some examples of statements that meet the "in furtherance" requirement: "[S]tatements identifying other conspirators and their roles in the conspiracy, statements to inform other conspirators of the activities or status of the conspiracy, and statements as to the source or purchaser of controlled substances."  Id. at 385; see also United States v. Kelsor, No. 08-81-5, 2009 WL 1850177, at *7 (S.D. Ohio June 25, 2009) ("Statements in furtherance of a conspiracy include statements made to apprise a co-conspirator of the progress of the conspiracy, to induce his continued participation or to prompt action on his part which facilitates the conspiracy, or to allay his fears, as well as statements made before the objects of the conspiracy have been completed with the intent to . . . impede the government's investigation of the conspiracy.").

The Court discusses the three categories of statements — (i) that Oldham and Gardner had Malachi, (ii) Gills's rap videos, and (iii) statements about jail accounts — in turn.

### 1.  Statement (1): Malachi Wilson

The first statement at issue — that Oldham and Gardner had Malachi Wilson — relates to a feud between Gills and Malachi Wilson's brother, Jonathan Wilson.  Testimony at trial revealed that Jonathan Wilson and Gills got into a dispute when Wilson discovered Gills in bed

with a woman with whom Wilson had a romantic relationship.  After getting into a verbal altercation, Gills went downstairs and Jonathan Wilson left the building.  Jonathan Wilson fired three to four shots into the air as he left.  J. Wilson at 9-14.  Later that day, Gills shot at a van in retaliation because he thought Jonathan Wilson was inside, although Gills was mistaken.  Jonathan Wilson then went into hiding.  Gills subsequently called Jonathan Wilson and said that, if he could not get Jonathan, he would get his brother instead.  J. Wilson at 15, 20-21.

Rodney Harden testified at trial that Gills later informed him that Gills was with Ricco Holmes — a mutual friend — when Holmes received a phone call from Oldham and Gardner.  R. Harden Vol. II at 8-9.  They told Gills that "they had Malachi" Wilson, to which Gills responded to "lay law down."  R. Harden Vol. II at 9-10.  The evidence (including a secret jail recording of Oldham discussing the shooting) showed, by a preponderance of the evidence, that Oldham then shot and killed Malachi.  See Exhibit 367.

The Court finds that the statement that Oldham and Gardner had Malachi Wilson was in furtherance of the conspiracy.  Although the dispute between Gills and Jonathan Wilson may have begun as a personal issue, there was substantial testimony at trial that members of the group would take on each other's feuds as part of being a member.  X. Turner Vol. I at 24-25 (acts of disrespect against members of the group were responded to with violent acts), 56-58 (there was an understanding that members of the group would have each other's back and that, if you messed with one, you messed with all), 57 (the group had a saying: "Murda Ville[,] a family, one bus[t] and we all bang," (i.e., one shoots, they all shoot; one fights, they all fight)), 80-82; R. Dudley Vol. II at 72, 104; B. Marshall Vol. II at 29-30; D. Scott Vol. I at 25.

Furthermore, in addition to simply supporting each other, Xavier Turner testified that it was important for the group to assist members with retaliating against acts of disrespect so that

people outside the group "wouldn't try nothing."  X. Turner Vol. I at 81-82.  This was required

because, before the group was formed, individuals from outside the area called the south side —

where the Howard Estates is located — the "soft side."  Id. at 75.  Therefore, in supporting

fellow members with acts of violence when those members felt disrespected, the Government

has shown, by a preponderance of the evidence, that the group furthered its goal of discouraging

others from selling drugs or interfering with drug sales within the territory by shoring up a

violent reputation for the group.  See X. Turner Vol. II at 11-13 (reputation for violence was

important to keep outside sellers away from the territory); see also X. Turner Vol. I at 33-34

(members got more respect either for how good they were at selling drugs or for their reputation

for violence).

The Court thus concludes that the Government has shown, by a preponderance of the

evidence, that the statement to Gills that "they had Malachi" Wilson (Gills's rival's brother) was

in furtherance of the conspiracy.

### 2.  Statements (2) and (3): Rap Videos Posted Online

The Government also sought to introduce two rap videos posted by Leon Gills from jail

in March 2014.  These videos, entitled "Murder on my Mind" and "RATS," describe Gills's

propensity for violence, his severe dislike for those who cooperate with law enforcement, and his

desire to harm particular individuals due to "snitching."

The tone of these videos portrays serious threats of violence against those who Gills

thought were "snitching."  For example, in the RATS video, Gills expressly identifies numerous

individuals as "rats" — i.e., those who were working with the Government — including Markus

Evans, Malcolm Evans, Brandon Marshall, and Ricco Holmes.  Gills proclaims that these "rats"

are "gonna squeal before the heater get racked," and he talks about kidnapping and/or hurting

their family members, including one individual's young daughter.  To that end, Gills specifically raps: "Feds trying to get me life; if you tell you gon die."  Similarly, in his rap video "Murder on my Mind," Gills says that he "lay[s] law in [his] black t," that he "murder[s]" people, that "loyalty is all [he] know[s]," and that "all you rat niggas gone [sic] die slow," and that if he "say so you a dead man."

