UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,                    HON. MARK A. GOLDSMITH

v.                                        Case No. 12-CR-20287

D-1 ALEXANDRA L. NORWOOD,
D-2 JATIMOTHY E. WALKER,
D-3 JONATHAN E. WALKER,
D-4 JOHNATHAN L. OLDHAM, and
D-8 LEON GILLS,

                Defendants.

_____/

## OPINION AND ORDER DENYING DEFENDANTS' MOTIONS FOR JUDGMENTS OF ACQUITTAL (Dkts. 687 and 691)[1]

### I. INTRODUCTION

Defendants Alexandra Norwood, Jatimothy Walker, Jonathan Walker, Johnathan Oldham, and Leon Gills (collectively "Defendants")[2] — among others who pled guilty before trial — were charged with one count of racketeering conspiracy, in violation of 18 U.S.C. § 1962(d), for their participation in an alleged enterprise known by various monikers, including the "Howard Boys," "Hot Boys, and "Murda Ville."  In addition to the RICO-Conspiracy charge,

---

[1] Defendant Leon Gills filed a separate motion for a judgment of acquittal based on the evidence regarding Count 35— the shooting of Charles Orr (Dkt. 687).  In that motion, Gills also joins in the remaining Defendants' joint motion for judgment of acquittal (Dkt. 691).  To distinguish Gills's individual motion from the other joint motion for judgment of acquittal filed by the Defendants, the Court will refer to Gills's separate motion as "Gills Br."

  Further, to the extent Gills's motion requests a judgment of acquittal on Count 36 — use and discharge of a firearm during and in relation to a crime of violence, i.e., the shooting of Orr — the jury found Gills not guilty on this Count, and thus the motion is denied as moot to the extent it addresses this Count.

[2] Jamil Cureton also was charged with, and went to trial on, the racketeering conspiracy count. The jury found him not guilty.  The Court thus denies the motion as moot as applied to Cureton.

1

these individuals also faced various combinations of other charges, including murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1), and attempted murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(5).

Now before the Court are Defendants' joint motion for judgment of acquittal (Dkt. 691) and Defendant Gills's individual motion for judgment of acquittal regarding Counts 35 and 36 (Dkt. 687), both filed pursuant to Federal Rule of Criminal Procedure 29(a).   The Government filed a response to Defendants' motions (Dkt. 702), Defendant Norwood filed a reply brief (Dkt. 703), the Government filed a response/supplemental brief to Norwood's reply (Dkt. 704), and Norwood filed a second reply/supplemental brief (Dkt. 707).   Gills also filed a supplemental brief in support of his individual motion (Dkt. 725), and the Government filed a supplemental brief in response (Dkt. 728).[3]

The Court concludes that oral argument would not assist with resolution of the instant motions.   See E.D. Mich. Local Criminal Rule 12.1; E.D. Mich. Local Rule 7.1(f)(2).   For the reasons set forth below, the Court denies Defendants' motions.

## II.  BACKGROUND

The facts of this case have been fully set forth in various other decisions of this Court, and need not be repeated in full here.   However, the Court sets forth a brief overview to provide context.   Citations to the testimony and evidence supporting this overview may be found in the Court's Memorandum Opinion Granting the Government's Motion for the Admission of Coconspirator Statements (Dkt. 784).   The Court also will provide further details of the facts —

---

[3] Norwood also filed a separate "supplemental brief in support of motion for judgment of acquittal" in September 2014 (Dkt. 732), in which he raised new arguments that were not raised in Defendants' original joint motion.  This new supplemental brief was filed within the deadline the Court provided for all post-trial motions, including those motions under Federal Rules of Criminal Procedure 29 and 33.  The Court will address the arguments raised in this filing in a separate decision regarding the other post-trial motions.

as supported by the evidence — where appropriate throughout the remainder of this Opinion and Order.

The Howard Boys — also known as Hot Boys, Murda Ville, MV, Howard Estate Hustlers, 858, and MV/HB — were a neighborhood street gang based out of the Howard Estates, a public housing complex in Flint, Michigan.  Members identified themselves and the gang through various hand signs, tattoos, graffiti, rap lyrics, and photographs on social networking websites.

Members of the Howard Boys sold drugs within what they believed to be their exclusive territory; outsiders were not permitted to sell drugs within these boundaries.  To enforce this rule, members committed acts of violence against those whom they perceived to be wrongfully selling in their territory.  They also committed acts of violence against people who they believed had disrespected them and against members of a rival neighborhood gang, T-Hood.  Howard Boys members were expected to retaliate against slights with acts of violence, and members supported one another with these violent acts.  According to one former member, committing retaliatory violent acts was important for maintaining a reputation for violence so as to dissuade others from trying to interfere with the Howard Boys and their drug-selling territory.  Violence also served as a way for members to garner respect from other members.

Although members of the Howard Boys did not generally pool their profits from individual members' drug selling, they did assist each other with sales and protecting the selling territory.  For example, members would warn others about police or a rival gang's presence in the area, take turns selling, and sometimes share sales in "five off the dub" transactions — a deal in which one individual provides drugs to another individual who has a customer, in exchange for a portion of the sale proceeds.

Before trial, six coconspirators pled guilty to racketeering conspiracy due to their association with the Howard Boys.  At trial, five of the remaining Defendants — Norwood, Jatimothy Walker, Jonathan Walker, Oldham, and Gills —were convicted of racketeering conspiracy.  One Defendant, Jamil Cureton, was acquitted of this charge.  The jury also convicted Norwood, Jatimothy Walker, Jonathan Walker, Oldham, and Gills of various other crimes, including murder in aid of racketeering (Norwood, Jatimothy Walker, Jonathan Walker, and Oldham), attempted murder in aid of racketeering (Jonathan Walker, Oldham, and Gills), use and discharge of a firearm during and in relation to a crime of violence (Jonathan Walker, Oldham, and Gills), distribution of cocaine base (Oldham), possession of a firearm with an obliterated serial number (Oldham), possession of an unregistered firearm (Oldham), and dealing in firearms without a license (Oldham).  The jury acquitted Gills of one count of use and discharge of a firearm during and in relation to a crime of violence, relating to the attempted murder of Charles Orr.

At the close of the Government's case-in-chief, Defendants sought judgments of acquittal under Federal Rule of Criminal Procedure 29(a).  Defendants then orally renewed these motions before the case was submitted to the jury.  The Court reserved ruling on those motions, see Fed. R. Crim. P. 29(b), and after the jury returned its verdict, Defendants Norwood and Gills submitted additional written briefing to the Court, see Fed. R. Crim. P. 29(a), (c).

### III.  RULE 29 STANDARD

Rule 29 of the Federal Rules of Criminal Procedure governs a defendant's motion for a judgment of acquittal.  Such a motion may be made at the close of the Government's case but before the defendant puts on his case, at the close of all evidence, and/or after the jury has returned a guilty verdict or otherwise been discharged.  See Fed. R. Crim. P. 29(a), (c).  Under

4

Rule 29, a court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a).

The standard governing a Rule 29 motion is well established:

> When considering a Rule 29 motion for a judgment of acquittal, the Court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>United States v. Humphrey</u>, 279 F.3d 372, 378 (6th Cir. 2002) (quoting <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979) (emphasis in original)). "Circumstantial evidence alone, if substantial and competent, may support a verdict and need not remove every reasonable hypothesis except that of guilt." <u>Id.</u> (quoting <u>United States v. Keeton</u>, 101 F.3d 48, 52 (6th Cir. 1996)). . . . The granting of a motion to acquit should be "confined to cases where the prosecution's failure is clear." <u>Keeton</u>, 101 F.3d at 52 (6th Cir. 1996) (quoting <u>Burks v. United States</u>, 437 U.S. 1, 17 (1978)).

<u>United States v. Blanchard</u>, No. 05-80355, 2008 WL 3915007, at *1 (E.D. Mich. Aug. 20, 2008).

Under Rule 29(b), "[i]f the court reserves decision [on a motion], it must decide the motion on the basis of the evidence at the time the ruling was reserved." The Court cannot weigh the evidence, evaluate the credibility of witnesses, or substitute its judgment for that of the jury. <u>See</u> <u>United States v. Hilliard</u>, 11 F.3d 618, 620 (6th Cir. 1993). As Defendants recognize, a defendant bears a "very heavy burden" in challenging the sufficiency of the evidence. <u>United States v. Davis</u>, 577 F.3d 660, 671 (6th Cir. 2009).

## IV. ANALYSIS

Defendants raise five main arguments in support of their motions. First, Defendants claim that there has been a "failure of proof of the racketeering enterprise as alleged." Defs. Br. at 7 (Dkt. 691). In support of this argument, Defendants assert that, (i) there was no concerted activity by the "Howard Boys," but instead the drug sellers acted as "independent contractors"; (ii) the name of the alleged enterprise changed; (iii) the conduct and relationships of the

5

individuals changed "drastically" in 2005, including engaging in "internal warfare"; and (iv) individuals left the group due to incarceration. Id. at 8-9.

Second, Defendants claim that there is a "failure of proof of a necessary relationship of [the] alleged acts of racketeering activity and the racketeering enterprise." Id. at 10. Defendants maintain that there is "no evidence that the alleged [Violent Crimes in Aid of Racketeering ("VICAR")] murders were 'enabled' by the racketeering enterprise described in the indictment." Id.[4]

Third, Defendants assert that there "is a failure to prove a RICO motive for each [VICAR] count." Id. at 10-20. Defendants argue that there is no evidence that each Defendant's purpose with respect to the VICAR counts "was to maintain or increase his position in the racketeering enterprise." Id. at 10. Defendants then discuss each of the VICAR counts in support of this claim. Id. at 14-20.

Fourth, Defendants maintain that there is a "fatal variance between the racketeering enterprise allegation of the indictment and the evidence presented at trial." Id. at 20-22. Defendants argue that the evidence of different names and internal fighting suggests that there were "multiple enterprises or conspiracies, not the overarching single one alleged in the indictment." Id. at 22.

Fifth, Defendants claim that the Government has "failed to prove that the alleged racketeering enterprise had a substantial affect on commerce." Id. at 22-24. Defendants reiterate that the gun and drug sales were "carried out by individuals, not a so-called 'Howard Boys'

---

[4] Defendants also claim that, because the VICAR counts are unsupported, the special sentencing enhancements based on those same acts should be stricken. Defs. Br. at 24. Given that the Court rejects Defendants' arguments regarding the sufficiency of the evidence as to the VICAR counts, the Court also rejects Defendants' request to strike the special sentencing enhancements.

racketeering enterprise. The function of the racketeering enterprise, if there was one, was to intimidate and to protect boundaries." Id. at 23-24.

The Court addresses each argument in turn, and finds each one lacking under the applicable Rule 29 standard.