The Court first notes that threats generally are not hearsay because they are not assertions; rather "threats are generally considered 'verbal acts' not admitted for the truth of the matter asserted." Dorchy v. Jones, 320 F. Supp. 2d 564, 578 (E.D. Mich. 2004); Pizano v. Davis, No. 05-70372, 2006 WL 4975357, at *8 (E.D. Mich. Mar. 8, 2006) (collecting cases).  Here, the threats were not offered as assertions, but rather to show that they were made, i.e., that Gills was threatening potential witnesses to dissuade them from testifying.

To the extent the videos do contain assertions offered for the truth of the matter asserted, the Court concludes that they are admissible as non-hearsay under Rule 801(d)(2)(E).[6]  See

---

[6] Even if the Court were to conclude that Federal Rule 801 did not apply, and that the videos were hearsay, the Court still would admit them pursuant to Rule 807, the residual exception to the hearsay rule.  Rule 807 permits the introduction of hearsay statements if: (i) the statement has equivalent circumstantial guarantees of trustworthiness; (ii) it is offered as evidence of a material fact; (iii) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and (iv) admitting it will serve the purposes of the rules of evidence and the interests of justice.  See FRE 807.  Here, the videos were recorded, and there is no dispute that it was Gills who wrote the songs, videotaped himself rapping them, and placed them online.  The videos also are offered as evidence of a material fact: that members of the conspiracy furthered their exclusive territory by seeking to evade law enforcement and impeding attempts to stop the conspiracy by intimidating those who "snitched."  See Am. First Superseding Indictment, Count One at ¶ 6 (purposes of conspiracy included "[p]rotecting the enterprise and its members and associates from detection, apprehension, and prosecution by law enforcement authorities.").  Similarly, the fact that Gills wrote songs about threatening witnesses and posted them online is more probative than any other evidence the Government can obtain through reasonable efforts, because it is direct evidence of a member of the conspiracy making these explicit threats.  Lastly, admitting the videos serves the purposes of the rules and the interests of justice, particularly given that Gills testified during trial — including about the songs — and was thus available for cross-examination by both the Government and his co-Defendants.

United States v. Wilson, 493 F. Supp. 2d 460, 463-464 (E.D.N.Y. 2006) (rap lyrics admissible as coconspirator statements).  The Government has shown, by a preponderance of the evidence, that the videos were intended to dissuade potential Government witnesses from cooperating, and the statements may have had this impact.  For example, one coconspirator who pled guilty earlier in the case refused to testify at trial given the threats against his family.  Similarly, during argument on the admissibility of the videos, the Government explained that, when interviewing some potential witnesses about testifying, the individuals asked, "haven't you seen Facebook yet."  See 7/9/2014 (Rough Tr.) at 142.

The Court also finds that this conduct — threatening witnesses to dissuade them from testifying — was undertaken in furtherance of the ongoing conspiracy.[7]  The governing indictment charges that one purpose of the conspiracy was to "[p]rotect[] the enterprise and its members and associates from detection, apprehension, and prosecution by law enforcement authorities."  Am. First Superseding Indictment, Count One at ¶ 6 (Dkt. 191).  Testimony and physical evidence at trial revealed, by a preponderance of the evidence, that those in the conspiracy actively sought to evade law enforcement and deter others from cooperating with law enforcement.  For example, Xavier Turner testified that he, Gills, Cureton, and others had a discussion in 2011-2012 where they decided to tell the FBI that the group was just a "rap group," even though this was not true.  X. Turner Vol. I at 49-50.  Similarly, there was substantial evidence of group members threatening and/or harming cooperating witnesses.  For example, Gills has a tattoo of a stop sign riddled with bullet holes that reads "stop snitchin."  The

---

The Government also notified Defendants of its intent to introduce the videos in advance of trial.  See FRE 807(b); see also Third Am. Notice of Intent to Introduce Evidence of Other Acts (Dkt. 544).

[7] As described earlier in this decision, the Court also rejects the argument that the videos could not have been in furtherance of the conspiracy because the declarant (Gills) was in jail at the time they were made.  See Martinez, 430 F.3d at 327.

Government also introduced into evidence a t-shirt with the statement, "A snitch nigga a bitch nigga." Id. at 70-71. A post on Cureton's Facebook page further stated, "I can smell a rat/pow pow pow let 'em feel the gat." Exhibit 78.

Recorded phone calls involving Defendants — which were admitted against the individual Defendant on the call — further revealed their inclination toward harming cooperators. For example, the Government introduced recordings against Gills in which he (i) agreed that someone should slit the throat of Xavier Turner — an unindicted coconspirator who was also a cooperating witness, (ii) told an individual where Turner was located and said the individual should "make it rain on it," (iii) said that the day Turner returned to town would be his "death day," and (iv) actually called Turner and referred to him as a "rat ass bitch." Recorded telephone conversations involving Norwood (August 21, 2010), Oldham (October 22, 2008), and Jatimothy Walker (February 24, 2011) also described those Defendants' distaste for and/or desire to harm snitches, i.e., cooperating witnesses. Exs. 82/82A.