## A. The Racketeering Enterprise

Defendants first argue that there has been a failure of proof regarding the racketeering enterprise as alleged. Defs. Br. at 7-9. Defendants acknowledge that, under the Supreme Court's decision in Boyle v. United States, 556 U.S. 938 (2009), the Government has to prove three structural features to establish the association-in-fact enterprise: "a purpose, relationships among those associated with the racketeering enterprise, and longevity sufficient to permit these associates to pursue the racketeering enterprises' [sic] purpose." Defs. Br. at 8 (citing Boyle, 556 U.S. at 946). Defendants claim that these requirements have not been met for four reasons: (i) lack of a common activity/purpose; (ii) variations in the name over time; (iii) internal "warfare" among members; and (iv) the incarceration of members, which broke up the purported group. Id. at 8-9. However, Defendants cite no legal authority in support of these arguments. And, as discussed below, the Government presented sufficient evidence of an enterprise.

### 1. Common Activity/Purpose

Defendants claim that the Government failed to establish that the enterprise had any shared activity. Defs. Br. at 8. According to Defendants, witnesses at trial "consistently described drug sellers as independent contractors," and the members' "affiliation was for the purpose of defining a geographic area and protecting each other." Id. Defendants claim that "[n]one of the Government witnesses testified that the racketeering entity, by whatever name, had any economic function." Id. The Court disagrees.

At trial, there was significant evidence of drug sales and related violence by and on behalf of members of the group. Witnesses at trial testified that the group's members conspired to maintain an exclusive territory within which they — and only they and their associates — could sell drugs. There also was substantial testimony that individuals who were not affiliated with the group were not permitted to sell drugs in the group's neighborhood, <u>see</u> X. Turner Vol. I at 93-96; D. Scott Vol. I at 24-25; J. Wilson at 6; R. Dudley Vol. I at 6-7, and that violent acts were taken against outsiders who members viewed as encroaching on the territory, Angus Vol. I at 14-15 (admitted against Jonathan Walker); A. Golfin at 23-24; R. Dudley Vol. II at 36-38. Indeed, as relevant to Norwood and Jonathan Walker, those two Defendants told Sergeant Angus that only members of the group were permitted to sell drugs within the group's territory. Angus Vol. II at 8-9; Angus Vol. I at 15. Testimony at trial also revealed that group members viewed a reputation for violence as important, to dissuade outsiders from interfering with the group's exclusive selling territory. <u>See</u> X. Turner Vol. II at 11-13; X. Turner Vol. I at 75-76.

In addition, there was testimony that although members typically kept their own profits, they would often work together in their drug-selling operations. For example, members would take turns selling so as to minimize competition, X. Turner Vol. I at 114, share customers and drugs (for a fee) when members ran out of drugs (also known as "five off the dub"), <u>id.</u> at 106-107, 111; D. Scott Vol. II at 80-82, lend drugs to each other, X. Turner Vol. I at 110-111, and warn other sellers of the presence of law enforcement and rivals in the area, X. Turner Vol. I at 110, 114; X. Turner Vol. II at 24-26; B. Marshall Vol. II at 14; D. Scott Vol. I at 40. And sellers were permitted to sell in the area only if accepted by the group. R. Dudley Vol. II at 123.

Accordingly, although the group may not have pooled their profits from drug sales, the Government introduced sufficient evidence that the enterprise had a common, economic

function: to define and protect an exclusive geographic territory within which <u>only</u> members and associates could sell drugs.  Cf. <u>United States v. Hackett</u>, 762 F.3d 493, 497 (6th Cir. 2014) ("Although members did not split the profits from their drug sales, they did supply each other with drugs. . . .  Violence was important because [the enterprise] competed with rival gangs . . . for the neighborhood drug trade. . . . In short, [enterprise] members protected the gang's violent reputation; the gang's reputation protected its territory; and the territory allowed gang members to make money by selling drugs.").

### 2.  Name Changes

Defendants next argue that the Government failed to establish the requisite enterprise because the name of the group varied over time.  Defs. Br. at 8-9.  Defendants claim that the differing names were used to refer to individuals based on age and where they lived.  <u>Id.</u>

While this was certainly an argument for the jury, the Court concludes that a reasonable juror could find that the change in names did not establish the existence of several different groups, but, rather, referred to one overarching enterprise.  Testimony at trial revealed that the varying names for the group — Hot Boys, Howard Boys, Murda Ville, MV/HB, etc. — all were monikers for the same group.  X. Turner Vol. I at 11-14, 76-77; B. Marshall Vol. II at 7-8; D. Scott Vol. I at 12, 26-27.  While the various names may have been adopted by different generations or subsections of members, the group itself — and its common purpose of defending its exclusive territory to sell drugs — remained the same.

In <u>Boyle</u>, the Supreme Court recognized that an enterprise need not even have a name, let alone one that remains constant over the course of the enterprise's existence.  <u>Boyle</u>, 556 U.S. at 948.  Accordingly, the Court rejects Defendants' argument that the various names — many of

9

which were related to the territory in which Defendants sold drugs — necessitates a finding that no such enterprise existed.

### 3. Conduct/Relationships Over Time

Defendants next contend that the evidence was insufficient to establish the existence of a cohesive enterprise, because there was testimony of "internal warfare" within the group.  Defs. Br. at 9.  In particular, Defendants highlight testimony by Xavier Turner, a former member, that the conduct and relationships among "residents of the area who used the[] [above] names changed dramatically at least as early as January 30, 2005, when Matthew Oldham was killed by Charles Orr."  Id.

As the Government highlights, however, the presence of internal disputes within an alleged enterprise does not require a finding that no such enterprise existed, or that the enterprise ceased to exist as of the date of the dispute.  See United States v. Fernandez, 388 F.3d 1199, 1222-1223 (9th Cir. 2004) ("The evidence presented at trial showed that despite the violent dispute between [internal] factions, members of the group still identified themselves as members or associates of [the group] . . . .  Despite the dispute between two factions within the organization, therefore, the evidence clearly established a single . . . enterprise."); United States v. Orena, 32 F.3d 704, 710-711 (2d Cir. 1994) (rejecting challenge to sufficiency of evidence regarding existence of enterprise based on internal fighting, and noting that "the eruption of [internal] conflict is not dispositive of the issue whether a single enterprise existed"); United States v. Batts, 171 F. App'x 977, 981 (4th Cir. 2006) ("Nor does internal competition prevent the gang from being an enterprise.").  Contrary to Defendants' assertions, the evidence and testimony at trial suggested that the group continued even after the internal fighting began, including (i) secret telephone recordings of some of the Defendants from jail identifying

10

themselves as members of the group, (ii) violent acts committed after January 2005 to protect the exclusive drug-selling territory, and (iii) fights in the jail between members of the group and members of their rival, T-Hood.

### 4. Role of Incarceration

Finally, Defendants argue that there was insufficient evidence of the enterprise as alleged, because various Defendants — i.e., individuals with "alleged significant roles or status in the group" — left because they were incarcerated. Defs. Br. at 9. Defendants offer no authority for their proposition that incarceration necessarily warrants a finding that the enterprise did not exist as alleged.

The Court has repeatedly rejected this argument in other decisions in this case, and does so again here. See, e.g., 7/2/2014 Op. and Order at 3 n.1. The incarceration of certain members does not preclude a finding that the enterprise existed as alleged. Indeed, case law establishes that an enterprise may continue even though some of its members are in jail, and the incarceration of a member does not necessarily terminate his or her involvement in the enterprise. United States v. Martinez, 430 F.3d 317, 327 (6th Cir. 2005); United States v. Robinson, 390 F.3d 853, 882 (6th Cir. 2004); see also United States v. Mauro, 80 F.3d 73, 77 (2d Cir. 1996) (defendant's incarceration did not end the operation); United States v. McArthur, No. 12-26, 2013 WL 3989674, at *3 (D. Minn. Aug. 2, 2013) (changes in structure and personnel, often because a member went to prison, did not require a finding that the group lost its identity as an enterprise). And the evidence at trial suggested that the enterprise was still ongoing over the course of this very litigation — let alone during the Defendants' various incarceration periods — including threatening conduct toward witnesses and a fight in the jail between members of the group and members of their rival, T-Hood.

Therefore, the Court rejects Defendants' argument that there is insufficient evidence of the existence of a continuing enterprise due to the Defendants' incarceration.

## B.  Relationship Between Acts of Racketeering and Enterprise

In a two-paragraph argument composed primarily of the applicable standards regarding the "relationship" prong of RICO, Defendants next claim that there was a "failure of proof of a necessary relationship of alleged acts of racketeering activity and the racketeering enterprise." Defs. Br. at 10.  Defendants argue that there is "no evidence that the alleged [VICAR] murders were 'enabled' by the racketeering enterprise described in the indictment."  Id.

The Government must show that alleged predicate racketeering acts are related to the illegal purposes of the enterprise.  United States v. Corrado, 227 F.3d 543, 554 (6th Cir. 2000). To satisfy this requirement, the Government "need not prove that the predicate acts were directly interrelated."  United States v. Lawson, 535 F.3d 434, 444 (6th Cir. 2008).  Rather, "the predicate acts must 'be connected to the affairs and operations of the criminal enterprise,'" id. (quoting Corrado, 227 F.3d at 554), meaning either that "'(1) the defendant was enabled to commit the offense solely by virtue of his position in the enterprise; or (2) the offense was related to the activities of the enterprise.'"  Id. (quoting Corrado, 227 F.3d at 554).

With respect to the predicate acts of drug sales by Defendants, the Court finds that the evidence, taken in the light most favorable to the Government, established that these acts could only be undertaken given the Defendants' affiliation with the enterprise.  There was substantial testimony at trial that individuals who were not affiliated with the enterprise were not permitted to sell drugs in the defined territory.  See X. Turner Vol. I at 94-96; D. Scott Vol. I at 24-25; J. Wilson at 6; R. Dudley Vol. I at 6-7; C. Orr at 146; E. Williams Vol. I at 9.  Further, the evidence revealed that members of the enterprise would assist each other with drug sales, such as

providing drugs when other members ran out, D. Scott Vol. II at 80-82; J. Wilson at 6; X. Turner Vol. I at 106-108, 110-111, and warning of police presence in the area, B. Marshall Vol. II at 14; D. Scott Vol. I at 40; X. Turner Vol. I at 110, 114. Accordingly, a reasonable juror could conclude that Defendants were enabled to make these sales in the territory given their affiliation with the group.