The group's threats toward cooperating witnesses were not just verbal; in some instances, actual action was taken. For example, Darryl Scott testified that he witnessed a fight in jail between Jonathan Walker and Deondrick Morgan because Jonathan Walker felt Morgan was "talking too much," i.e., testifying against Shawn Gardner — an unindicted coconspirator. D. Scott Vol. II at 5-6; Exhibit 604. The Government also showed that Oldham and Jonathan Walker sent out information about cooperating witnesses, and that, in at least one instance, a witness was confronted prior to testifying. See 7/7/2014 (Rough Tr.) at 177-181; 7/9/2014 (Rough Tr.) at 132-136 (setting forth the various instances of alleged witness intimidation).

The Court also notes that the timing of the videos suggests they were intended to threaten and discourage cooperators from testifying. The videos, which contain violent and threatening

20

language, were uploaded to Gills's account on approximately March 9 and 11, 2014 — less than three months before the instant trial was set to begin on charges against Gills for RICO Conspiracy and Attempted Murder in Aid of Racketeering.  Jonathan Walker and Oldham also sent statements and lists of cooperators during the same timeframe — in or about mid-March 2014.  See 7/9/2014 (Rough Tr.) at 135, 151-152, 158.  The timing of these disclosures further suggests that the group worked together to actively discourage "snitching."

Therefore, the Court finds that the Government has shown, by a preponderance of the evidence, that the group had a conspiratorial goal of silencing cooperating witnesses, and that Gills's rap videos were intended to further that objective.  Indeed, the Court notes that, in response to the Government's written motion to admit the statements, no Defendant argued that the statements were not "intended to promote conspiratorial objectives," Zertuche, 565 F. App'x at 384-385; the sole argument raised was that the statements were not made during the conspiracy— an argument the Court rejected above.[8]

Therefore, the Court concludes that the rap videos are admissible as coconspirator statements made during and in furtherance of the conspiracy under Rule 801(d)(2)(E).

### 3.  Statements (4) and (5):  Recordings Regarding Jail Accounts

The Government also sought to admit two recordings into evidence that purportedly showed that members of the conspiracy would provide funds to other members who were incarcerated.  In the first recording, Oldham (incarcerated at the time) tells Gills that he does not have any money in his account, and that he needs money for phone calls.  Gills responds, "Tell

---

[8] Defendants did argue at the July 9, 2014 hearing that the videos were simply Gills venting frustration.  See 7/9/2014 (Rough Tr.) at 141-142.  Defendants did not repeat this argument in response to the Government's motion for admission of coconspirator statements.  Moreover, as described above, the specificity of the names and threats in the videos, as well as the timing of the videos, leads the Court to reach the same conclusion — that the Government has shown, by a preponderance of the evidence, that the videos were intended to further the goals of the conspiracy.

your mama to come to the Bricks and get a couple dollars or something man."  Gills also tells Oldham that he "got a couple.  I ain't got I'm I really done fell off but I got something to put on a phone."

In the second call, Gills (incarcerated at the time) asks his grandmother — Bertha White — if Malcolm received money that Gills previously asked be provided to him.  After Ms. White says yes, Gills responds, "Flat out and if any of any of my niggas need something just let me know bird alright cause I'm gonna hold my niggas down with me."

The Court finds that the Government has proven, by a preponderance of the evidence, that these calls were in furtherance of the conspiracy.  As alleged in the indictment, and as shown by evidence at trial, members of the conspiracy would support each other by "provid[ing] assistance to incarcerated members by providing them with money."  Am. First Superseding Indictment, Count One at ¶ 15.  For example, Xavier Turner testified that, when members of the group were incarcerated, other members would help out by putting money in their commissary accounts or help with bond payments.  X. Turner Vol. I at 93.  Similarly, account statements from Jonathan Walker's commissary accounts reveal a deposit by "Brandon" in March 2008, which may well be Brandon Marshall — an unindicted coconspirator who was friends with Jonathan Walker, shared weapons with him, and had photographs of him on his social media page, including one of Jonathan Walker in state court.  B. Marshall Vol. II at 15-16, 22; Exs. 484, 3004-A.

Furthermore, as with the rap videos, no Defendant argued in response to the Government's motion that these statements were not "intended to promote conspiratorial objectives," Zertuche, 565 F. App'x at 384-385; rather, the sole argument raised was that Defendants were incarcerated at the time the statement was made.  As stated before, the Court

rejects this argument.   The statements regarding giving money to coconspirators are thus admissible under Rule 801(d)(2)(E).

### III.  CONCLUSION

For the foregoing reasons, the Court grants the Government's motion for the admission of coconspirator statements (Dkt. 694).

SO ORDERED.

Dated:  May 13, 2015                         s/Mark A. Goldsmith
      Detroit, Michigan                    MARK A. GOLDSMITH
                                     United States District Judge

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on May 13, 2015.

                                     s/Johnetta M. Curry-Williams
                                     Case Manager