With respect to the VICAR counts, as described in more detail below, a reasonable juror could conclude that the evidence at trial revealed that these violent acts were an important part of the enterprise's activities, both for membership within the group and for how the group was viewed by outsiders. Within the group, there was testimony that members of the enterprise enhanced their reputation and gained respect through violent acts, particularly in retaliation for slights against group members. See X. Turner Vol. I at 33-34. For example, Roderick Dudley testified that he would respond to acts of disrespect so that the group "wouldn't see [him] as being soft or weak," R. Dudley Vol. II at 26, and Xavier Turner explained that members were expected to respond to acts of disrespect because, "if one person can do it, everybody think[s] they can do it," X. Turner Vol. I at 81. Witness testimony also reasonably supports the inference that members of the group understood that they should help each other in retaliating against acts of disrespect against other members. See X. Turner Vol. I at 56-58 (the group had a saying: "Murda Ville[,] a family, one bus[t] and we all bang"); see also id. at 24-25; 80-82; R. Dudley Vol. II at 72, 104; B. Marshall Vol. II at 29-30; D. Scott Vol. I at 25. See generally United States v. Martinez, 978 F. Supp. 2d 177, 190-191 (E.D.N.Y. 2013) (evidence that defendant committed an act of violence to punish someone who disrespected members of the enterprise sufficient to satisfy relatedness requirement).

As for how the group was viewed by outsiders, there was extensive testimony of the importance of violence to the enterprise to ensure that its exclusive selling territory remained protected from outsiders.  See X. Turner Vol. I at 94-96; R. Dudley Vol. I at 7; C. Orr at 146; see also R. Dudley Vol. II at 36-38; A. Golfin at 23-24.  Indeed, one former member — Xavier Turner — testified that it was important for the group to support members with retaliatory action so that people outside the group "wouldn't try nothing."  X. Turner Vol. I at 82.  Xavier Turner explained that some people used to refer to the area where the Howard Estates is located as the "soft side."  Id. at 75.  He further explained that drug sellers in the area had been getting robbed. Id. at 11, 132.  The group thus viewed building and maintaining a reputation for violence as important, so as to keep outside sellers away from the exclusive territory and to prevent those same outsiders from interfering with the group members' drug sales.  See id. at 75-76, 81-82; X. Turner Vol. II at 11-13.

Therefore, in addition to the reasons discussed in further detail below, the Court rejects Defendants' conclusory argument that the Government failed to satisfy the relatedness requirement.

## C.  RICO Motive for VICAR Counts

Defendants next claim that the Government failed to prove the necessary motive for each VICAR count.  Defs. Br. at 10-20.  The VICAR statute prohibits the commission of certain violent crimes — such as murder, assault with a dangerous weapon, etc. — "as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity."  18 U.S.C. § 1959(a).  To establish a VICAR violation, the Government is required to prove beyond a

14

reasonable doubt "(1) that the [o]rganization was a RICO enterprise, (2) that the enterprise was engaged in racketeering activity as defined in RICO, (3) that the defendant in question had a position in the enterprise, (4) that the defendant committed the alleged crime of violence, and (5) that his general purpose in doing so was to maintain or increase his position in the enterprise." United States v. Concepcion, 983 F.2d 369, 381 (2d Cir. 1992).

With respect to their arguments in this particular section, Defendants claim that there was insufficient evidence on the fifth element: that the "general purpose [of committing the violent act] was to maintain or increase [the defendant's] position in the racketeering enterprise." Defs. Br. at 10-20. Defendants go through each of the VICAR counts and explain why they believe there was a failure of proof on the VICAR motive for that count. Id. The Government counters that each VICAR count was supported by evidence that the act was committed, at least in part, for the purpose of maintaining or increasing a position in the enterprise. Gov't Resp. at 10-19.

Congress enacted VICAR to complement RICO and, as numerous courts have explained, "it intended VICAR, like RICO, 'to be liberally construed to effectuate its remedial purposes.'" United States v. Banks, 514 F.3d 959, 967 (9th Cir. 2008) (quoting Concepcion, 983 F.2d at 380-381). To that end, courts have found the VICAR-motive requirement of "maintaining or increasing [one's] position in an enterprise" satisfied if "the jury could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership." United States v. Dhinsa, 243 F.3d 635, 671 (2d Cir. 2001) (quotation marks and citation omitted). Similarly, "[v]iolent crimes to protect the enterprise's racketeering activities . . . generally satisfy the motive element." United States v. Barbeito, No. 09-00222, 2010 WL 2243878, at *18 (S.D. W.Va. June 3, 2010).

Although the Government must show an enterprise-related purpose, the Government is not "required to prove the defendant acted 'solely' or 'primarily' for a gang-related purpose." United States v. Hackett, 762 F.3d 493, 500 (6th Cir. 2014) (citing Banks, 514 F.3d at 965-966). There is no indication that "Congress intended for courts to busy themselves with ranking the reasons that a defendant had for committing the offense." Banks, 514 F.3d at 967 (alterations, quotation marks, and citation omitted). Therefore, a VICAR motive may still be established even if the defendant was motivated to commit the act, in part, out of a personal interest or motive. See, e.g., United States v. Kamahele, 748 F.3d 984, 1008-1009 (10th Cir. 2014).

However, the enterprise-related purpose in committing the act must be "more than merely incidental: It must be within [the defendant's] 'general' purpose, or, in the alternative, the violence committed must be in some way 'integral' to the defendant's membership in the" enterprise. Banks, 514 F.3d at 969. The Sixth Circuit has described this standard as requiring that maintaining or increasing the defendant's position in the racketeering enterprise be an "animating purpose" behind the violent act. See Hackett, 762 F.3d at 500. In Hackett, the Sixth Circuit relied on Banks, the established and oft-cited Ninth Circuit precedent on this issue, which explained the reasoning behind imposing such a requirement:

> We do not mean to say, however, that a defendant falls within the scope of VICAR if his desire to enhance or maintain his status in the organization had any role, no matter how incidental, in his decision to commit a violent act. To adopt such a broad interpretation would risk extending VICAR to any violent behavior by a gang member under the presumption that such individuals are always motivated, at least in part, by their desire to maintain their status within the gang; if the reach of this element were not cabined in some way, prosecutors might attempt to turn every spontaneous act or threat of violence by a gang member into a VICAR offense. . . . Otherwise, every traffic altercation or act of domestic violence, when committed by a gang member, could be prosecuted under VICAR as well.

\*          \*          \*

> By limiting the statute's scope to those cases in which the jury finds that one of the defendant's general purposes or dominant purposes was to enhance his status or that the violent act was committed "as an integral aspect" of gang membership, we ensure that the statute is given its full scope, without allowing it to be used to turn every criminal act by a gang member into a federal crime.

Banks, 514 F.3d at 968-970.

Therefore, using these standards, the Court will examine whether the Government sufficiently showed that (i) at least one of the purported purposes with respect to each VICAR count was to maintain or increase the Defendant's position in the enterprise, i.e, because it was expected of him by reason of his membership in the enterprise, or that he committed it in furtherance of his membership; and (ii) this purpose was the Defendant's "general" or "animating" purpose in committing the act, or that the act was integral to his membership in the enterprise.

### 1. Murder of Jonathan Parker

In the late 1990s, Eddie Williams sold drugs in the Howard Estates area. E. Williams Vol. I at 6. Xavier Turner and Charles Orr testified that Williams was a respected drug seller who supplied drugs and guns to some members of the group, and who appeared successful in his drug sales. X. Turner Vol. I at 129-134; C. Orr. at 70. Turner described Williams as one of his "main supplier[s]." X. Turner. Vol. I at 116.

In 1999, Jonathan Parker — also known as Jonas — robbed Williams of drugs and cash. E. Williams Vol. I at 7. Later that year, Parker also shot Williams. Id. at 7-8. The dispute between Williams and Parker continued into 2004. Id. at 13.

On July 17, 2004, Williams saw Parker in the neighborhood around the Howard Estates. Id. at 14. Williams quickly left the area. Id. at 14-15. Williams then spoke with Norwood and

asked if Norwood "want[ed] to get money," which Williams testified meant he was asking Norwood to kill Parker in exchange for money.  Id. at 15-16.  A few days later, Williams saw Norwood and gave him approximately $1,400.  Id. at 18.  At the time of the monetary exchange, Williams was aware that Parker had been killed.  Id. at 19.  Norwood later told Charles Orr that he had committed Parker's murder in exchange for money.  C. Orr at 69-70.

Williams testified that he asked Norwood to handle the killing because Norwood had a "reputation."  E. Williams at 16-17; see also T. Sondgeroth, 6/16/2014 (Rough Tr.) at 111 (testifying that Norwood told Agent Sondgeroth that Norwood knew he had a reputation for being violent).  Orr and Turner testified that members of the enterprise treated Norwood differently after the shooting because he was "more respected," i.e., "people wouldn't go against him or nothing."  C. Orr at 70-71; see also X. Turner Vol. II at 14.

The Court concludes that, taking the evidence in the light most favorable to the Government, a reasonable jury could conclude that the shooting of Jonathan Parker was both related to the enterprise and satisfied the VICAR-motive requirement.  Testimony at trial revealed that Williams, a person associated with the Howard Boys, see E. Williams Vol. I at 32, supplied drugs and weapons to members of the group and sold drugs in the area.  Indeed, Turner testified that Williams was one of his "main supplier[s]" between 2002 and 2010.  X. Turner Vol. I at 116; see also X. Turner, Vol. I at 129-134.[5]  Eddie Williams also testified that Parker had robbed him of drugs and money and shot him.  E. Williams Vol. I at 7-8.

While one of Norwood's motives may have been to obtain monetary compensation, a reasonable jury also could conclude that an animating purpose was to show others that

---

[5]  This undermines Norwood's argument that "Williams did not characterize himself as an 'important supplier' to the group, and neither did other witnesses."  Norwood Supp. Reply at 2 (Dkt. 703).  It also undermines Norwood's claim that the "shooting of Parker had nothing to do with the affairs of the alleged enterprise," id. at 3, because, as described above, the enterprise had a goal of protecting the exclusive territory from outside interference with their drug sales.

interfering with drug sales in the territory would not be tolerated, nor would threatening associates of the group. Indeed, testimony at trial showed that Norwood subsequently killed Omar Bashir over this same issue — the stealing of drugs. See C. Orr at 71-75; see also X. Turner Vol. II at 17-19. Norwood's acts are in line with extensive testimony at trial that group members used violent acts to dissuade people from interfering with the group and its defined territory. See, e.g., X. Turner Vol. II at 20 (members of the group were expected to respond with violence when their drugs were stolen); id. at 11-13; see also Concepcion, 983 F.2d at 382-383 (VICAR motive satisfied where a rational juror could find beyond a reasonable doubt that the defendant initiated violence in connection with protecting the group's narcotic business and selling locations); Cooper v. United States, 343 F. App'x 830, 832 (3d Cir. 2009) (finding VICAR motive satisfied where testimony established that "the group believed that the first victim posed a threat to all the members in the group," and, therefore, "a rational trier of fact could conclude beyond a reasonable doubt that [the defendant] would have lost standing in the group had he opted out of participating in the murder").

Moreover, the circumstances of Parker's shooting could lead a reasonable juror to conclude that part of Norwood's animating purpose in committing the crime was to enhance his reputation for violence. For example, the shooting was committed while it was still light out, on a neighborhood street, with other members of the enterprise nearby. Kamahele, 748 F.3d at 1008-1009 (noting that one factor supporting a VICAR motive is that the shooting was committed in broad daylight on a neighborhood street). Indeed, Orr testified that, soon after the shooting, he "heard through the streets" that Norwood had killed Parker — testimony from which a reasonable juror could infer that Norwood may have publicly committed the shooting to enhance his own reputation. C. Orr at 68-69; id. at 68 (testifying that Orr "heard [about the

shooting] like everybody else had heard").  In addition, the relatively small amount of money Norwood accepted for the shooting — $1,400 — could lead a reasonable juror to conclude that Norwood had another motive other than strict financial compensation.  See United States v. Whitten, 610 F.3d 168, 180 (2d Cir. 2010) ("Finally, given the modest expected yield from the robbery [i.e., $1,200], the jury may rationally have concluded that Wilson had an additional, non-pecuniary motive for committing such a crime.").  And although not dispositive, the fact that a reasonable jury could infer that Williams chose Norwood for his reputation for violence, as well as that members of the group viewed Norwood differently after the shooting, also support the inference that a general purpose in committing the act was, in part, to maintain or enhance Norwood's reputation in the group.  See United States v. Rubi-Gonzales, 311 F. App'x 483, 486 (2d Cir. 2009) (noting that, after the murder, "other [gang] members testified that [the defendant] started 'gaining more respect' within [the gang]"); United States v. Soler, No. 94-533, 1998 WL 167327, at *2 (S.D.N.Y. Apr. 9, 1998) ("The jury could reasonably infer that by killing Rosario, Soler would increase his personal reputation as someone not to be toyed with, someone who would deal ruthlessly with others, and thus increase his standing in the [gang].  In addition, Soler's action would increase the [gang's] reputation as an organization of people to be taken seriously . . . .").  Indeed, Xavier Turner testified about how being feared was important to the group, because it helped keep outside drug sellers and other threats to sales away.  X. Turner Vol. II at 11-13.

Furthermore, Norwood told Agent Sondgeroth that Norwood knew he had a reputation for being violent, and that was "just the way he carried himself on the streets."  T. Sondgeroth, 6/16/2014 (Rough Tr.) at 111.  To that end, Norwood described himself as having an enforcer or overseer role in the organization, sometimes having to try to calm down the younger members.

20

Id. at 110.  All of these facts combined could lead a reasonable jury to conclude beyond a reasonable doubt that one of Norwood's animating purposes in shooting Parker was to maintain or increase his position in the group, even if it was not his only, or even primary, purpose.

The Court is not persuaded by Norwood's reliance on United States v. Thai, 29 F.3d 785 (2d Cir. 1994) or United States v. Jones, 291 F. Supp. 2d 78 (D. Conn. 2003), as these cases are distinguishable.  As relevant to Norwood's argument here, the defendant in Thai was convicted of conspiracy to commit assault with a dangerous weapon due to the bombing of a restaurant. Thai, 29 F.3d at 817.  The Second Circuit found that the VICAR motive had not been satisfied for this bombing, because "there [was] no evidence from which the jury could conclude that [the defendant's] motive for wanting to bomb the [restaurant] was other than purely mercenary."  Id. at 818.  Indeed, the only testimony about the motive for this shooting came from a coconspirator, who said that the defendant specifically stated that he wanted to bomb the restaurant because "somebody offer[ed] him [a] big amount of money to do it," i.e., over $10,000.  Id.  The Second Circuit highlighted that "[t]here was no evidence . . . that the bombing was to be a response to any threat to the [alleged enterprise] or to [the defendant's] position as [the organization's] leader, nor any evidence that he thought that as a leader he would be expected to bomb the restaurant."  Id.

Here, on the other hand, the evidence revealed that Williams was associated with the enterprise, including by providing drugs and weapons to members, and that Parker — the victim of Norwood's shooting — had been causing problems for Williams.  There also was evidence that Norwood killed another individual for similar acts of drug robbery, and testimony about Norwood's reputation for violence both before and after the murder.  Further, the circumstances of the shooting — in daylight, in public, with other members of the enterprise close by and aware

21

— suggest that Norwood wanted it known that he committed the crime. Therefore, there was evidence here from which a reasonable juror could conclude that Norwood's agreement to kill Parker was undertaken, in part, in response to a threat to the organization and to enhance his reputation for violence. This is more than the mere "guesswork" at issue in Thai.

The same holds true with respect to Jones, 291 F. Supp. 2d at 87-88. In that case, the defendant murdered an individual who the defendant had heard had disrespected the defendant's girlfriend. In finding that the evidence was insufficient to support a VICAR conviction for this murder, the district court noted that the victim "was not affiliated with a drug-trafficking organization and did not pose a threat to Jones's drug-trafficking activities or the [e]nterprise's drug turf." Id. at 87. Here, on the other hand, a reasonable juror could conclude that Parker was a threat to both the group members' drug supply and their drug-selling activities, as shown by his robbing Williams of drugs and money while Williams was in the Howard Estates area. Furthermore, the district court in Jones highlighted that the victim's conduct was "not directed at [the defendant] and was not related to the drug-trafficking activities of [the defendant] or the [e]nterprise." Id. Parker's conduct, on the other hand, was arguably related to the enterprise's drug-trafficking activities, and was certainly directed at an associate of the group.

The Court finds the facts of this case similar to the facts underlying the recent decision in United States v. Mayes, Jr., No. 12-385, 2014 WL 3530862, at *8-9 (E.D.N.Y. July 10, 2014). In that case, the defendant was charged with a VICAR count based on his shooting of an individual with whom the defendant's "crew" had a dispute. The district court focused on a number of factors in concluding that the government had sufficiently shown a VICAR motive. First, the court noted that the fact that the defendant had told others about the murder "shed light on his motive for committing it." Id. at *8. Second, witnesses at trial testified that, as a result of

22

the murder, the defendant "gained respect from associates and rivals by making it known that he was willing to kill if provoked." Id.  Third, the district court emphasized the "significant evidence about the ways that members of drug trafficking organizations use violence to maintain or enhance their reputation." Id. at *9.  The court highlighted that, based on the testimony, "an act of violence can serve as a way for a younger member of a group to prove himself and rise to a higher level in an organization.  A reasonable juror could have drawn the inference that, by analogy, [the defendant] committed the . . . murder as a teenager in order to build his reputation among his group in East New York." Id.  In light of this evidence, the district court concluded that a reasonable jury could have found that the defendant committed the murder to increase his position in the enterprise.  Similar factors — i.e., telling others about the murder (and even committing it in daylight around other members of the enterprise), having the murder benefit his reputation, and the importance of violence to the enterprise and its members — are also at play here.

Therefore, the Court concludes that a reasonable juror could conclude beyond a reasonable doubt that the murder of Jonathan Parker was related to the enterprise, and that Norwood committed this murder, at least in part, to maintain or increase his position in the enterprise.

### 2.  Murder of Marion Hardy

On August 1, 2006, Marion Hardy went to get some money from his baby's mother's apartment in the Howard Estates.  M. Brown at 14.  While walking through the Howard Estates, he was approached by Jatimothy and Jonathan Walker and Sean Cunningham.  Id. at 16, 18-20.  Hardy and the Walker brothers got into a dispute; Hardy took off his jersey and "squared up," as if ready to fight.  Id. at 20; see also X. Turner Vol. II at 22-23.  Instead of fighting, Jatimothy

pulled out a gun and began shooting Hardy.  M. Brown at 20-22; <u>see</u> <u>also</u> X. Turner Vol. II at 22-24.  Jonathan Walker then "finished [Hardy] off" by shooting him some more.  M. Brown at 21-22; <u>see</u> <u>also</u> X. Turner Vol. II at 23-24.  Cunningham then kicked Hardy's body, and the three ran into Leon Gills's mother's apartment.  M. Brown at 23-24.

Roderick Dudley testified that, after the shooting, he was driving in a car with Jonathan Walker when Jonathan Walker told him about the shooting, including that Jatimothy Walker "shot first like the lower body and he [Jonathan Walker] shot up top to finish him."  R. Dudley Vol. II at 27.

Having reviewed the record, the Court concludes that a reasonable jury could find beyond a reasonable doubt that the Walker brothers committed this murder because they knew it was expected of them by virtue of their membership in the enterprise and/or in furtherance of that membership.  Witnesses at trial testified that members of the group were expected to respond to acts of disrespect — such as that by Marion Hardy — with acts of violence.  <u>See</u> X. Turner Vol. I at 75, 79-82.  In addition, members were expected to support one another with these violent retaliatory acts.  <u>See</u> X. Turner Vol. I at 56-58; 80-82; R. Dudley Vol. II at 72, 104; B. Marshall Vol. II at 29-30; D. Scott Vol. I at 25.  This was important to maintaining a reputation for violence, which helped prevent outsiders from thinking that they could sell drugs or cause problems in the group's exclusive territory.  X. Turner Vol. I at 81-82; X. Turner Vol. II at 11-13.  Committing acts of violence also helped enhance a member's reputation within the group. <u>See</u> X. Turner Vol. I at 33-34 (members got more respect either for how good they were at selling drugs or for their reputation for violence); R. Dudley Vol. II at 26 (testifying that he would respond to acts of disrespect so he would not be viewed by the group as weak); <u>see</u> <u>also</u> C. Orr at 70-71; X. Turner Vol. II at 14.

Furthermore, Jatimothy Walker described himself as "the boss" of the Howard Estates, Ex. 82, a reputation a reasonable jury could conclude he sought to enforce by shooting Marion Hardy upon being challenged in the heart of the group's territory. See United States v. Smith, 413 F.3d 1253, 1278 (10th Cir. 2005) (VICAR motive satisfied where members of the enterprise were expected to retaliate against acts of violence committed on fellow members, and members were expected to live up to their nicknames, such as "King") overruled on other grounds by United States v. Hutchinson, 573 F.3d 1011 (10th Cir. 2009).

Similarly, the fact that the Walker brothers committed this murder while other Howard Boys were present, and that Jonathan Walker bragged about it later to Roderick Dudley — a coconspirator of the enterprise — further supports a finding that at least one of the animating purposes behind this killing was to enhance or increase their position within the group. Whitten, 610 F.3d at 180 (bragging about violent acts suggests the defendant committed them to maintain or enhance his position in the group); Kamahele, 748 F.3d at 1008-1009 (fact that shooting was committed out in the open could be interpreted as trying to send a message to others); United States v. Wilson, 116 F.3d 1066, 1078-1079 (5th Cir. 1997) (VICAR motive satisfied based on testimony that members were expected to violently respond to disrespect) overruled on other grounds by United States v. Brown, 161 F.3d 256, 257 n.1 (5th Cir. 1998); Barbeito, 2010 WL 2243878, at *18 ("[T]he motive element of VICAR may be satisfied if it is demonstrated that committing an act of violence in response to a particular action by a third-party is expected or demanded of members and failure to commit the act would diminish a member's standing in the enterprise."); Banks, 514 F.3d at 970 (VICAR motive satisfied even if "the jury could reasonably infer no more than that Banks acted out of concern for his status in the eyes of his 'little homies' within the gang, or his reputation among other gang members generally").

In other words, taking the evidence in the light most favorable to the Government, a reasonable jury could conclude beyond a reasonable doubt that Jatimothy and Jonathan Walker murdered Marion Hardy "because [they] knew it was expected of [them] by reason of [their] membership in the enterprise or that [they] committed it in furtherance of that membership." Dhinsa, 243 F.3d at 671, and that this conduct was integral to their membership in the group. Accordingly, the Court rejects the Walker brothers' argument.

### 3.  Shooting at 10-11 Party Store

On March 17, 2009, Jonathan Wilson — a former member of the Howard Boys — went to visit his romantic interest, Crystal Williams, at her apartment. See J. Wilson at 5, 7-8. He was armed with a pistol, which he always had on him. Id. at 8-9. When he arrived, Williams's daughter told him that Williams was in her bedroom with another man. Id. at 9-10. Wilson moved the kids into the living room, took out his pistol, and entered the bedroom. Id. at 10. He found Williams in bed with Leon Gills. Id.

Wilson subsequently took Williams out of the bedroom and they got into a heated argument. Id. at 11. Wilson ran into Gills, who was mad and repeating that Wilson had "pull[ed] out a gun." Id. at 12. Gills subsequently left the apartment, and Wilson followed. Id. at 13. After leaving the complex, Wilson fired three to four shots in the air. Id. at 13-14. Gills later told Xavier Turner that he felt disrespected by Wilson and was going to "[l]ay law down." X. Turner Vol. II at 41.

Later that afternoon, a group of individuals, including Rodney Harden, were sitting in Maranda Barnes's van at the 10-11 Party Store. R. Harden Vol. I at 5. Jonathan Wilson often drove the van, although he was not in it at the 10-11 Party Store. J. Wilson at 14; R. Harden at 5-

6. Another car was parked next to the van at the store, facing the opposite direction. R. Harden Vol. I at 6.

Harden got out of the van, went into the store, and bought some candy. Id. at 6-7. The individual from the driver's seat of the neighboring car also exited the vehicle and went into the store. Id. Harden identified this individual at trial as FA — i.e., Markus Evans — a member of the Howard Boys. Id. at 11; see also X. Turner Vol. II at 43-44 (Xavier Turner saw video on the news of Markus Evans pulling up to the 10-11 store, going into the store, and then jumping into the passenger seat when he came back out); T. Sondgeroth, 6/26/2014 (Rough Tr.) at 167-168.

When Harden returned to the van, he noticed that a different individual was now sitting in the driver's seat of the neighboring car. This individual was "mugging" him, i.e., giving him an unfriendly stare. R. Harden Vol. I at 7-8. The individual — later identified as Gills — subsequently raised a gun and began shooting at the van, wounding the occupants inside the van, including Rodney Harden. Id. at 8-9; see also X. Turner Vol. II at 44 (noting that the surveillance video revealed Gills sitting in the driver's seat after Evans left, and Gills shooting at the van). Xavier Turner testified that the gun used in the shooting belonged to Markus Evans, the other individual in the car with Leon Gills. X. Turner Vol. II at 46.

In a phone call between Gills and Shawn Gardner a few weeks later, Gills told Gardner of the dispute between him and Jonathan Wilson, and that there "ain't no talking when we beefing, it's just choppers." See Ex. 350. Gills bragged about shooting "Wilson's boys" to Gardner.

Harden and Gills — though a mutual friend — subsequently had a conversation in which Gills apologized to Harden. R. Harden Vol. I at 14-16. Gills took responsibility for the shooting, but claimed that he had not meant to shoot Harden. Id. at 16. Gills told Harden that he had thought Jonathan Wilson was in the van at the time of the shooting. Id.; see also X. Turner

27

Vol. II at 43 (Gills told Xavier Turner that he "had did a shooting and he thought it was [Jonathan Wilson], but it wasn't [Jonathan Wilson]").

Although the dispute between Jonathan Wilson and Gills may have started as a purely personal matter, the Court finds that a reasonable jury could conclude that Gills's purpose in shooting at the van was animated by — although not based entirely on — a goal of maintaining or enhancing his reputation within the enterprise, as an integral part of his membership.  The evidence supports a finding that Gills committed the shooting because he felt disrespected by Jonathan Wilson pulling a gun on him, and Wilson's shooting into the air as he left the apartment.  X. Turner Vol. II at 41.  But Gills did not undertake his revenge in secrecy, or divorced from other members of the group.  Rather, Gills specifically told other group members how upset he was by Wilson's actions, that he was going to "[l]ay law down," and he bragged about the shooting after the fact, including boasting that there "ain't no talking when we beefing, it's just choppers," i.e., guns.  Id.; see also Ex. 350.  Gills also committed the shooting in broad daylight while in the car with Markus Evans — another member of the enterprise — and using Evans's gun.

As discussed earlier, there was extensive testimony that members of the group were expected to retaliate against perceived personal disrespect with acts of violence, and that this was necessary to avoid appearing "weak" or "soft" to other members and outsiders.  See X. Turner Vol. I at 33-34, 75, 81-82; X. Turner Vol. II at 11-13; R. Dudley Vol. II at 26.  To that end, unlike in Jones, 291 F. Supp. 2d at 88 — a case upon which Defendants heavily rely — the record here contains numerous instances of members of the enterprise committing acts of violence in response to perceived personal slights, including the murder of Marion Hardy and the attempted murders of Efrem Anderson and Dartanian Edwards.  See Jones, 291 F. Supp. 2d at 88

28

("The . . . record . . . is bereft of any incident, other than the [murder at issue], where [the defendant] or Enterprise members violently retaliated for a personal act of disrespect committed by an individual who did not pose a threat to the Enterprise's drug-related activities.").

Rather, this case is similar to United States v. Tipton, 90 F.3d 861, 890-891 (4th Cir. 1996). In that case, the defendants were convicted of killing one individual and wounding another for the purpose of maintaining or increasing their position in an enterprise engaged in racketeering activity. The defendants claimed the violent acts were undertaken due to a "purely personal grievance of [one of the defendants] against [one of the victims] for 'messing' with [the defendant's] girlfriend." Id. In rejecting this argument, the Fourth Circuit noted that "the jury properly could have inferred from the evidence of the enterprise's policies of mutual support, violent retaliatory action, and group expectations of its members that both [of the defendants] participated in the [acts] as an integral aspect of their membership in the enterprise and in furtherance of its policies." Id. at 891 (quotation marks and brackets omitted). In particular, the Fourth Circuit highlighted that, "although the evidence clearly established private revenge as [one defendant's] primary purpose, it also supported a finding that once [that defendant] had enlisted the aid of his fellow enterprise members in his behalf, he acted not only for himself but as a member of the enterprise in furthering its policies of retaliatory violence against any who sufficiently antagonized any of its members, and in order to maintain his position in it." Id. The same is true here.

Accordingly, the Court concludes that a reasonable jury could find the VICAR-motive requirement established for Gills's shooting at the van in public in broad daylight, even if his primary purpose was personal revenge. See Banks, 514 F.3d at 971-972 (evidence that defendant enlisted his "little homies" in the gang to help retaliate against act of disrespect

implied that what "motivated [the defendant] to repeatedly attack [the victim] could have been — or had become — more than a merely personal vendetta"); United States v. Gross, Jr., 199 F. App'x 219, 249 (4th Cir. 2006) (in rejecting argument that an assault was merely personal, finding it "significant that Gross Jr. enlisted members of the enterprise to assist him in locating and assaulting [the victim]"); Kamahele, 748 F.3d at 1008-1009 (rejecting argument that shooting in response to act of disrespect against gang member was purely personal, because (i) fellow gang members were enlisted to retaliate, (ii) the members wore gang insignia, and (iii) "the shooting was in broad daylight, suggesting that the shooters wanted the family and others to know that [the gang] was responsible"); Whitten, 610 F.3d at 180 (bragging about violent acts suggests the defendant committed them to maintain or enhance his position in the group). Moreover, the fact that Gills was ultimately mistaken about who was in the van does not undermine this motive. See Concepcion, 983 F.2d at 381 (VICAR motive can be established even if the person harmed is not the intended target).

Similarly, the Court concludes that RICO's relatedness prong has been satisfied. As discussed earlier, there was extensive testimony at trial that members were expected to retaliate against acts of violence and disrespect committed against both themselves and their coconspirators. See X. Turner Vol. I at 56-58 (the group had a saying: "Murda Ville[,] a family, one bus[t] and we all bang"); see also id. at 24-25, 80-82; R. Dudley Vol. II at 72, 104; B. Marshall Vol. II at 29-30; D. Scott Vol. I at 25. This was done to ensure that outsiders did not try to encroach upon their drug territory or create other problems for the group. See X. Turner Vol. II at 11-13; X. Turner Vol. I at 75. This reputation for violence — and the acts accompanying it — is thus connected to the affairs of the enterprise.

### 4.  Murder of Malachi Wilson

After the shooting at the 10-11 Party Store, Jonathan Wilson received a phone call from Gills. J. Wilson at 15. Gills told Wilson, "that shit was for you, that was for you, watch yo ass, watch yo back, I'm gone get you." Id. Wilson moved out of Flint after this threat. Id. at 20.

Wilson then received another phone call from Gills. Id. at 21. Gills told Wilson that if Gills "couldn't get [Jonathan Wilson], he'll get [his] brother" — Malachi Wilson — and that Gills "knew where [Jonathan Wilson] was at and where [his] brother stayed at off of Lippincott and if he couldn't get [Jonathan Wilson], then [Jonathan Wilson's] brother was gone go." Id.

Rodney Harden testified that he subsequently had a conversation with Leon Gills about Malachi Wilson. R. Harden Vol. II at 27. Harden testified that Gills told him that he (Gills) was with Ricco Holmes when Holmes received a phone call from Oldham and Shawn Gardner. Id. at 29-30. Holmes gave the phone to Gills, at which point Gardner and/or Oldham said that "they got Malachi" and wanted to know what Gills wanted them to do. Id. at 31; see also X Turner Vol. II at 47-48 (Gills told Xavier Turner that Gardner called him, said that Malachi Wilson was in the 12th lot, and asked what to do). Gills responded to "lay law down." R. Harden Vol. II at 31; X. Turner Vol. II at 48. Malachi Wilson was then shot dead in the road by Oldham.

Later, secret jailhouse recordings captured both Gills and Oldham discussing the Malachi Wilson shooting with Carvell Gordon — another coconspirator. See Exs. 366, 367. Oldham admitted to having shot Malachi Wilson. See Ex. 367; see also R. Dudley Vol. II at 5-6 (Oldham also told Dudley he shot Malachi Wilson). Gills told Gordon that he later told Malachi Wilson's child's mother to keep quiet about the shooting or he would "be at her doorstep." Ex. 366; see also Tiara Milhouse, 6/30/2014 (Rough Tr.) at 118-120.

The Court concludes that a reasonable jury could find that Oldham killed Malachi Wilson because he knew it was expected of him as a member of the enterprise and/or in furtherance of

that membership.  Jonathan Wilson testified that Gills called him and threatened to kill his brother, Malachi Wilson, if Jonathan Wilson did not return.  Oldham and Gardner — members of the enterprise — subsequently called Gills to ask what they should do with Malachi Wilson when they spotted him around the Howard Estates.  When Gills told them to "lay law down," Oldham responded by fatally shooting Malachi Wilson.

There was extensive testimony at trial that members retaliated against acts of personal disrespect with violence, and that members of the enterprise were expected to support one another with these retaliatory acts, i.e., "Murda Ville[,] a family, one bus[t] and we all bang." See X. Turner Vol. I at 56-58; see also id. at 24-25, 80-82; R. Dudley Vol. II at 72, 104; B. Marshall Vol. II at 29-30; D. Scott Vol. I at 25.  There also was testimony that members gained more respect among the group based on their reputation for violence.  See X. Turner Vol. I at 33-34.  Therefore, a reasonable jury could conclude that Oldham committed this act of violence as retaliation for the act of disrespect Jonathan Wilson committed against Gills, as described earlier, and that such retaliation was done to maintain or enhance his position within the enterprise, as an integral part of his membership in the group.  See United States v. Wilson, 579 F. App'x 338, 343 (6th Cir. 2014) ("[A] jury could find that Wilson shot Franklin because she was affiliated with the 'opposition' and because her boyfriend had threatened to shoot [another member's] girlfriend — for if a Crip 'disrespects, handle your business[.]'"); United States v. Kamahele, 748 F.3d 984, 1008-1009 (10th Cir. 2014) (upholding VICAR conviction against gang members who shot at a home of the family of an individual who had disrespected their fellow gang member); United States v. Tipton, 90 F.3d 861, 891 (4th Cir. 1996); United States v. Burden, 600 F.3d 204, 221 (2d Cir. 2010) (holding that, although "[p]ersonal beefs also may have been satisfied, . . . the evidence supported a finding that the defendants engaged in violent acts

32

because it was expected of them as a way of taking care of each other and as members of the Organization"); United States v. Cooper, 343 F. App'x 830, 832-833 (3d Cir. 2009) (holding that, "although [the defendant] had a personal motive to commit the second murder[,]" the VICAR motive was sufficiently established in light of evidence at trial that maintaining a reputation for violence — i.e., that "if people had a problem with you, they were going to have a problem with" senior members of the group — was important to the group).

### 5. Shooting of Charles Orr

Matthew Oldham (Johnathan Oldham's brother) and Charles Orr — both members of the Howard Boys — got into a dispute in 2005 because Orr had sex with Matthew Oldham's "girl." C. Orr at 75-76.  When Orr went to buy drugs from Matthew Oldham, Matthew Oldham "pulled a gun out on [Orr] and threatened to kill [him]."  Id. at 76.  Orr left and returned to an apartment, where his cousin — Defendant Norwood — gave him a gun.  Id. at 77.  When Orr ran into Matthew Oldham again, there was an exchange of gun fire and Orr shot and killed Matthew Oldham.  Id. at 78-79.  Shawn Gardner, who was with Matthew Oldham at the time, id. at 77, subsequently chased Orr, and shot him.  Id. at 79.  Orr left town thereafter.  Id. at 80.

In July 2009, after Orr returned, he was walking to his sister's house when he was shot again in broad daylight.  Id. at 81, 85.  Orr testified that he was shot many times, and that it "[f]elt like baseballs started hitting [him] in the" chest.  Id. at 82.  Orr further testified that, as he was falling, he looked into a nearby van and saw that "Leon Gills was driving and Shawn Gardner was shooting from the passenger seat."  Id. at 82-83.  Orr also said an unidentified person also was shooting from the backseat.  Id. at 83.  The van drove off around a curve.  Id. at 84.

A few weeks later, Gills was arrested by police as part of a felony traffic stop.  M. Ross at 6.  The officers found a loaded firearm in the seat pocket in front of Gills, as well as another matching magazine in his pocket.  Id. at 6-7.  Testimony and evidence at trial revealed that the firearm matched one of the guns used in the shooting of Charles Orr.  A. Carriveau at 14; see also Gills Br. at 3 (cm/ecf page) (conceding that, "several months after Mr. Orr was shot, he (Mr. Gills) was found to be in possession of one of the weapons that . . . [was] used in the shooting of Mr. Orr").

In addition to the relatedness and VICAR-motive arguments discussed below, Gills also asserts that there was insufficient evidence for a reasonable juror to find him guilty of aiding and abetting this attempted murder.  Gills Br. at 4-5 (cm/ecf pages).  Gills argues that because "no evidence was submitted at trial of any prior knowledge, on Mr. Gills' part, of any premeditated plan to shoot Orr, (by Mr. Gardner or anyone else)," no reasonable juror could conclude beyond a reasonable doubt that Gills was guilty of aiding and abetting attempted murder.  Id.

Reviewing the evidence and testimony provided during the Government's case in chief, the Court agrees that insufficient evidence exists that Gills actually shot Orr.  However, the Court concludes that sufficient evidence exists for a reasonable juror to find beyond a reasonable doubt that Gills aided and abetted this attempted murder.

To be found guilty of aiding and abetting, the Government needed to prove that: (i) the specific crime was committed; (ii) Gills helped to commit the crime, or encouraged someone else to commit the crime; and (iii) Gills intended to help commit or encourage the crime.  United States v. Haynes, 98 F. App'x 499, 504 (6th Cir. 2004) vacated on other grounds by 543 U.S. 1112 (2005).  An aider and abettor's state of mind may be inferred from all of the facts and circumstances, including a close association between the defendant and the principal, the

defendant's participation in the planning or execution of the crime, and evidence of flight after the crime." People v. Turner, 540 N.W.2d 728, 734 (Mich. Ct. App. 1995). Further, while "[m]ere presence . . . is insufficient to establish that a defendant aided and abetted in the commission of the offense[,] . . . a claim of mere presence is not a 'catch-all excuse' to defeat an inference of guilt beyond a reasonable doubt. In evaluating a 'mere presence' defense, a factfinder must distinguish, based upon the totality of the circumstances, between one who is merely present at the scene and one who is present with criminal culpability." Rodriguez v. McKee, No. 11-14903, 2014 WL 2199625, at *5 (E.D. Mich. May 27, 2014) (quotation marks and citations omitted).[6]

Here, Orr testified that he saw Gills driving the van. C. Orr at 82-83. Although Orr testified that Gardner and an unidentified person in the back of the van were the shooters, he also testified that the van kept driving off around a corner as Orr was running away. C. Orr at 83. Moreover, Gills was found to be in possession of one of the firearms used in the shooting a few weeks later.

From these facts, a reasonable juror could conclude that Gills encouraged and intended to encourage the shooting. Although there was a lack of evidence that Gills participated in any premeditated planning to kill Orr, a reasonable jury could infer that Gills became "present with criminal culpability" during the act. Rodriguez, 2014 WL 2199625, at *5. Testimony and evidence at trial established that Gills was close with Gardner — his cousin — and that Gills was driving the van from which Gardner and another individual were shooting. Further, there is no evidence that Gills attempted to help Orr. To the contrary, Orr's testimony suggested that the

---

[6]   The Sixth Circuit had suggested that courts may look to state law when reviewing a defendant's VICAR conviction. See Hackett, 762 F.3d at 501 (citing Ohio law on attempted murder). In any case, there does not appear to be any federal case law that contradicts these non-controversial principles.

van — in which Gills was the driver — drove away, thereby providing "evidence of flight after the crime" that can help establish criminal culpability. Turner, 540 N.W.2d at 734. Gills's driving of the van during the shooting also strongly supports an aiding-and-abetting theory, because it assured the shooters that there would be a means of escape, thereby encouraging them to continue with their crime. See Rodriguez, 2014 WL 2199625, at *5 (aiding and abetting encompasses situations where the aider and abettor provides silent "moral support" that is recognizable to, and relied up by, the principal). From these facts, when viewed in the light most favorable to the Government, a reasonable juror could conclude beyond a reasonable doubt that Gills aided and abetted the attempted murder.

The decision in Coleman v. Ludwick, No. 09-13842, 2010 WL 5015387, at *1 (E.D. Mich. Dec. 3, 2010), provides helpful guidance. In that case, two men entered a video store; one approached the counter and the other stood by the doorway. The man who approached the counter pulled a gun and demanded money; gunshots were then fired. Id. The petitioner, who was the man in the doorway, was convicted of first-degree felony murder under an aiding-and-abetting theory. Id. at *3. The Michigan Court of Appeals and the federal district court affirmed this conviction, finding that the petitioner had aided and abetted by, in part, holding the entryway door open, thereby facilitating his and his co-defendant's escape. Id. Similarly here, a reasonable jury could conclude that by driving the van when the shots were fired, Gills facilitated the crime by providing the shooters with confidence regarding a means of escape.

Similarly, in People v. Nelson, No. 281567, 2010 WL 785925, at *1 (Mich. Ct. App. March 9, 2010), the Michigan Court of Appeals affirmed the conviction of a defendant found guilty of aiding and abetting in a shooting. In that case, the defendant had been seen driving the vehicle and the co-defendant had shot at the victims using an AK-47 assault rifle. In affirming

36

the conviction, the Michigan Court of Appeals highlighted that (i) the defendant was the driver of the vehicle from which shots were fired; (ii) an AK-47 assault rifle is a larger weapon that is not easily concealed, and (iii) the vehicle was positioned for a clear shot and an easy escape.  Id. at *2; see also People v. Gordon, No. 302799, 2012 WL 1890149, at *2 (Mich. Ct. App. May 22, 2012) (fact that defendant helped the shooter flee the scene — and thus was guilty of aiding and abetting — could be inferred by "the fact that the murder weapon was transported away from the scene of the murder in the car defendant was driving"); People v. Clark, No. 316546, 2015 WL 248659, at *10 (Mich. Ct. App. Jan. 20, 2015) ("Defendant's intent can be inferred from his close association [with the carjacker], . . . and his participation in driving away the vehicle in which they had arrived.  Defendant's driving away, or flight after the incident, is further evidence of his intent."); People v. Riley, 659 N.W.2d 611, 614 (Mich. 2003) (although defendant may not have had knowledge of co-defendant's intent to kill before the strangulation occurred, "defendant performed acts that assisted the commission of the murder," including lying to a neighbor that the victim was not home, which possibly "precluded the provision of medical assistance to the victim while he was still alive, hampered detection of the murder, or facilitated defendant and [the murderer's] escape").

Although not relevant for his initial motion for judgment of acquittal, the Court notes that Gills's testimony at trial provides further evidence of an intent to encourage the shooting that is pertinent to Gills's renewed motion.  See Fed. R. Crim. P. 29(b) ("If the court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved.").  Gills testified that, before shooting, Gardner stated, "[O]h shit, there go that bitch ass nigga that killed [Matthew Oldham]."  Gills, 7/14/2014 (Rough Tr.) at 97.  Gills also testified that as he drove the van away from the scene, Gardner continued firing at Orr.  Id. at 99-100, 104.  Gills

ultimately drove Gardner back to the south side of Flint, where he dropped Gardner off.  Id. at 103.  Viewed in the light most favorable to the Government — including the fact that Gills continued driving the van while the shooting continued — a reasonable jury could conclude beyond a reasonable doubt that Gills — as the driver of the van — intended to encourage or assist with the commission of the crime.

The Court also finds that a reasonable jury could conclude beyond a reasonable doubt that Gills intended to encourage or assist with the shooting to maintain or increase his position in the enterprise as an integral aspect of his membership, and that the shooting was related to the enterprise.  Taking the evidence in the light most favorable to the Government, Orr — a former member of the enterprise — shot Matthew Oldham — another member of the enterprise.  When Matthew Oldham died, Shawn Gardner — another member of the enterprise — took it upon himself to avenge Matthew Oldham's death, an understanding shared by members of the group.  See X. Turner Vol. I at 56-58 (the group had a saying: "Murda Ville[,] a family, one bus[t] and we all bang"); see also id. at 24-25; 80-82; R. Dudley Vol. II at 72, 104; B. Marshall Vol. II at 29-30; D. Scott Vol. I at 25.  A reasonable jury could conclude that Gills, in turn, took it upon himself to assist Gardner, because Gills knew it was expected of him by reason of his membership in the enterprise or in furtherance of that membership.  Dhinsa, 243 F.3d at 671.  In other words, Gills may have feared that failing to assist with the shooting by driving the vehicle as a means of escape could lead to members of the group viewing him as soft or weak.  See R. Dudley Vol. II at 26; see also Cooper, 343 F. App'x at 832 ("Since members of [the enterprise] were bound together by a code of loyalty, . . . a rational trier of fact could conclude beyond a reasonable doubt that [the defendant] would have lost standing in the group had he opted out of participating in the murder" of a threat to the group.); Gross, Jr., 199 F. App'x at 234 (VICAR

motive satisfied even though violent act was taken against former member of the enterprise); United States v. Krasniqi, 555 F. App'x 14, 17-18 (2d Cir. 2014) (same).

Indeed, Gills himself employed other members of the group to help him retaliate violently against personal slights he had experienced, thereby suggesting that he viewed this as an important part of membership in the enterprise.  See Shooting at 10-11 Party Store and Murder of Malachi Wilson, supra.  And one of his nicknames, "Gunman," further supports that he may have assisted with the retaliatory shooting to maintain or increase his status in the group. See United States v. Smith, 413 F.3d 1253, 1278 (10th Cir. 2005) overruled on other grounds by United States v. Hutchinson, 573 F.3d 1011 (10th Cir. 2009).

Similarly, a reasonable jury could find beyond a reasonable doubt that the offense was related to the activities of the enterprise.  United States v. Lawson, 535 F.3d 434, 444 (6th Cir. 2008).  The shooting was revenge for the death of a member of the group, Matthew Oldham.  As described above, there was testimony at trial that it was important for members to adopt the grievances of other members, including committing violent acts in retaliation.  This "one bus[t] and we all bang" mindset was important to the enterprise's reputation for violence, which allowed them to protect their exclusive drug-selling territory from outside sellers and threats. See X. Turner Vol. II at 11-13; X. Turner Vol. I at 56-57, 75-76 (reputation for violence important to eliminate reputation that the area was the "soft side"); 81-83.

Accordingly, the Court rejects Gills's argument that there was insufficient evidence to support a jury finding that: (i) he aided and abetted the shooting of Charles Orr; (ii) he had the requisite VICAR motive; and (iii) the shooting was related to the enterprise.

**6. Shooting of Alonzo Golfin**

On February 7, 2010, Alonzo Golfin — an individual from Atherton Terrace, the base for the Howard Boys's rival gang — was shot ten times while in the parking lot of the Arbor Village apartments, which is located in the Howard Boys's territory.  R. Dudley Vol. II at 35-38; A. Golfin at 5, 17-18, 20-21, 33.   According to testimony at trial, Jonathan Walker admitted responsibility for the shooting.  R. Dudley Vol. II at 37-38.  Roderick Dudley testified that Jonathan Walker told him that Jonathan Walker had gotten into an altercation with "one of them Terrace boys," i.e., Golfin, about "hustling," which means selling drugs.  Id.  Dudley stated that Walker said that he left the area, grabbed a gun from Malcolm Evans — another member of the enterprise — and went back and shot Golfin ten times.  Id.  According to Dudley, guys from the Terrace were forbidden from selling drugs at the Arbor Village apartments.  Id.  Indeed, although Jonathan Walker blamed Malcolm Evans for the shooting when speaking with Sergeant Angus, Jonathan Walker purportedly told Sergeant Angus that the shooting was committed because "[t]hat was the area that the Howard Boys sold their drugs, one of the areas and that someone from the Terrace was not allowed to do that."  Angus Vol. I at 14-15.

Defendants, relying solely on Jonathan Walker's statement blaming Evans, speculate that the shooting was simply some "unknown personal conflict" between Malcolm Evans and Golfin. Defs. Br. at 17-18.[7]  However, considering all of the evidence and taking it in the light most favorable to the Government, a reasonable jury could conclude that Jonathan Walker shot Alonzo Golfin because Jonathan Walker believed Golfin — an individual from outside the Howard Estates area, and, indeed, from the rival gang's neighborhood — was selling drugs inside the enterprise's defined territory.  The jury also could conclude that, although Jonathan

---

[7]  Defendants claim that, according to the testimony, Evans "did not make any reference to what Golfin was doing, and did not say what motivated him," presumably asserting that the jury could not infer that the conduct was motivated by, or related to, the enterprise.  However, Sergeant Angus specifically testified that Jonathan Walker indicated that Evans said that "the individual from [the] terrace [i.e., Golfin] was over in the Arbor Village selling drugs."  Angus Vol. I at 15.

Walker lied to Sergeant Angus about who committed the shooting so as to escape blame, he told the truth about why the shooting was committed. In other words, a reasonable jury could conclude that Jonathan Walker shot Golfin as part of the enterprise's purpose of protecting the defined territory from outside drug sellers and, in particular, rival gang members. See A. Golfin at 23-24; R. Dudley Vol. II at 36-38; X. Turner Vol. I at 94-96; R. Dudley Vol. I at 7-8; C. Orr at 146. Further, in light of the fact that he told Dudley of having shot Golfin after it occurred, a reasonable jury could conclude that Jonathan Walker viewed this act as helping his reputation in the group, as an integral part of his membership. This certainly satisfies the relatedness and VICAR-motive requirements. See United States v. Jones, 291 F. Supp. 2d 78, 86-87 (D. Conn. 2003) (collecting cases holding that violent acts committed over disputes about drug-selling territory satisfy VICAR's motive requirement).

### 7. Shooting of Efrem Anderson

In February 2010, Leon Gills was shot in the foot by a member of the Drifters Motorcycle Club. See Exs. 525, 367. The next night, Johnathan Oldham went to a party at the Boogie Down Motorcycle club to, as he put it during a secret jailhouse recording, "get [him] a Drifter nigga." Ex. 367. Oldham told Carvell Gordon — a coconspirator who pled guilty before trial — that he had been "gunnin' for all Drifters." Id.

According to the testimony at trial, a dispute occurred at the club, resulting in some people getting kicked out. M. Dye at 83-84; O. Perry at 94-95. The removed individuals were followed by Efrem Anderson, who had visible a .45 caliber pistol and possibly racked it. E. Anderson at 69-71; M. Dye at 89; O. Perry at 96. The testimony revealed that Oldham subsequently obtained a gun from Markus Dye, returned to the club, and fired several shots at Anderson. M. Dye at 85-86; O. Perry at 97-98; see also Ex. 367. Oldham later told Gordon that

41

he shot Anderson because Oldham thought he was a Drifter — in retaliation for the shooting of Gills — as well as because of Anderson pulling a gun on them. Ex. 367; see O. Perry at 98.

The Court finds that, taking the evidence in the light most favorable to the Government, a reasonable jury could conclude that this shooting was both related to the enterprise, and satisfied VICAR's motive requirement. With regard to relatedness, as described above, testimony at trial revealed that members retaliated against acts of violence and disrespect committed against both themselves and their coconspirators to protect their exclusive territory. Indeed, in light of the fact that Oldham proudly told Gordon that the Drifters called a truce following Anderson's shooting, see Ex. 367, a reasonable jury could conclude that the shooting of Anderson was intended to send a message that affronts against the Howard Boys would result in violent retaliation. And as explained earlier, violence was important to the enterprise for protecting its exclusive drug-selling territory from outside threats. This reputation for violence — and the acts accompanying it — are thus connected to the affairs of the enterprise.

Similarly, a rational trier of fact could conclude that at least one of the animating purposes behind the shooting of Efrem Anderson was to maintain or increase Johnathan Oldham's status in the enterprise. Oldham told others of his involvement in the shooting — including Carvell Gordon. Further, Oldham committed the shooting in public and in front of Jonathan Walker, suggesting that he wanted people — including members of the enterprise — to know of his violent act. In addition, Oldham expressly bragged to Gordon that the shooting was a result of his desire to "get [him] a Drifter nigga" in retaliation for the shooting of Gills a few days earlier. See Ex. 367. And, as described earlier, members of the enterprise adopted each other's grievances, sought to promote their violent reputation, and earned respect among other members based on their violent reputation.

Accordingly, taking the evidence in the light most favorable to the Government, the Court concludes that sufficient evidence exists for a reasonable jury to conclude beyond a reasonable doubt that the VICAR-motive requirement had been satisfied.  See United States v. Tipton, 90 F.3d 861, 891 (4th Cir. 1996) ("[A]lthough the evidence clearly established private revenge as his primary purpose, it also supported a finding that once [the defendant] had enlisted the aid of his fellow enterprise members in his behalf, he acted not only for himself but as a member of the enterprise in furthering its policies of retaliatory violence against any who sufficiently antagonized any of its members, and in order to maintain his position in it."); see also United States v. Barbeito, No. 09-00222, 2010 WL 2243878, at *18 (S.D. W. Va. June 3, 2010) ("[T]he motive element of VICAR may be satisfied if it is demonstrated that committing an act of violence in response to a particular action by a third-party is expected or demanded of members and failure to commit the act would diminish a member's standing in the enterprise."); United States v. Martinez, 978 F. Supp. 2d 177, 192 (E.D.N.Y. 2013) (noting that the defendant wanted to make others in the gang aware of his crime, and concluding that, "[e]ven if [the defendant] were motivated primarily or in part by a desire for personal revenge, the fact that he viewed [the victim's] actions as an affront to the gang . . . and enlisted fellow [gang] members to carry out the murder . . . demonstrates that he was acting, at least in part, for the gang in furthering its policies of retaliatory violence . . . and in order to maintain his position in it" (quotation marks and citations omitted)); United States v. Banks, 514 F.3d 959, 971-972 (9th Cir. 2008).

## D.  Variance Between Indictment and Evidence

Defendants next claim that a fatal variance has occurred between the indictment and the evidence at trial.  Defs. Br. at 20-22.  "'A variance to the indictment occurs when the charging

43

terms of the indictment are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment." United States v. Adams, 722 F.3d 788, 805 (6th Cir. 2013) (quoting United States v. Caver, 470 F.3d 220, 235 (6th Cir. 2006)). The Sixth Circuit has held that, "[i]n conspiracy cases, 'a variance constitutes reversible error only if . . . the indictment alleged one conspiracy, but the evidence can reasonably be construed only as supporting a finding of multiple conspiracies.'" Id. at 805-806 (alterations and emphasis in original) (quoting Caver, 470 F.3d at 235). "[W]hether single or multiple conspiracies have been shown is usually a question of fact to be resolved by the jury," and the principal considerations include "the existence of a common goal, the nature of the scheme, and the overlapping participants in various dealings." Id. (quotation marks and citations omitted).

"The concept of variance is designed to prevent the prosecution from convicting the defendant of a different offense, not a lesser variation on the charged offense." United States v. Solorio, 337 F.3d 580, 590 (6th Cir. 2003) (citation omitted). It is a "'theory of error often raised but seldom seen.'" United States v. Parlier, 570 F. App'x 509, 514 (6th Cir. 2014) (quoting United States v. Williams, 612 F.3d 417, 423 (6th Cir. 2010)).

Focusing on the differing names, internal fighting, and membership changes over time, Defendants argue that "it is clear there were multiple enterprises or conspiracies, not the overarching single one alleged in the indictment." Defs. Br. at 22. Defendants assert that they were prejudiced by this variance, because it permitted the admission of evidence of numerous violent acts, rap songs, and admissions by co-Defendants on the premise that there was a single racketeering enterprise. Id.

Defendants' arguments are a rehash of those raised above — i.e., that the name changes, internal conflict, and generational groupings revealed fundamental changes in associations,

thereby suggesting multiple enterprises and conspiracies. Id. at 21-22. With respect to the name changes, however, witnesses testified at trial that the names all referred to the same group of geographically-based individuals who protected the same defined territory from outside drug sellers. See X. Turner Vol. I at 11-14, 76-78; B. Marshall Vol. II at 8; D. Scott Vol. I at 12, 26-27. The indictment alleged that the group's names, territorial boundaries, and purposes were defined by the geographic proximity to the Howard Estates public housing complex and Howard Avenue, which the evidence at trial supported. Am. First Superseding Indictment ¶ 9. Moreover, the indictment specifically charged that the name of the enterprise changed over time based on its generational makeup. See id. ("The Howard Boys maintained and controlled this territory, such that, within the territory they and their associates conducted drug and weapons sales with impunity. Originally the members of the enterprise referred to themselves as the 'Hot Boys' or 'HB's.' A later and younger generation of Howard Boys members began referring to themselves as 'Murda Ville' or 'MV's.' Today members identify themselves as Howard Boys, Hot Boys, or 'MV-HB's, and their territory as "Murda Ville," "Howard Block," or "The Bricks."); see also id. ¶ 1 (charging Defendants with being "members and associates of a criminal organization on the south side of Flint, Michigan, known as the Howard Boys (HB), also known as (a.k.a.) Hot Boys (HB), a.k.a. Howard Block (HB), a.k.a. Murda Ville (MV)"). Therefore, the evidence at trial did not "prove[] facts materially different from those alleged in the indictment." Adams, 722 F.3d at 805; see also United States v. Wilson, 168 F.3d 916, 924 (6th Cir. 1999) (holding that the "mere fact that a conspiracy can be subdivided . . . does not mean that multiple conspiracies existed," because, as long as "the different sub-groups are committing acts in furtherance of one overall plan, the jury can still find a single, continuing conspiracy").

As for Defendants' claim that internal strife resulted in a "fundamental change in associations" after the shooting of Matthew Oldham, the Court concludes that this did not result in a variance. Although the internal strife suggests that certain members, such as Charles Orr, were subsequently targeted by other members of the group, this does not mean the underlying enterprise ceased to exist. Rather, the Government introduced sufficient evidence that the enterprise continued to maintain its common purpose even after these events — to protect its defined territory from outside drug sellers and rivals through threats and acts of violence. This is sufficient. See Adams, 722 F.3d at 806 (holding that no variance occurred because, "[a]lthough defendants are correct that the evidence showed competing factions within the conspiracy," this did not undermine the "common goal" for the conspiracy); Wilson, 168 F.3d at 924 ("The parties are not always identical, but this does not mean that there are separate conspiracies.").

The Court thus concludes that a reasonable jury could find that one enterprise with a common goal existed — as alleged in the indictment. In other words, the Court does not agree that the evidence, considered in the light most favorable to the Government, can be construed "only as supporting a finding of multiple conspiracies." Adams, 722 F.3d at 805-806 (emphasis in original). It was, therefore, appropriate to leave the question of single-versus-multiple conspiracies to the jury. Defendants' argument regarding a fatal variance is rejected.

## E. Substantial Effect on Interstate Commerce

Defendants last argue that the Government failed to prove that the alleged racketeering enterprise had a substantial effect on commerce. Defs. Br. at 22-24. Citing the Sixth Circuit's decision in Waucaush v. United States, 380 F.3d 251, 255 (6th Cir. 2004) and Judge Edmunds's decision in United States v. Garcia, 143 F. Supp. 2d 791, 812 (E.D. Mich. 2000), Defendants claim that the "drugs and gun sales [in this case] were carried out by individuals, not a so-called

46

'Howard Boys' racketeering enterprise.  The function of the racketeering enterprise, if there was one, was to intimidate and protect boundaries.  None of its purposes were economic."  Id. at 23-24.

The Court previously considered this same argument with respect to the language of the jury instructions and rejected it then:

> In order to convict a defendant under the RICO statute, 18 U.S.C. §§ 1962(c) & (d), the Government generally needs to prove "that the enterprise's racketeering activities had a de minimis connection with interstate commerce."  United States v. Gardiner, 463 F.3d 445, 458 (6th Cir. 2006).  It is well-established that drug dealing is quintessential economic activity.  United States v. Tucker, 90 F.3d 1135, 1140 (6th Cir. 1996).  The Sixth Circuit has also held that possession of a firearm that traveled through interstate commerce affects interstate commerce.  United States v. Chesney, 86 F.3d 564, 572 (6th Cir. 1992).  However, if an enterprise engages only in violence, that activity is non-economic.  Waucaush, 380 F.3d at 256.  In such instances, there must be evidence that the activity had a substantial effect on interstate commerce.  Id.
>
> Here, . . . [a]t trial, there was evidence that the alleged enterprise trafficked drugs, which is economic activity that has effects on interstate commerce. . . . [T]he indictment in Waucaush alleged only violent acts and there was no evidence of any economic enterprise.  See Waucaush, 380 F.3d at 253 (indictment only alleged that gang protected their turf through murder and attempted murders).  Regarding Defendants' argument about the lack of a common pot of money or group economic activity, this did not comport with the expansive definition of enterprise, which may be a loose affiliation of individuals that act as a "continuing unit that functions with a common purpose."  Boyle, 556 U.S. at 946.  Furthermore, there was evidence that Defendants shared firearms, drug clients, drugs/product, and cash, i.e., the numerous "five-off-the-dub" transactions.

7/22/2014 Op. and Order at 9-10 (Dkt. 706).

As that decision makes clear, despite Defendants' protestations, there was sufficient evidence from which a jury could conclude that the enterprise trafficked in drugs, even if members did not pool profits.  For example, witnesses testified that members of the group would

warn each other about police presence or the presence of rival gang members, D. Scott Vol. I at 40, split drugs and customers in "five-off-the-dub" transactions, X. Turner Vol. I at 106-108, D. Scott Vol. II at 81, take turns selling, X. Turner Vol. I at 114, and, at times, lend drugs to each other, id. at 110-111.  Furthermore, testimony at trial revealed that members of the enterprise worked together to protect their exclusive drug-selling territory through threats and acts of violence, X. Turner Vol. I at 75, 93-94, and that outsiders were not permitted to sell drugs in the area, E. Williams Vol. I at 9; D. Scott Vol. I at 24, 40; X. Turner Vol. I at 95.  To that end, guns were shared among members for their use and protection.  X. Turner Vol. I at 102, 132; X. Turner Vol. II at 24-25; B. Marshall Vol. II at 15.

In short, the evidence at trial showed more than a group that performed violent acts disconnected from any economic activity.  Rather, sufficient evidence existed to support the Government's claim that the enterprise worked to protect its exclusive territory in which group members and associates, and only those individuals, could sell drugs.  And some of these drug sales involved the assistance of, and sharing of drugs and money between, members.  Therefore, the Court finds that the Government sufficiently established at least a de minimis connection to interstate commerce; a substantial effect was not required.

## V.  CONCLUSION

For the foregoing reasons, the Court denies Defendants' motions for judgments of acquittal (Dkts. 687, 691).

SO ORDERED.


Dated:  May 13, 2015                          s/Mark A. Goldsmith
     Detroit, Michigan                    MARK A. GOLDSMITH
                                  United States District Judge

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on May 13, 2015.

s/Johnetta M. Curry-Williams
Case Manager