UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                              Plaintiff,                    HON. MARK A. GOLDSMITH
v.                                                          Case No. 12-CR-20287

D-1 ALEXANDRA L. NORWOOD,
D-2 JATIMOTHY E. WALKER,
D-3 JONATHAN E. WALKER,
D-4 JOHNATHAN L. OLDHAM, and
D-8 LEON GILLS,

                              Defendants.
_____/

## OPINION AND ORDER DENYING DEFENDANT NORWOOD'S MOTION FOR NEW TRIAL (Dkt. 744/762), DEFENDANT GILLS'S MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT, OR, IN THE ALTERNATIVE, FOR A NEW TRIAL (Dkt. 736), AND DEFENDANT JONATHAN WALKER'S MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT OR, IN THE ALTERNATIVE, FOR A NEW TRIAL (Dkt. 735), and REJECTING THE ARGUMENTS RAISED IN NORWOOD'S SUPPLEMENTAL BRIEF (Dkt. 732)[1]

### I. INTRODUCTION

Now before the Court are various post-trial motions filed by Defendants in this case:

Defendant Alexandra Norwood's Motion for New Trial (Dkts. 744/762),[2] Defendant Leon

---

[1] Norwood states in his supplemental brief that this filing — which raises brand new arguments — is a "supplement to the defendants' Motion and Incorporated Memorandum of Law for Judgment of Acquittal (R. 691)." Given that this supplemental brief was filed within the deadline set for post-trial briefing, as opposed to before the jury reached its verdict, the Court addresses the new arguments here, rather than in the Opinion and Order Denying Defendants' Motions for Judgments of Acquittal (Dkt. 785).

[2] This motion is joined by Jonathan Walker, see Notice of Joinder (Dkts. 739, 767), Leon Gills, see Notice of Joinder (Dkt. 748), and Johnathan Oldham, see Notice of Joinder (Dkt. 754) (claiming to be joining in Docket 733, which is not Norwood's Motion for New Trial, but titling the notice on the docket as joining "motion for new trial filed under seal," which the Court interprets as Docket 744/762). Jatimothy Walker also joined in Norwood's reply filed in support of this motion, but he did not join in the actual motion itself. See Notice of Joinder (Dkt. 758).

Gills's Motion for Judgment Notwithstanding the Verdict, or, in the Alternative, for a New Trial (Dkt. 736), and Defendant Jonathan Walker's Motion for Judgment Notwithstanding the Verdict or, in the Alternative, for a New Trial (Dkt. 735).[3]   Defendant Norwood also filed a Supplemental Brief in Support of Motion for Judgment of Acquittal (Dkt. 732).[4]   The Government filed a consolidated response to these filings (Dkt. 752), and Defendants Norwood and Gills filed replies (Dkts. 756 and 757, respectively).

The Court concludes that oral argument would not assist with resolution of the instant motions and the arguments raised in Norwood's supplemental brief.   See E.D. Mich. Local Criminal Rule 12.1; E.D. Mich. Local Rule 7.1(f)(2).   For the reasons described below, the Court denies the motions (Dkts. 744, 762, 735, 736) and rejects the arguments raised in Norwood's supplemental brief (Dkt. 732).

## II.  BACKGROUND

The facts of this case have been fully set forth in the numerous decisions issued in this case, and need not be repeated in full here.   For an extensive summary of the facts, see the following Opinions and Orders:   United States v. Norwood, No. 12-20287, 2013 WL 5965328 (E.D. Mich. Nov. 8, 2013) (regarding Norwood's motion to dismiss); Memorandum Opinion

---

[3] This motion is joined by Jatimothy Walker.  See Notice of Joinder (Dkt. 737).  It is also joined by Leon Gills (Dkt. 741), although the grounds for such joinder are unclear, given that part of the motion focuses on the purported harmful effects of Gills testifying at trial.

[4] This supplemental brief is joined by Jatimothy Walker as to Count Three: the murder of Marion Hardy.  See Notice of Joinder (Dkt. 734).  It is also joined by Johnathan Oldham, Jonathan Walker, and Leon Gills, although it is unclear on what grounds, given that these Defendants were not charged with Count Two — the focus of Norwood's supplemental brief — and the notices of joinder do not specify the particular grounds upon which the Defendants join.  See Notice of Joinder (Dkt. 738); Notice of Joinder (Dkt. 739); Notice of Joinder (Dkt. 740); Notice of Joinder (Dkt. 767).

Granting the Government's Motion for the Admission of Coconspirator Statements (Dkt. 784);

and Opinion and Order Denying Defendants' Motions for Judgments of Acquittal (Dkt. 785).

To the extent there are particular facts relevant to a specific argument raised in the instant

motions, the Court will discuss those facts in detail in the relevant sections below.  For ease of

reference, however, the Court provides a brief factual overview of the case:

> The Howard Boys — also known as Hot Boys, Murda Ville, MV,
> Howard Estate Hustlers, 858, and MV/HB — were a neighborhood
> street gang based out of the Howard Estates, a public housing
> complex in Flint, Michigan.  Members identified themselves and
> the gang through various hand signs, tattoos, graffiti, rap lyrics,
> and photographs on social networking websites.
>
> Members of the Howard Boys sold drugs within what they
> believed to be their exclusive territory; outsiders were not
> permitted to sell drugs within these boundaries.  To enforce this
> rule, members committed acts of violence against those whom they
> perceived to be wrongfully selling in their territory.  They also
> committed acts of violence against people who they believed had
> disrespected them and against members of a rival neighborhood
> gang, T-Hood.  Howard Boys members were expected to retaliate
> against slights with acts of violence, and members supported one
> another with these violent acts.  According to one former member,
> committing retaliatory violent acts was important for maintaining a
> reputation for violence so as to dissuade others from trying to
> interfere with the Howard Boys and their drug-selling territory.
> Violence also served as a way for members to garner respect from
> other members.
>
> Although members of the Howard Boys did not generally
> pool their profits from individual members' drug selling, they did
> assist each other with sales and protecting the selling territory.  For
> example, members would warn others about police or a rival
> gang's presence in the area, take turns selling, and sometimes share
> sales in "five off the dub" transactions — a deal in which one
> individual provides drugs to another individual who has a
> customer, in exchange for a portion of the sale proceeds.
>
> Before trial, six coconspirators pled guilty to racketeering
> conspiracy due to their association with the Howard Boys.  At trial,
> five of the remaining Defendants — Norwood, Jatimothy Walker,
> Jonathan Walker, Oldham, and Gills —were convicted of

> racketeering conspiracy. One Defendant, Jamil Cureton, was acquitted of this charge. The jury also convicted Norwood, Jatimothy Walker, Jonathan Walker, Oldham, and Gills of various other crimes, including murder in aid of racketeering (Norwood, Jatimothy Walker, Jonathan Walker, and Oldham), attempted murder in aid of racketeering (Jonathan Walker, Oldham, and Gills), use and discharge of a firearm during and in relation to a crime of violence (Jonathan Walker, Oldham, and Gills), distribution of cocaine base (Oldham), possession of a firearm with an obliterated serial number (Oldham), possession of an unregistered firearm (Oldham), and dealing in firearms without a license (Oldham). The jury acquitted Gills of one count of use and discharge of a firearm during and in relation to a crime of violence, relating to the attempted murder of Charles Orr.

Op. and Order Denying Defendants' Motions for Judgments of Acquittal at 2-4.

Defendants subsequently filed the instant post-trial motions, pursuant to Federal Rules of Criminal Procedure 29(c) and 33.

### III.  RULE 29 AND RULE 33 STANDARDS

The standards for deciding a motion brought pursuant to Rule 29 are clear:

> When considering a Rule 29 motion for a judgment of acquittal, the Court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Humphrey, 279 F.3d 372, 378 (6th Cir. 2002) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original)). "Circumstantial evidence alone, if substantial and competent, may support a verdict and need not remove every reasonable hypothesis except that of guilt." Id. (quoting United States v. Keeton, 101 F.3d 48, 52 (6th Cir. 1996)). Furthermore, the Court must "draw all available inferences and resolve all issues of credibility in favor of the jury's verdict." United States v. Salgado, 250 F.3d 438, 446 (6th Cir. 2001). The granting of a motion to acquit should be "confined to cases where the prosecution's failure is clear." Keeton, 101 F.3d at 52 (6th Cir. 1996) (quoting Burks v. United States, 437 U.S. 1, 17 (1978)).

United States v. Blanchard, No. 05-80355, 2008 WL 3915007, at *1 (E.D. Mich. Aug. 20, 2008).

As Defendants recognize, a defendant "bears a very heavy burden" in a challenge to the

4

sufficiency of the evidence.  <u>United States v. Davis</u>, 577 F.3d 660, 671 (6th Cir. 2009) (quotation marks and citation omitted).

      Federal Rule of Criminal Procedure 33 allows a court, "[u]pon the defendant's motion," to "vacate any judgment and grant a new trial if the interest of justice so requires."  The Sixth Circuit has stated that "[t]he rule does not define 'interest of justice' and the courts have had little success in trying to generalize its meaning."  <u>United States v. Munoz</u>, 605 F.3d 359, 373 (6th Cir. 2010) (quotation marks, brackets, and citation omitted).  However, case law has established certain grounds for granting a new trial, which include: (i) the jury verdict was "against the manifest weight of the evidence" or (ii) substantial legal errors or omissions occurred.  <u>Id.</u> at 373-374.  The grant or denial of a new trial is within the district court's discretion.  <u>Id.</u> at 366 (noting that the Sixth Circuit reviews "a district court's decision to grant or deny a Rule 33 motion for abuse of discretion"); <u>see</u> <u>also</u> <u>United States v. Hoffa</u>, 382 F.2d 856, 862 (6th Cir. 1967) ("[G]ranting or refusing to grant such motions rests within the sound discretion of the District Court and its action must stand in the absence of a clear showing of abuse of discretion.").  The defendant bears the heavy burden to show that a new trial is warranted.  <u>United States v. Davis</u>, 15 F.3d 526, 531 (6th Cir. 1994).

## IV.  ANALYSIS

      The Court will first address the arguments raised in Norwood's supplemental brief: (i) the insufficiency of the evidence on Count Two; (ii) the unconstitutional vagueness of the Violent Crimes in Aid of Racketeering statute ("VICAR"), 18 U.S.C. § 1959, as applied to Count Two; and (iii) the unconstitutionality of the VICAR statute, as applied to Count Two, under the Commerce Clause.  Next, the Court will address Norwood's Motion for New Trial, which raises claims regarding: (i) jury intimidation; (ii) the admission of Defendant Gills's rap lyrics; (iii) jury

5

instructions about the definition of an "enterprise"; and (iv) the effectiveness of the limiting instructions that were given to the jury.

The Court then addresses Gills's motion, which makes arguments regarding: (i) the sufficiency of the evidence regarding the existence of the enterprise and Gills's participation in it; (ii) the sufficiency of the evidence on Counts Eight and Thirty-Five; and (iii) the Court's response to a jury question about aiding and abetting. Finally, the Court reviews the arguments raised in Jonathan Walker's motion: (i) the sufficiency of the evidence on Count Three; (ii) whether severance from Gills was required; and (iii) whether the Court erred in admitting statements that Jonathan Walker gave to Government agents as part of a proffer agreement with the Government.

**A. Defendant Norwood's Supplemental Brief (Dkt. 732)**

**1. VICAR Motive – Count Two**

In his supplemental brief in support of the motion for judgment of acquittal that was filed at the close of the Government's case-in-chief, Norwood first reiterates his arguments regarding the lack of evidence sufficient to satisfy the motive requirement under VICAR, 18 U.S.C. § 1959, for Count Two: regarding the murder of Jonathan Parker. Norwood Supp. Br. at 2-6. Norwood claims that the evidence at trial "supports only the conclusion that the shooting was done for money. It permits nothing more than guesswork to even suggest that the shooting was done for the purpose of Norwood increasing his status in the Howard Boys." Id. at 4. Norwood also argues — without citation to any case authority — that, to establish motive, the evidence must reveal the defendant's state of mind "before the event, not reactions of others to the event after the fact." Id. at 5-6.

6

The Court addressed and rejected this same argument in its Opinion and Order Denying Defendants' Motions for Judgments of Acquittal, and does so again here for the same reasons. Indeed, the Court included citation to case authority suggesting that the reactions of others to the violent act can be relevant in inferring the defendant's state of mind.  See Op. and Order Denying Defendants' Motions for Judgments of Acquittal at 20, 22-23 (citing United States v. Rubi-Gonzales, 311 F. App'x 483, 486 (2d Cir. 2009); United States v. Mayes, Jr., No. 12-385, 2014 WL 3530862, at *8 (E.D.N.Y. July 10, 2014)).

To the extent other Defendants seek to join in this argument with respect to their individual VICAR convictions, the Court addressed each of the VICAR convictions in its previous Opinion and Order.  Defendants raise no new arguments in their notices of joinder. Accordingly, the Court rejects the claim that the Government did not sufficiently prove the necessary VICAR motive for each count.

### 2. VICAR Statute's Constitutionality As Applied to Count Two

Norwood raises for the first time in his supplemental brief two additional claims, both regarding the constitutionality of the VICAR statute as applied to his VICAR conviction. Norwood Supp. Br. at 6-13.  First, Norwood claims that he was not provided fair notice that the shooting of Parker would constitute a federal offense.  Id. at 6-10.  Second, Norwood asserts that the VICAR statute, as applied here, exceeds Congress's authority under the Commerce Clause. Id. at 10-13.  The Court examines each argument in turn.

#### i.  Notice Requirement

Norwood first argues that, in light of the broad definition of "enterprise" used in this case, the application of the VICAR statute to the murder of Jonathan Parker was unconstitutional due to vagueness.  Norwood Supp. Br. at 6-10.  Specifically, Norwood claims that "[t]he

application of [VICAR] along with RICO enterprise as defined in <u>Boyle v. United States</u>, 556 U.S. 938, 946 (2009), to make Norwood criminally responsible for a state murder offense, based on the VICAR element that only requires proof that his motive was to increase his status in a loosely defined RICO enterprise — one that requires no status — is unconstitutional in this case." <u>Id.</u> at 6-7.  Norwood argues that neither VICAR nor RICO "provides notice of the kind required by the constitution that a street crime, the homicide of Jonathan Parker, based on the facts presented in Norwood's trial, comes within their scope." <u>Id.</u> at 9.  Therefore, Norwood suggests the VICAR statute, as applied here, is void for vagueness. <u>Id.</u> at 9-10.  He asserts that this constitutes a violation of the Due Process Clause. <u>Id.</u>

Under the United States Constitution, "a criminal statute must give fair warning of the conduct that it makes a crime." <u>Bouie v. City of Columbia</u>, 378 U.S. 347, 350 (1964).  The "void-for-vagueness" doctrine thus requires that a penal statute "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." <u>Kolender v. Lawson</u>, 461 U.S. 352, 357 (1983).  Accordingly, a law fails to satisfy the Due Process Clause of the Constitution "if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits . . . ." <u>Giaccio v. Pennsylvania</u>, 382 U.S. 399, 402-403 (1966).  Where, as here, "the first amendment is not implicated, a 'void for vagueness' challenge must be unconstitutional as applied to the defendant and 'must be examined in light of the facts of the case at hand.'" <u>United States v. Levy</u>, 904 F.2d 1026, 1032 (6th Cir. 1990) (quoting <u>United States v. Barnes</u>, 890 F.2d 545, 552 (1st Cir. 1989)).

As relevant here, the VICAR statute provides as follows:

> Whoever, as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value

from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do, shall be punished –

(1) for murder, by death or life imprisonment, or a fine under this title, or both . . . .

18 U.S.C. § 1959(a)(1). The statute defines "racketeering activity" as meaning the same as under 18 U.S.C. § 1961(1), and "enterprise" as including "any partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity, which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1959(b).

Norwood challenges the VICAR statute as unconstitutionally vague as applied to the murder of Jonathan Parker. He claims that the statute does not put a reasonable person on notice that this "street crime" would come within the statute's scope, particularly given the non-hierarchical nature of the alleged enterprise. Norwood Supp. Br. at 7, 9-10. In other words, Norwood claims that with such a loose "assortment of individuals," without any discernible hierarchy, the "maintaining or increasing position" requirement of the VICAR statute is unconstitutionally vague as applied to Count Two. Norwood cites no authority discussing the VICAR statute in the context of an as-applied vagueness challenge. Nevertheless, the Court concludes that the statute is not unconstitutionally vague as applied here.

First, Norwood's argument relies on his inaccurate view of the evidence. Norwood claims that the evidence offered at trial was that "of a non-hierarchical assortment of individuals, who happened to be relatives or friends, and who were commonly engaged in the drug trade

within a geographic subdivision of Flint, Michigan.  Their purported enterprise purpose was nothing more than that the enterprise associates were to 'watch each others' backs.'"  Norwood Supp. Br. at 7.  But the evidence revealed much more than that.  Although members may not have pooled their profits from drug sales, the evidence at trial revealed an identifiable group that worked together to enforce an exclusive territory — maintained by developing a reputation for violence — in which only members and associates were permitted to sell drugs.  The evidence also showed that members would help one another with sales, including warning of police presence, taking turns selling, and sometimes sharing customers and drugs.  This is more than a random assortment of individuals who simply "watch[ed] each others' backs."

Second, the Court is not persuaded by Norwood's suggestion that the non-hierarchical nature of the enterprise and corresponding lack of officially defined roles means that VICAR's "maintaining or increasing position" language failed to provide adequate notice that the murder of Jonathan Parker could fall within the statute's purview.  This argument assumes that maintaining or increasing a "position" requires a formalized rank or title.  In other words, Norwood's claim presupposes that the word "position" cannot mean a more informal "status" or "reputation."  See Norwood Reply at 3 ("Norwood . . . has argued that the application of [VICAR] along with RICO enterprise as defined in Boyle v. United States, 556 U.S. 938, 946 (2009), to make Norwood criminally responsible for a state murder offense based on the [VICAR] element that only requires proof that his motive was to increase his status in a loosely defined RICO enterprise — one that requires no status — is unconstitutional in this case." (emphasis added)).

That argument has been rejected by other courts.  For example, in United States v. Whitten, 610 F.3d 168, 180 (2d Cir. 2010), the defendant argued that maintaining or increasing

his gang "status" was not a purpose that fell within the category of qualifying statutory motives. The Second Circuit rejected this argument, noting that "in ordinary usage the words [position and status] are synonyms, and in the dictionary they reference each other." Id. For example, according to Webster's Third New International Dictionary Unabridged, the term "position" means "social or official rank or status." Id. Accordingly, in upholding the VICAR conviction, the Second Circuit concluded that it did not matter "that the [alleged enterprise] did not promote by grade in a ramified hierarchy." Id. Other courts have followed this same reasoning in upholding VICAR convictions. See, e.g., United States v. Banks, 514 F.3d 959, 970 (9th Cir. 2008) ("[F]ormal recognition by an organization's hierarchy has never been required to establish the purpose element of the VICAR statute. . . . . [T]he evidence is sufficient for a VICAR conviction even if, for example, the jury could reasonably infer no more than that Banks acted out of concern for his status in the eyes of his 'little homies' within the gang, or his reputation among other gang members generally."); see also United States v. Heilman, 377 F. App'x 157, 204-205 (3d Cir. 2010) (listing different types of evidence that courts have considered sufficient for purposes of satisfying VICAR, including testimony "that members acted to enhance their reputation generally or in the eyes of a specific faction or individual, about the violent nature of the organization, . . . and acknowledging the importance of maintaining status").

Indeed, there are many reasons why an individual may seek to maintain or increase his status in the enterprise, independent of trying to either maintain or move up in formalized rank. For example, members of an enterprise engaged in the drug trade may seek to maintain or increase a reputation for violence to dissuade potential intruders from interfering with the member's and other group members' drug sales within the protected territory. Testimony at trial revealed this to be a particularly important attribute to the Howard Boys, and it also revealed that

the victim here — Jonathan Parker — had been causing problems for Eddie Williams, an associate of the group and drug supplier for some of its members. See X. Turner Vol. I at 33-34, 75-82, 116; X. Turner Vol. II at 11-13; E. Williams Vol. I at 7-8.

Further, even if the enterprise did not include a formal rank structure at the time of the crime, the assailant may be seeking to cement his reputation for the future, in case such a formalized system is implemented. To that end, Norwood's statement that he had to calm down the younger members suggests that he did ultimately view himself in an authority role. T. Sondgeroth, 6/16/2014 (Rough Tr.) at 110. Finally, members may desire to prove their continued worth to the group and/or individual members, even if that will not necessarily result in a rise in rank. For example — to put it in a workplace context — employees may continue to produce outstanding work product, even if there are no prospects for official promotion, so as to maintain a positive reputation or status among their colleagues. The same may hold true for street gang members. Banks, 514 F.3d at 970. Indeed, Xavier Turner testified that members of the group gained respect based on their reputation for violence and ability to sell drugs. X. Turner Vol. I at 33-34. All of these are commonsense interpretations of "maintaining or increasing position in [the] enterprise," regardless of an official rank or hierarchical structure. Cf. Banks, 514 F.3d at 967 (holding that VICAR, like RICO, should be liberally construed to effectuate its remedial purposes).

In its Opinion and Order Denying Defendants' Motion for Judgments of Acquittal (Dkt. 785 (at 17-23)), the Court provided an in-depth examination of how VICAR's "maintaining or increasing position" requirement had been met with respect to the shooting of Jonathan Parker. In particular, the Court noted that Parker had caused trouble for a respected associate and drug supplier of the enterprise, as well as the importance of violence to the organization. Therefore,

the Court rejects Norwood's suggestion that the VICAR statute is unconstitutionally vague as applied here because it did not provide sufficient notice that the murder of Jonathan Parker could be construed as seeking to "maintain[] or increas[e] [Norwood's] position" in the non-vertically hierarchical enterprise.   On the facts of this case, the Court concludes that Norwood had sufficient notice that his shooting of Jonathan Parker subjected him to penalties under the VICAR statute.[5]

### ii.  Commerce Clause

Norwood next argues that VICAR, as applied in this case to Count Two, is unconstitutional because it "exceeds the scope of the commerce power."  Norwood Supp. Br. at 10-13.  Norwood asserts that there was "no allegation in the indictment and no evidence at trial of any effect on interstate commerce by the shooting alleged in Count 2 of the Indictment."  Id. at 10.  He claims that "[w]here the alleged violent act is plainly non-economic in nature and bears only the kind of attenuated relationship presented here by a theory of use of a murder to gain or maintain respect in an enterprise that requires no status, the use of the statute exceeds the scope of federal authority to make a local crime a federal offense."  Id. at 13.  The Court disagrees.

The Sixth Circuit addressed this issue in United States v. Riddle, 249 F.3d 529, 535-539 (6th Cir. 2001).  In that case, the defendants challenged the district court's jurisdiction because they claimed the government had not sufficiently established a link with interstate commerce.  In rejecting this argument, the Sixth Circuit noted that the interstate-commerce requirement, while

---

[5]  In its response to Norwood's supplemental brief, the Government also explained why the governing indictment provided sufficient notice under Federal Rule of Criminal Procedure 7. Gov't Resp. at 34-36.  In reply, Norwood claimed that the Government misconstrued his argument, and that he is not raising a challenge to the sufficiency of the indictment.  Norwood Reply at 3 ("Norwood has not argued that Counts One or Two fail to provide the notice required by Rule 7.").  Therefore, the Court need not address this argument.

referred to as "a 'jurisdictional' element," "does not affect subject matter jurisdiction." Id. at 536. Rather, the court held that "a claim of an insufficient connection to interstate commerce is a challenge to one of the elements of the government's case and is therefore considered a claim about the sufficiency of the evidence." Id. According to the Sixth Circuit, such a challenge is, therefore, "best understood as a facial challenge to the constitutionality of [the statutes] and an as-applied challenge to the sufficiency of the government's evidence in the [statutory] convictions." Id.

The Sixth Circuit then proceeded to review the challenged statutes. With respect to RICO, the court noted that a "de minimis connection suffices for a RICO enterprise that 'affects' interstate commerce." Id. at 537. With respect to the VICAR count, the defendant claimed the statute was unconstitutional because the murder at issue had no connection with interstate commerce. Id. at 538. In adopting the test previously set forth by the Second and Fourth Circuits, the Sixth Circuit held that VICAR's "requirements are met if the government establishes a connection between the [VICAR] act of violence and a RICO enterprise which has a de minimis interstate commerce connection." Id. The court concluded that the government had done so in Riddle: "Riddle does not contest the connection between Biondillo's murder and the Strollo enterprise, and we have determined above that the enterprise sufficiently affected interstate commerce." Id.[6]

---

[6]  Norwood faults the Government for "fail[ing] to cite any authority from the Sixth Circuit, except United States v. Riddle, 249 F.3d 529 (6th Cir. 2001), to support it's [sic] position that there is no need for a violent act to have any direct connection to commerce." Norwood Reply at 4. Norwood appears to suggest that Riddle should not apply post-Boyle. Id. But Norwood fails to cite a single case suggesting that the decision in Riddle is no longer good law, nor does he explain how the Supreme Court's decision interpreting the scope of RICO's enterprise requirement suddenly made the decision in Riddle obsolete. Indeed, Norwood's entire argument on this point is constrained to three conclusory, unsupported sentences in his reply. This is insufficient.

Here, the Court previously determined that the VICAR counts were related to the enterprise, and that the enterprise's activities were sufficiently connected with interstate commerce. Although there was no official hierarchy in the group, there was testimony at trial that members increased their status in the group by committing acts of violence, and that a reputation for violence benefitted the group as a whole. Furthermore, Norwood himself acknowledged that he would have to calm down younger members — a role that could be benefitted or enhanced by a reputation for violence. In addition, with regard to the shooting of Jonathan Parker in particular, the Court previously determined that a reasonable jury could infer that this murder was connected to the enterprise as sending a message that any interference with associates of the group and members' drug supplies would be retaliated against with violence — a message that was related to the enterprise's purpose of maintaining an exclusive territory to increase drug profits. And the Court has repeatedly rejected Norwood's argument that the enterprise itself did not have a sufficient connection to interstate commerce. See United States v. Norwood, 12-20287, 2014 WL 3659526, at *5-6 (E.D. Mich. July 22, 2014); Op. and Order Denying Defendants' Motions for Judgments of Acquittal at 46-48 (Dkt. 785).

The Court is not persuaded by Norwood's reliance on United States v. Garcia, 68 F. Supp. 2d 802 (E.D. Mich. 1999). In that pre-Riddle case, the district court concluded that the VICAR count itself — for murder of an individual — had no connection to interstate commerce, even though the district court concluded that the Government had met its burden of establishing the RICO enterprise's interstate-commerce requirement. Id. at 811-812. This latter conclusion was undermined in a related case involving Garcia's co-defendant, in which the Sixth Circuit found no evidence that the alleged enterprise "was involved in any sort of economic enterprise."

<u>Waucaush v. United States</u>, 380 F.3d 251, 256 (6th Cir. 2004).[7]  The Sixth Circuit expressly noted that there was no evidence of drug sales in that case, except for one defendant for whom the Government "admit[ted] that these drug charges were unrelated to the activities" of the group.  <u>Id.</u>  Indeed, the Sixth Circuit distinguished <u>Riddle</u> on that basis, <u>i.e.</u>, that the enterprise in <u>Riddle</u> <u>did</u> engage in economic activity.  <u>Id.</u> at 255-256.[8]  Nor was there evidence of any other substantial effect on interstate commerce by the group's activities in <u>Waucaush</u>.  Therefore, the Sixth Circuit held that "a reasonable jury could not conclude that [the] enterprise  . . . affected interstate commerce."  <u>Id.</u> at 258.

Here, on the other hand, the Court has repeatedly concluded that the enterprise was involved in economic activity: its members were involved in (and assisted each other with) drug sales, and the group worked to protect an exclusive territory from which its members could sell drugs by maintaining a reputation for violence.  See <u>Waucaush</u>, 380 F.3d at 255-256 (citing <u>United States v. Crenshaw</u>, 359 F.3d 977, 986-987, 991-992 (8th Cir. 2004) (no commerce clause problem when intrastate acts of violence were related to enterprise's interstate economic

---

[7]  In <u>Garcia</u>, the only connections to interstate commerce regarding the enterprise that were alleged were: (i) gang members traveled intrastate on an interstate highway to commit murders; (ii) one gun used by gang members was manufactured in another state; (iii) guns used by the gang were purchased from a trade center that frequently did business with citizens of other states; (iv) a gang member heard from a cellmate that a law enforcement officer had alluded to the possibility of other gang cells in other states; and (v) that two gang members discussed law enforcement initiatives against the gang while on a trip to Mexico.  See <u>Garcia</u>, 68 F. Supp. 2d at 805.  Further, the alleged predicate acts were solely based upon "acts involving murder"; they did not include "other, traditional RICO allegations such as robbery, hijacking, car theft, drugs, and extortion, which are more commonly present in RICO prosecutions"  <u>Id.</u> at 805 n.2.  On a motion for rehearing, the district court ultimately reversed its determination that the Government had alleged a sufficient effect on interstate commerce for purposes of RICO as well.  See <u>United States v. Garcia</u>, 143 F. Supp. 2d 791 (E.D. Mich. 2000).

[8]  The Sixth Circuit's decision in <u>Riddle</u> was issued after the district court's decision in <u>Garcia</u>, but before the Sixth Circuit's decision in <u>Waucaush</u>.  Of particular note, more recent court decisions from other jurisdictions have refused to follow <u>Garcia</u>, noting that its holding "has not been adopted or affirmed by any other court in the . . .  years since it was decided."  See <u>United States v. Boyle</u>, No. 08-534, 2009 WL 2032105, at *9 (S.D.N.Y. July 9, 2009).

activities)).  Accordingly, the Court rejects Norwood's argument that his VICAR conviction is unconstitutional as exceeding Congress's power under the Commerce Clause.

## B.  Defendant Norwood's Motion for New Trial (Dkt. 744/762)[9]

### 1.  Jury Intimidation

Defendant Norwood also filed a separate motion for new trial.  Norwood first argues that he was denied the right to an impartial jury.  Norwood Br. at 2-4 (Dkt. 762).  Norwood "submits, as was previously submitted in Defendant Oldham's motion for mistrial, (R628), that, as a result of the outrageous conduct by third parties, a majority of the jury was seriously intimidated and a new trial is necessary because he was denied the right to an impartial jury."  Id. at 3.  Norwood claims that the dismissal of the jurors who were equivocal about their ability to remain fair and impartial was insufficient.  Id. at 3-4.

Norwood raises no new substantive arguments in support of this claim.  Instead, he relies on the arguments previously raised in Defendant Oldham's motion for mistrial, and he simply reiterates his belief that the jury was irreparably tainted.  The Court previously ruled on this issue, see 7/18/2014 Op. and Order (Dkt. 761), and Norwood has provided no sound reason for concluding that ruling was incorrect.  Indeed, the Court's earlier ruling expressly noted that the jurors —except the ultimately excused Jurors 2 and 9 — each credibly testified at a Remmer hearing that they would still be able to remain fair and impartial despite the events at issue.  Id. at 8-9.  Therefore, the Court rejects Norwood's argument regarding an impartial jury.

### 2.  Admission of Defendant Gills's Rap Lyrics

Norwood next claims that the Court erred in admitting the rap songs made by Defendant Gills.  Norwood Br. at 4-7.  In support of this argument, Norwood raises three reasons the songs

---

[9]  This motion was originally filed under seal as Docket Number 744.  After the Court lifted the seal, see 3/12/2015 Order (Dkt. 760), the motion was filed on the docket publicly as Docket Number 762.

were not admissible under Federal Rule of Evidence 801(d)(2)(E): (i) there was insufficient evidence the raps were intended to further the alleged conspiracy, as opposed to promote Gills's music career through boasting and puffery; (ii) the raps were not made during and in the course of the conspiracy, because they were created after the alleged conspiracy's conclusion; and (iii) the lyrics were mere artistic expression, thereby reducing their probative value and reliability. Id.

The Court addressed and rejected the first two arguments in its Memorandum Opinion Granting the Government's Motion for the Admission of Coconspirator Statements (Dkt. 784). In that decision, the Court concluded that sufficient evidence was introduced that an enterprise existed, that Defendants were members, and that the introduced raps were made in the course of the conspiracy. The Court highlighted evidence that the raps were made at a time when the conspiracy was continuing, and it expressly rejected Defendants' claim that the videos were not admissible because they were made after both Gills's and the other Defendants' incarceration. Furthermore, the Court concluded that the rap videos were in furtherance of the conspiracy, because — based on their content and timing — the videos were intended to dissuade potential witnesses from cooperating, and, indeed, may have actually had this effect.[10]

Nor is the Court persuaded by Norwood's argument that the lyrics were mere artistic expression, thereby reducing their probative value and reliability. While this was an appropriate

---

[10] Although Norwood also mentions the song "Pat Around" for the first time in his motion for new trial, he fails to provide any explanation for why he believes this song — in particular — was inadmissible. Instead, his argument focuses primarily on the rap videos Gills posted from jail. See Norwood Br. at 4-7; see also Norwood Reply at 4-5 (Dkt. 756) (noting that the songs "were made nearly two years after the Indictment and after all of the defendants had been incarcerated for their roles in the alleged conspiracy"). Indeed, the Defendants did not object to the admission of this song at trial. 6/3/2014 (Rough Tr.) at 81-82. Nevertheless, the Court finds "Pat Around" also admissible, as it detailed the group's conspiratorial objective of evading law enforcement.

argument for the jury, the Government adequately showed that the videos threatened potential testifying witnesses, a fact that is certainly probative in this case.

Norwood's reliance on State v. Skinner, 95 A.3d 236 (N.J. 2014) does not alter the Court's conclusion. In that non-binding, state-court case, the New Jersey Supreme Court interpreted New Jersey Rule of Evidence 404(b) with respect to the admission of rap lyrics at trial. The court concluded that the reading of the lyrics had been improper, because they "constituted highly prejudicial evidence against [the defendant] that bore little or no probative value as to any motive or intent behind the attempted murder offense with which he was charged." Id. at 238. Indeed, the New Jersey Supreme Court noted that "many of the lyrics found in defendant's car and read to the jury were composed long before the circumstances underlying the instant offense took place." Id. at 240. To that end, while the lyrics "plainly depict[ed] various crimes and other bad acts," those "crimes and acts were unconnected to the specific facts of the attempted-murder charge against [the] defendant." Id. at 241; see also id. at 250 ("Furthermore, there was no argument by the State that the rap lyrics constituted direct evidence of the offense involved in this matter."); id. at 251 ("[T]here was no evidence that the crimes and bad acts about which defendant wrote in rap form were crimes or bad acts that he in fact had committed.").

Here, on the other hand, the rap videos — which were uploaded to the internet a few months before trial — helped establish the existence of the enterprise, its members, and at least one of its alleged purposes and/or means and methods: evading law enforcement by using threats and violence to dissuade witnesses from "snitching." The Skinner court specifically noted that "rap lyric evidence that provides direct proof against a defendant — such as an admission or details that are not generally known and dovetail with the facts of the case — should be analyzed

for relevance under [Rule] 401 and evaluated under [Rule 403]'s standard for prejudice, and not the standard for prejudice under a [Rule 404(b)] analysis." <u>Id.</u> at 249 n.5; <u>see also id.</u> at 252 (distinguishing <u>Greene v. Commonwealth</u>, 197 S.W.3d 76 (Ky. 2006), on the basis that the defendant in <u>Greene</u> had rapped about the very crime for which he was being charged). That is the case here, and thus <u>Skinner</u> is distinguishable. <u>See id.</u> at 252 (holding that, "absent such a strong nexus to defendant's charged crime, his fictional expressive writings are not properly evidential").[11]

A case that is on point, however, is <u>United States v. Wilson</u>, 493 F. Supp. 2d 460, 462-463 (E.D.N.Y. 2006). In <u>Wilson</u>, the district court admitted rap lyrics that were found both in the defendant's possession and on his coconspirator's computers. The court noted that the lyrics described the illegal activities of the purported enterprise, and thus were "relevant to determining whether the [group] exists and whether it is 'an enterprise engaged in racketeering activity.'" <u>Id.</u> at 463. The district court in <u>Wilson</u> also found that the lyrics were not hearsay, because they qualified as coconspirator statements made during the course and in furtherance of a conspiracy involving the defendant. <u>Id.</u>[12] The Court concludes the same analysis applies here and, therefore, rejects Norwood's argument that a new trial is warranted based on the admission of these raps.

### 3. Jury Instructions Regarding RICO Enterprise

---

[11]   <u>Skinner</u> also dealt with the admission of the defendant's own lyrics as possible negative character evidence against him under Rule 404. Norwood has not explained how the admission of Gills's raps acted as evidence of Norwood's character.

[12]   Norwood argues that <u>Wilson</u> is distinguishable because it only "dealt with the admission of rap lyrics against individual defendants under [Federal Rule of Evidence] 404(b)." Norwood Reply at 4. This is wrong. The district court in <u>Wilson</u> expressly found the coconspirators' lyrics to be admissible under Rules 401 and 801(d)(2)(E). There is no mention of Rule 404(b) anywhere in the <u>Wilson</u> decision.

Norwood argues that the Court erred in declining to include language in the RICO jury instruction stating that the enterprise could not be a "random assortment of independent individuals committing various, unrelated crimes and who all happened to live in the same area." Norwood Br. at 7. Norwood claims that the failure to include this language "prejudiced [him] and likely led to confusion as to the findings required to establish a RICO enterprise." Id. at 8. Norwood also asserts that the "rejection of the inclusion of this phrase also violated Norwood's right to present his theory of defense in the jury instructions." Id. at 8-9.

Before trial, the Court concluded that providing the jury with a preliminary instruction regarding the RICO-Conspiracy charge would be appropriate, given the anticipated length of trial, the number of witnesses and exhibits expected to be introduced, and the complexity of the legal standards. The Court asked the parties to submit a joint memorandum regarding their respective positions on the language of the preliminary instruction. See 5/13/2014 Order (Dkt. 576).

As relevant here, the parties offered proposed language on the definition of an "enterprise." The parties agreed that the Court should instruct the jury that, "to find that the Howard Boys enterprise existed, you must find beyond a reasonable doubt that there was an ongoing organization, formal or informal, in which the persons associated with it functioned as a continuing unit." See Ex. 1 to Joint Mem. at 2 (Dkt. 589-2). However, Defendants requested that the Court add the following language thereafter: "rather than a random assortment of independent individuals committing various, unrelated crimes and who all happened to live in the same area." Id. The parties largely agreed on the remaining paragraphs of the instruction about the definition of an "enterprise." Id.

21

The Government objected to Defendants' proposed addition as having "no basis in law," but acting instead as "merely an attempt by the defense to propose their theory of the case to the jury."   See Joint Mem. at 3 (Dkt. 589).   In response, Defendants simply asserted that they "believe[d] [their] version is a correct statement of the law based upon Boyle and Ouwinga v. Benistar, 419 Plan. Servs., 694 F.3d 783, 793 (6th Cir. 2012)."   Id. at 5.

The Court agreed with the Government:

> The Court . . . rejects Defendants' phrase concerning "a random assortment of individuals."   Defendants' phrase reflects the defense theory that no organization existed, and that each Defendant was, at most, merely an individual acting independently of the other Defendants.   While the defense theory may be a sound concept, no case has been drawn to the Court's attention that endorses Defendants' proposed language.   Therefore, this is not appropriate for a preliminary instruction on the state of the law to the jury.

See 5/28/2014 Op. and Order at 4 (Dkt. 613).   Accordingly, the Court did not include this language in its preliminary instruction to the jury.   See 6/2/2014 (Rough Tr.) at 72.

Toward the conclusion of the trial, the Court requested that the parties submit proposed final jury instructions.   Although there were some disputes between the parties regarding the appropriate instruction to give the jury regarding the definition of "enterprise," Defendants did not renew their request that the Court instruct the jury that an enterprise is not "a random assortment of independent individuals committing various, unrelated crimes and who all happened to live in the same area."   In addition, each of the Defendants, except Gills, submitted theories of the case, which the Court included in the instructions.

In light of the foregoing, Norwood's claim that a new trial is warranted based on the Court's preliminary instruction to the jury is meritless.   Norwood does not claim that any aspect of the instruction explaining what is an enterprise — and what is and is not required to prove

such an enterprise — was legally incorrect. Rather, Norwood simply faults the Court for declining to include Defendants' proposed language regarding what is <u>not</u> an enterprise. But even now, after the Court previously explained that Defendants had failed to provide any authority endorsing their proposed language, Norwood continues to omit any such authority. Therefore, Norwood has not explained how the Court erred in refusing to include language that has not been adopted by any other court explaining what does not constitute an enterprise. And in light of the fact that Norwood does not dispute that the Court accurately (and in quite detail) instructed the jury regarding what is and is not required to establish an enterprise, Norwood's claim that the omission of the proposed language "likely led to confusion as to the findings required to establish a RICO enterprise" is baseless. <u>See</u> Norwood Br. at 8.

Norwood also claims that the refusal to include this language in the "enterprise" instruction "violated [his] right to present his theory of defense in the jury instructions." Norwood Br. at 8-9. This argument is meritless. The Court invited Defendants to submit theories of the case to be read to the jury, <u>see</u> 7/9/2014 Order (Dkt. 674), and each of the Defendants did so, except for Gills. <u>See</u> Jatimothy Walker Theory (Dkt. 683); Norwood Theory (Dkt. 686); Oldham Theory (Dkt. 688); Jonathan Walker Theory (Dkt. 689). The Court then read these theories to the jury verbatim as part of the instructions. <u>See</u> 7/18/2014 (Rough Tr.) at 155-163; <u>see also</u> Sixth Circuit Pattern Jury Instruction 6.01 (including the defense theory of the case). Accordingly, Norwood fails to explain how the Court's refusal to include language regarding what is <u>not</u> an enterprise when defining enterprise in the instructions precluded the Defendants from presenting this theory of the case to the jury.

Furthermore, the Court's instructions were not inconsistent with, and did not undermine, Defendants' theories of the case. The Court explained to the jury that an enterprise requires

evidence of an "ongoing organization, formal or informal," and evidence that the various associates "functioned as a continuing unit." The Court also explained that the enterprise need not have any "particular or formal structure as long as it had enough organization so that its members operated in a coordinated manner in order to carry out the alleged common purposes of the group." Defendants were free to argue — and did argue in closing arguments — that these requirements had not been met, i.e., that they were an unorganized group of individuals from the same neighborhood committing unrelated crimes. But Norwood points to no authority requiring the Court to include negatives, i.e., what does not satisfy a statutory definition, in the instructions themselves. Indeed, the fact that the Court specifically instructed the jury that an enterprise requires some form of "organization" and "continuing unit" by necessity included Defendants' theory: that it does not include "a random assortment of independent individuals committing various, unrelated crimes." Cf. United States v. Thomas, 238 F.3d 426 (Table), 2000 WL 1720991, at *2 (6th Cir. Nov. 9, 2000) (district court did not err in refusing to give defendant's requested instruction, because "the court's instructions covered [the defendant's] theory of defense in a substantial way that [the defendant] appears to overlook: if the jury believed that [the defendant's] crime had not been perpetrated through force, violence, threat or intimidation, it would have acquitted [the defendant] of the charge"); United States v. Horton, 847 F.2d 313, 322 (6th Cir. 1988) ("It is not error to fail to use the language requested by the parties if the instruction as given is accurate and sufficient.").

Accordingly, the Court rejects Norwood's argument that the failure to expressly include language regarding what does not meet the requirements of an enterprise requires a new trial.

### 4. Limiting Instructions

Lastly, Norwood claims that the limiting instructions in this case were inadequate. Norwood Br. at 9-11.  He argues that, in light of the number of limiting instructions given to the jury, the instructions were "ineffective in limiting an improper and unconstitutional spillover effect they were designed to eliminate." Id. at 10-11.

The Court disagrees.  As Norwood recognizes, limiting instructions regarding the admissibility of certain statements and evidence were given throughout the trial, as appropriate. Furthermore, before the jury began deliberations, the Court reiterated that the jury had to consider separately the evidence against each Defendant.  See 7/18/2014 (Rough Tr.) at 153-154. The Court also permitted the jury to use notebooks throughout the trial, in which the jurors could notate when evidence or testimony was only admissible against a certain Defendant.

The Sixth Circuit has expressed a presumption that jurors are "capable of sorting out the evidence and considering the case of each defendant separately."  United States v. Warner, 690 F.2d 545, 553 (6th Cir. 1982).  To that end, courts "presume juries correctly follow instructions that are given to them."  United States v. Feagan, 472 F. App'x 382, 390 (6th Cir. 2012). Norwood has not provided any evidence that would lead the Court to question those presumptions here.  Indeed, the Court has repeatedly rejected the Defendants' arguments regarding the purported ineffectiveness of limiting instructions throughout this case.  See 5/16/2014 Op. and Order at 7 (Dkt. 587); 7/2/2014 Op. and Order at 5-8 (Dkt. 670).

In fact, the result at trial suggests that the jury capably followed the Court's limiting instructions.  All six of the trial Defendants were charged with Count One of the indictment — RICO Conspiracy.  Yet, the jury returned guilty verdicts only against five: Norwood, Jonathan Walker, Jatimothy Walker, Oldham, and Gills.  The jury returned a not-guilty verdict for Cureton.  This result certainly undercuts Norwood's suggestion that the jury was incapable of

segregating which evidence was introduced against which Defendants. <u>See</u> <u>United States v.</u> <u>Dimora</u>, 750 F.3d 619, 631 (6th Cir. 2014) (in holding that severance was not required, despite claim of prejudicial spillover, noting that "[t]he jury did its job, separately evaluating the evidence against the defendants on each count, convicting and acquitting Dimora on some charges, and doing the same for Gabor on others").

Norwood's reliance on authority from the Second Circuit is not persuasive. First, those cases concerned whether a new trial was necessary in light of the district court's erroneous admission of plea allocutions that violated the Confrontation Clause. <u>See</u> <u>United States v. Riggi</u>, 541 F.3d 94, 102 (2d Cir. 2008) (government conceded it was error to admit the allocutions); <u>United States v. Becker</u>, 502 F.3d 122, 130 (2d Cir. 2007) ("Whether or not the district court's decision to admit the plea allocutions in Becker's case was consistent with the then-controlling law of this Circuit, there can be no doubt after <u>Crawford</u> that their admission violated the Confrontation Clause."). Here, on the other hand, Norwood does not claim the statements were erroneously admitted. He simply claims — in conclusory fashion — that the accompanying instructions were ineffective.

In addition, the facts of those cases are significantly different than this one. For example, in <u>Riggi</u>, the Second Circuit highlighted that the "prejudicial spillover of the plea allocutions is manifest in the alignment of the verdicts. The jury convicted on every substantive count supported by a plea allocution; and where no plea allocution was offered in support of a substantive count, the jury acquitted." <u>Riggi</u>, 541 F.3d at 105. Here, on the other hand, the convictions did not align with the admission of the evidence. To the contrary, Cureton's acquittal suggests that the jury was capable of applying the evidence to the Defendant(s) against whom it was admitted. This case is, therefore, more like <u>United States v. Reifler</u>, 446 F.3d 65,

90 (2d Cir. 2006), in which the Second Circuit noted that the "discerning nature of the verdicts" — which acquitted some defendants and convicted others — "strongly indicate[d] that the plea allocutions played no role in the convictions."  Furthermore, the Second Circuit noted in <u>Riggi</u> that the government's statements during closing arguments "effectively eroded the court's limiting instruction and exacerbated the prejudicial effect."  <u>Riggi</u>, 541 F.3d at 107-108.  No such charge has been set forth by Norwood here.

Similarly, in <u>Becker</u>, the Second Circuit held that "[t]he number and repetitive nature of the allocutions also suggested that the conspiracy was widespread — making it plausible for the jury to assume that Becker was a participant simply by association with his co-workers." <u>Becker</u>, 502 F.3d at 131.  Such a concern is not present here, particularly in light of the jury's acquittal of Cureton — another alleged enterprise member.  This seriously undermines any similar argument that the Defendants were convicted by the jury "simply by association." Moreover, the Second Circuit noted in <u>Becker</u> that the district court's limiting instruction was deficient, failing to advise the jury not to consider the admission for criminal intent.  <u>Id.</u> at 133. Here, Norwood has not articulated a claim that the instructions were deficient; he simply claims that the number alone rendered them meaningless.  Norwood Br. at 10-11.

Accordingly, the Court rejects Norwood's argument that the limiting instructions were insufficient.  Norwood has offered no evidence or persuasive argument to overcome the presumption that the jury was capable of following the Court's instructions.  Instead, he relies on conclusory claims based on the number of instructions given.  This is insufficient.

## C. Defendant Gills's Motion for Judgment Notwithstanding the Verdict, or, in the Alternative, for a New Trial (Dkt. 736)

### 1. Gills's Membership in the Enterprise

Defendant Gills filed a separate motion for judgment notwithstanding the verdict, or, in the alternative, for a new trial.  In support of his motion, Gills first reiterates the argument that there "was a failure of proof of the existence of . . . an enterprise at trial."  Gills Br. at 2.  He also claims that "[t]he evidence did not show that Mr. Gills was a member, (or an 'associate'), of a racketeering (RICO) enterprise, as alleged in Count One."  Id.

As discussed in the Court's Memorandum Opinion Granting the Government's Motion for the Admission of Coconspirator Statements (Dkt. 784), as well as the Opinion and Order Denying Defendants' Motions for Judgments of Acquittal (Dkt. 785), sufficient evidence existed that an enterprise existed and that Gills was a member of it.  Accordingly, the Court rejects this argument.

### 2.  Relatedness and VICAR Motive — Counts Eight and Thirty-Five

Next, Gills repeats his argument that there was insufficient evidence to satisfy both the relationship prong of RICO and the motive requirement for VICAR on Counts 8 (the attempted murder of Barnes, Doby, McEwen, and Harden) and 35 (the attempted murder of Orr).  Gills Br. at 3-16.

The Court discussed and rejected these same arguments in its Opinion and Order Denying Defendants' Motions for Judgments of Acquittal (Dkt. 785).  The Court, therefore, rejects these arguments here as well.  However, the Court is compelled to briefly address one new issue raised by Gills in his reply.

As described in the Opinion and Order Denying Defendants' Motions for Judgments of Acquittal, Defendants filed motions for judgments of acquittal at the close of the Government's case-in-chief, pursuant to Federal Rule of Criminal Procedure 29(a) (Dkts. 687, 691).  As part of these motions, Gills challenged the sufficiency of the evidence on Counts 8, 9, 35, and 36.  The

28

Court reserved ruling on these motions.  See Fed. R. Crim. P. 29(b).  Defendants then orally renewed these motions before the case was submitted to the jury.

A few months later, Gills filed the instant motion, "pursuant to Federal Rules of Criminal Procedure 29 and 33."  In its response to this motion, the Government included some references to trial testimony given by Gills during his case.  See Gov't Resp. at 22-28.

Gills now faults the Government for including this testimony in its response.  Gills highlights that, under Rule 29(b), if the Court reserves ruling on the motion it may only consider the evidence presented at the time of the motion.  See Gills Reply at 3-6, 9-10 (Dkt. 757).  Gills suggests the Court strike these portions of the Government's argument from its response.  Id. at 5-6.

The trouble with Gills's argument, however, is that he assumes the Government's response is to his original motion that was made at the close of the Government's case-in-chief. To the extent the Government was responding to the instant motion — which was filed after the jury returned its verdict — the consideration of this testimony would have been proper.  See Fed. R. Crim. P. 29(b) ("If the court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved."); see also Fed. R. Crim. P. 29(c); United States v. Bonventre, No. 10-228, 2014 WL 3673550, at *2 (S.D.N.Y. July 24, 2014) ("Motions under Rule 29(c) are governed by the same standard as motions under Rule 29(a). . . . However, on a Rule 29(c) motion, the Court may consider all of the trial evidence and not only the evidence introduced during the Government's case in chief." (quotation marks and citation omitted)); United States v. Kalahar, No. 06-20514, 2007 WL 1500536, at *6 (E.D. Mich. May 23, 2007) (court may consider defendant's trial testimony if motion for judgment of acquittal is renewed at the close of proofs); United States v. Lu, 06-0676, 2009 WL 2929422, at *1 (D. Ariz. Sept. 10,

2009) ("Because Defendant renewed her motion at the close of trial, the Court must also consider whether the evidence at the close of trial was sufficient to sustain a conviction.").  That appears to have been the case here, particularly given that the Government had already filed a response to Gills's original motion (Dkt. 702).  Further, although Gills faults the Government for relying on his testimony, the Court notes that Gills appears to have relied on this testimony as well in his briefing.  See Gills Br. at 8 (Dkt. 736) (discussing Gills, 7/15/2014 (Rough Tr.) at 52-53).

Nevertheless, the Court initially focused exclusively on testimony and evidence introduced by the Government during its case-in-chief in the Opinion and Order Denying Defendants' Motions for Judgments of Acquittal.  The Court only considered Gills's testimony as further support for its finding, after concluding that the Government had introduced sufficient evidence from which a reasonable juror could conclude beyond a reasonable doubt that Gills was guilty on the VICAR count.  Therefore, the Court declines Gills's request to strike references to his testimony from the Government's response to his post-trial motion for judgment notwithstanding the verdict.

### 3.  Aiding and Abetting Jury Question

Lastly, Gills claims that a new trial is warranted based on the Court's response to a question from the jury during deliberations.  Gills Br. at 16-25.  In particular, Gills argues that the Court erred in declining to either simply respond "no," or to provide the jury with an instruction on the requirements for accessory after the fact, following a jury question asking if a certain hypothetical would qualify as aiding and abetting.  Id.  In his reply brief, Gills also claims that, even if the Court's response was not an error, it requires a new trial "in the interest of justice."  See Gills Reply Br. at 11-23.

In the late afternoon on July 21, 2014, the Court received the following question from the jury during its deliberations:

> If someone shoots someone out of a vehicle I am driving and I didn't know they were going to do it until[] they did, but I then drive away with them and then did not report it, is that considered aiding and abetting?

7/21/2014 Jury Question at 4:25 p.m.  The Court convened the parties to determine how best to respond.  The Government proposed reading the aiding-and-abetting instruction again.  Gills's counsel said that he "can't disagree with that," adding that, "It's a classic accessory after the fact situation . . . and the jury got no instructions on that so . . . I don't think we can tell them much other than to please read the instruction again."  7/21/2014 (Rough Tr.) at 13.

Despite this initial response, Gills's counsel then said a few minutes later that he would "be remiss if [he] didn't ask the Court to give an instruction on the distinction between aiding and abetting and accessory after the fact."  Id. at 14.  The Government disagreed with this request.  Id. at 15-16.  The Court thus allowed the parties to submit written argument on the issue that evening.  The Court noted, however, that the committee commentary to the Sixth Circuit pattern instructions stated that "'the line between an aider and abettor and an accessory after the fact is sometimes difficult to draw, particularly when dealing with the escape immediately following [the] crime.' . . . That seems to be exactly the fault line that we are crossing right here so it looks like we all may have some homework to do."  Id. at 19.

The Government e-mailed the Court that evening, saying that Gills's request was untimely, that he had failed to file a theory of the case or request an instruction on accessory after the fact earlier, and that the jury should be instructed to refer to the instruction on aiding and abetting.  The Government also noted that, "[i]f the Court is inclined to give an [accessory-after-the-fact] instruction," the Government proposed language to be read "in conjunction with

the aiding & abetting instruction in lieu of giving a separate instruction for an offense that has

not been charged."   See 7/21/2014 E-mail (Dkt. 736-2).   Gills filed a written memorandum,

arguing that the accessory-after-the-fact instruction should be given.   Gills Mem. at 5 (Dkt. 705).

The Court held a hearing on the issue the next morning.   The Court circulated the

following proposed language that it had prepared to respond to the question:

> Regarding yesterday's question concerning aiding and abetting, I
> cannot answer your question as phrased.   Courts do not answer
> hypothetical questions that contain factual predicates based on the
> specifics of the case, as contrasted with more generally phrased
> questions about the law.   At this point, you should review the
> instructions I gave you, including the aiding and abetting
> instruction.   If you have additional questions, I will respond to
> those.

The Government agreed that this language was appropriate.   Gills's counsel

acknowledged that he didn't "think the [Court's] proposal is unreasonable at all," but he "just

would prefer that the jury be given better or given more information about the legal question that

they've asked."   7/22/2014 (Rough Tr.) at 2-3.   The Court ultimately decided to give the

proposed language, explaining as follows:

> [T]he jury's question is really hypothetical, it's grounded in
> specific factual predicates of our case and courts generally do not
> answer such hypothetical questions because it would appear to
> enter upon the jury's fact-finding role.   The job of the Court is to
> provide instructions regarding the general principles of law that
> apply to a case without giving instructions that would be seen as
> applying principles to specific factual predicates of the case and it
> would seem to me that if I were to answer the jury's question
> directly, that's exactly what I will be doing so I'm not going to
> answer their question directly.
>
> I'm also not, at least at this time, going to give an
> instruction on . . . accessory after the fact.   First of all, the jury did
> not ask about that.   Second, the defendant is not charged with that
> crime and I don't think it would be appropriate for me to give an
> instruction to educate the jury about a crime about which the
> defendant is not charged.   It's also hazardous to guess exactly what

32

is motiving a jury to ask a particular question and I think courts should not try to speculate exactly what might be motivating a jury to ask a particular question so I think the proposed instruction I circulated this morning provides an appropriate response to the jury's question and it explains why the Court cannot directly answer their specific question because their question is grounded in the specific factual predicates of the case. It then proceeds to tell them to review their prior instructions and to review the instruction in particular the aiding and abetting which is the specific principle of law that they were inquiring about and then it opens the door for additional questions and of course we can respond to those new questions if and when they arise.

Id. at 3-4. The Court then provided the response — as circulated earlier — to the jury.

A little while later, the Court received another question from the jury, which read: "How long must a person know about a crime before it occurs to be considered prior knowledge?" The Court convened another conference with the parties to determine how to respond. Gills's counsel said that, because this question was "not a hypothetical, [and] . . . doesn't have anything to do with the facts of the case," the jury should be instructed to follow the instruction on aiding and abetting. Id. at 16. The Court noted that it was not clear what the jury was asking, because there had not been an instruction given that mentioned "prior knowledge." Therefore, the Court proposed telling the jury that it could not understand the question, and would respond to a re-formulated question if the jury so desired. Id. at 17, 19. Both sides agreed with this resolution. Id. at 19. Accordingly, the Court brought the jury into the courtroom and informed them that it was "not entirely sure of exactly what [they were] asking about so I'm going to ask you to reformulate that question if you want me to answer a question along those lines because as you framed it, I'm not exactly sure what you're asking me and I don't want to try to guess what you're asking me so if you want to reframe your question, then I'll then review it and come back to you with a response." Id. at 31.

33

The jury subsequently sent the Court two additional questions: "(1) If someone tells me they are going to commit a crime seconds before they do, [d]o I have prior knowledge of that crime?" and "(2) By law[,] what length of time is considered prior knowledge for aiding and abetting?"   The Court circulated a proposed response to counsel, and neither counsel for the Government nor counsel for Defendants — including Gills — had any objection.  Id. at 42-43. Accordingly, the Court provided the following response to the jury:

> Regarding your question about aiding and abetting, the law requires that the Government prove, beyond a reasonable doubt, that (i) a specific crime was committed, (ii) the defendant helped to commit the crime or encouraged someone else to commit the crime, and (iii) the defendant intended to help commit or encourage the crime.  The help and/or encouragement must occur -- and the intent must be formed -- before completion of the crime. You should consider this instruction along with all my other instructions.

Gills now argues that the Court's refusal either to respond "no" to the initial hypothetical, or to give an accessory-after-the-fact instruction in response to that question, was error, or, at a minimum, an injustice requiring a new trial under Rule 33.

Gills's argument is not well taken.  Gills has cited no authority stating that a court should provide an instruction on a charge not brought against the defendant, nor raised by the defendant as a defense.[13]  Case law suggests to the contrary.  For example, in United States v. Collom, 614 F.2d 624, 631 (9th Cir. 1979), the jury sent a question asking, "Is aiding and abetting after the fact constitute [sic] a violation of the law?"  The trial court reinstructed the jury on the elements of aiding and abetting, and invited them to ask further questions should the need arise.  Id.  The Ninth Circuit concluded this was an appropriate response:

---

[13]  The Government also highlights that accessory after the fact is not a lesser included charge to aiding and abetting.  Gov't Resp. at 44-46.  Gills does not directly respond to this argument in his reply.

> The meaning the jury attached to the words "after the fact" in the question is unclear since there had been no "accessory after the fact" charge or other instruction using that phrase. While the judge was free to do so, attempting to respond to the question directly would have risked further confusion. The judge therefore acted appropriately in merely rereading the previously given aiding and abetting instructions and inviting further questions should the confusion persist.

Id.; see also United States v. Clark, 96 F. App'x 816, 821 (3d Cir. 2004) ("Where the jury was required to consider only the charge of aiding and abetting, it would be confusing, not to say erroneous, for the court to instruct the jury on the law pertaining to another crime for which Clark was not charged."), vacated on other grounds by 543 U.S. 1109 (2005). Indeed, the Supreme Court has recognized that one proper course of action with respect to jury questions is to first direct the jury back to the given instructions, and, if that does not resolve the problem, then explore other alternatives. See Washington v. Sarausad, 555 U.S. 179, 195-196, 205 (2009). This was precisely the course the Court followed here.

Gills also faults both the Government and the Court for failing to provide any authority suggesting that a district court cannot respond to a hypothetical posed by the jury. See Gills Reply at 12-13. The Court notes that Gills, as the party objecting to the Court's course of action, has not provided any authority stating that the Court should give such an answer. Nevertheless, substantial authority exists suggesting that courts should not become a thirteenth juror by answering hypotheticals from the jury. For example, in United States v. Walker, 575 F.2d 209, 214 (9th Cir. 1978), the Ninth Circuit addressed this issue:

> A trial judge is often reluctant to respond to questions in language similar to that used by the jury, particularly where inquiries are phrased as hypothetical cases or questions requiring a categorical yes or no answer. Questions or illustrations from the jury may be phrased so that a simple affirmative or negative response might favor one party's position, place undue weight on certain evidence, or indicate that the trial judge believes certain facts to be true when

35

> such matters should properly be determined by the jury. Because
> the jury may not enlist the court as its partner in the fact-finding
> process, the trial judge must proceed circumspectly in responding
> to inquiries from the jury.

See also United States v. Jackson, 249 F. App'x 130, 134 (11th Cir. 2007) ("In light of its original detailed instructions that accurately presented the substantive law, the district court did not abuse its discretion in refusing to directly answer a jury's hypothetical question."); Arizona v. Johnson, 351 F.3d 988, 992-998 (9th Cir. 2003) (holding that simply responding "yes" to a jury question "may well have led some jurors to place undue emphasis on the court's answer and to conclude not only that someone in custody can legally give consent, but perhaps also to conclude or suspect that the presiding judge believed that Amaya-Flores consented in this case").

Nor is the Court persuaded by Gills's argument that the failure to instruct the jury on accessory after the fact prejudiced him, resulting in either error or an unjust trial. After receiving a question about timing for a third time from the jury, the Court instructed the jury, in relevant part, as follows, with respect to aiding and abetting: "The help and/or encouragement must occur -- and the intent must be formed -- before completion of the crime." This instruction was given with Gills's counsel's express consent, and it removed the concern of which Gills impliedly complains: that the jury was confused regarding the timing of when aiding and abetting stops. As such, the Court fails to see how the "interest of justice" requires a new trial based on the Court's permissible decision to provide an agreed-upon instruction regarding aiding and abetting — the crime charged — rather than on the non-charged crime of accessory after the fact.

Gills's arguments to the contrary are easily rejected. First, Gills claims that the Government conceded in its July 21, 2014 e-mail that an accessory-after-the-fact instruction would be acceptable. Gills Br. at 21 and n.2. However, the Government did not agree that such an instruction should be given. Rather, the Government argued that such an instruction would be

36

impermissible because: (i) Gills's request was untimely and (ii) Gills had not raised accessory after the fact as a defense. The Government noted, however, that "if the Court is inclined to give [such] an instruction," it should give language that was proposed by the Government. <u>See</u> 7/21/2014 E-mail (Dkt. 736-2). This was an alternative argument raised by the Government in the event the Court was inclined to agree with Gills that an accessory-after-the-fact instruction was warranted, a request the Court ultimately denied.

Second, Gills claims that the later response from the Court — specifically stating that the help/encouragement must have occurred, and intent have been formed, before completion of the crime — did not remedy the deficiency. Gills Br. at 23-24. According to Gills, this is "[b]ecause the jury had never explicitly asked for direction about what to do if they found that help and/or encouragement was given <u>before</u> 'completion of the crime,' but <u>had</u> asked what to do with help and encouragement that occurred <u>only</u> <u>after</u> completion of the crime." <u>Id.</u> (emphasis in original). The Court fails to understand this argument. In focusing on the requirements for aiding and abetting — the crime charged — the Court instructed the jury that the help and/or encouragement must have been given before completion of the crime. By necessity, then, help and/or encouragement given only after the crime was completed could <u>not</u> sustain an aiding-and-abetting conviction.

Finally, Gills attempts to distinguish the Government's reliance on <u>United States v.</u> <u>Clark</u>, 96 F. App'x 816, 821 (3d Cir. 2004), but, in doing so, Gills wholly misreads the language of that case. Gills first argues that the Third Circuit did not hold that it would have been erroneous for the Court to give an instruction clarifying the distinction between aiding and abetting and accessory after the fact. Gills Reply at 16-17. In support of this argument, Gills relies on the Third Circuit's language that it would be "confusing, <u>not</u> <u>to</u> <u>say</u> <u>erroneous</u>, for the

Court to instruct the jury on the law pertaining to another crime for which Clark was not charged."  Id. at 17 (emphasis added by Gills).  But the "not to say" language served to emphasize, rather than limit, the Court's holding.  In other words, the Third Circuit was suggesting that it may also have been erroneous, not that it would not have been.

Further, Gills relies on the Third Circuit's language that "[i]f Clark truly believed that the evidence did not fit the charge of aiding and abetting, the only charge under which he was indicted, he should have filed a motion for directed verdict, a motion for a mistrial, or a motion to set aside the verdict.  He did none of these."  Gills Reply at 17.  Gills highlights that, unlike the defendant in Clark, he has filed a motion for directed verdict and a motion to set aside the verdict on this basis.  But, in raising these issues, the Third Circuit was suggesting that giving a jury instruction on accessory after the fact would have been improper; instead, the defendant's proper course if he believed his actions actually fit within this alternative crime would have been to seek relief from the Court on the aiding-and-abetting crime charged.  The Third Circuit thus included this language simply to underscore that relief other than an instruction on a non-charged crime was available to the defendant in Clark.

Accordingly, the Court rejects Gills's argument that relief is required in light of the Court's handling of the jury's questions on aiding and abetting.[14]

---

[14]  Gills devotes a significant amount of his reply brief to the fact that the Court need not find actual error to grant relief under Federal Rule of Criminal Procedure 33 if the interest of justice otherwise requires.  He faults the Government for relying on an "error" standard.  Gills Reply at 11-23.  As explained above, the Court does not find that the instructions and responses to the jury's questions require the Court to grant relief under Rule 33.  Nevertheless, the Court notes that Gills's arguments in his reply regarding the Government's focus on "error" are unfair.  The heading of Gills's argument in his motion was, "The Court Committed Error in its Response to a Jury Question on the Evidence Necessary to Prove that Mr. Gills was an Aider and Abettor . . . ."  See Gills Br. at 16; see also id. at 25 ("[B]ecause this Court's erroneous refusal to grant that request cannot be reasonably characterized as 'harmless error,' this Court should now grant Defendant Gills's Motion.").  Therefore, Gills's faulting the Government for subsequently focusing on whether an "error" occurred is questionable.

**D. Defendant Jonathan Walker's Motion for Judgment Notwithstanding the Verdict or, in the Alternative, for a New Trial (Dkt. 735)**

### 1. VICAR Motive – Count Three

Defendant Jonathan Walker also separately filed a motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. Although a bit convoluted, Jonathan Walker appears to first argue that there was insufficient evidence to satisfy VICAR's motive requirement with respect to Count Three: the murder of Marion Hardy. Jonathan Walker Br. at 7-8 (quoting United States v. Hackett, 762 F.3d 493, 500 (6th Cir. 2014)).[15]

The Court discussed and rejected this same argument in its Opinion and Order Denying Defendants' Motions for Judgments of Acquittal (Dkt. 785). The Court, therefore, rejects it here as well.

### 2. Severance from Defendant Gills

Jonathan Walker next suggests, in conclusory fashion, that the Court's refusal to sever his trial from Leon Gills prejudiced him. Jonathan Walker Br. at 8. Without citation to any authority, Jonathan Walker first claims that the rap videos Gills created in jail "would not have been admissible in evidence against Jon[athan Walker] if he wasn't tried with Gills." Id. Jonathan Walker also asserts that, "it cannot seriously be suggested that everyone else did not suffer for being subjected to Gills' own testimony which would not have happened in a separate trial." Id. These arguments are unsupported, and thus easily rejected. See United States v.

---

[15]    Jonathan Walker also may be arguing that there was insufficient evidence that he was a member of the Howard Boys, because there was purportedly no evidence that he sold drugs in the area. Jonathan Walker Br. at 7-8. To the extent this is his argument, the Court also rejects it. Testimony — including statements Jonathan Walker himself gave to Agent Sondgeroth — suggests that he sold drugs in the neighborhood. See T. Sondgeroth, 6/16/2014 (Rough Tr.) at 123; X. Turner Vol. I at 105. Further, there was a large amount of evidence at trial — including pictures, social media pages, and evidence of violent actions taken against members of the rival gang, T-Hood, and others who disrespected members — connecting Jonathan Walker to the enterprise. See Memorandum Op. Granting the Government's Motion for the Admission of Coconspirator Statements (Dkt. 784).

Walker, No. 12-20287-3, 2014 WL 1154346, at *7 n.4 (E.D. Mich. Mar. 19, 2014).  Moreover, even addressing the merits of these arguments, they fail.

With respect to Jonathan Walker's argument regarding the rap videos Gills created in jail, the Court addressed this claim above and in other decisions, and need not do so again here.  The Court notes, however, that Jonathan Walker's claim that these videos would "not have been admissible in evidence against [him] if he wasn't tried with Gills" is incorrect.  The videos were admitted as coconspirator statements under Federal Rule of Evidence 801(d)(2)(E).  Therefore, subject to Rule 403 concerns — an issue not raised by Jonathan Walker here — they would have been admissible against him in a separate trial.  See Wilson, 493 F. Supp. 2d at 463.

With regard to his argument that he suffered by Gills's decision to testify, the Court rejects this argument for the same reasons as discussed above with regard to limiting instructions.  In particular, the Court notes that the jury acquitted Defendant Jamil Cureton of the same RICO-Conspiracy charge that the other, remaining trial Defendants faced.  Yet, this same jury who heard Gills's testimony and decided the case against Curteon similarly decided the case against Jonathan Walker.  This severely undermines Jonathan Walker's suggestion that Gills's testimony seriously harmed him.  See United States v. Kilgore, 401 F. App'x 842, 844-845 (4th Cir. 2010) (rejecting claim that defendant was entitled to mistrial or severance based on co-defendant's testimony, due to absence of evidence that the testimony "prevented the jury from making a reliable judgment about [the defendant's] criminal conduct").  Moreover, Jonathan Walker had the opportunity to cross-examine Gills when Gills took the stand at trial; Jonathan Walker chose not to do so.

Accordingly, the Court rejects Jonathan Walker's arguments about Gills.  See Zafiro v. United States, 506 U.S. 534, 540 (1993) ("A defendant normally would not be entitled to exclude

the testimony of a former codefendant if the district court did sever their trials, and we see no reason why relevant and competent testimony would be prejudicial merely because the witness is also a codefendant."); United States v. Amaya, 574 F. App'x 720, 723 (6th Cir. 2014) (holding that the district court properly denied a motion to sever based on testimony of co-defendant, because, in part, "had [the motion to sever] been granted, the government would have been able to call [the co-defendant] as a witness against [the movant]").

### 3. Admission of "Kastigar" Statements

Lastly, Jonathan Walker challenges the admission of statements that he gave to law enforcement agents before trial pursuant to a proffer agreement with the Government. See Jonathan Walker Br. at 9. Under that agreement, Jonathan Walker gave statements to Government representatives regarding his drug sales and some of the events described at trial. United States v. Walker, No. 12-20287-3, 2014 WL 1154346, at *2 (E.D. Mich. Mar. 19, 2013). The agreement specified that these statements could not be used against Jonathan Walker unless he breached the agreement, such as by failing to tell the truth or by failing a polygraph examination. Id. at *1.

The Government subsequently determined that Jonathan Walker had not provided complete or truthful information, and it offered for Jonathan Walker to take a polygraph examination; he declined. Accordingly, the Government notified Jonathan Walker that it intended to use his statements against him at trial. Id. at *2. Jonathan Walker subsequently filed a motion to preclude the Government from using these statements. Id.

The Court held two hearings on the motion, and ordered supplemental briefing. Id. The Court ultimately determined that Jonathan Walker materially breached the proffer agreement by

refusing the polygraph examination, and, therefore, the Government could use the statements at trial. Id. at *7.

Jonathan Walker suggests that the Court erred in this decision, but he provides no new argument as to why the decision was wrong. Instead, he simply "incorporates by reference and adopts his previously filed Motion to Enforce the Terms of a Kastigar Letter and Prohibit the Government from Distributing the FBI 302s and Using Them at Trial . . . and supplemental filing." Jonathan Walker Br. at 9-10. The Court rejects this argument for the same reasons outlined in its decision on Jonathan Walker's original motion. Walker, 2014 WL 1154346, at *1-8.

Jonathan Walker does assert that the statements prejudiced him at trial, because "his own words became integral parts of the government's case against him." Jonathan Walker Br. at 9; see also id. (arguing that the statements became of "even greater significant prejudicial [sic] in light of trial developments"). But the fact that evidence may have been an asset to the Government's case — a question the Court need not resolve — is not grounds for a new trial so long as it was properly admitted. And, as explained above, Jonathan Walker has offered no new argument as to why these statements were improperly admitted. Accordingly, the Court rejects this argument.

## V. CONCLUSION

For the foregoing reasons, the Court denies Defendant Norwood's motion for new trial (Dkt. 744/762), Defendant Gills's motion for judgment notwithstanding the verdict, or, in the alternative, for a new trial (Dkt. 736), and Defendant Jonathan Walker's motion for judgment notwithstanding the verdict or, in the alternative, for a new trial (Dkt. 735). The Court also

rejects the arguments raised in Defendant Norwood's supplemental brief in support of his motion

for judgment of acquittal (Dkt. 732).

       SO ORDERED.


Dated:  May 14, 2015               s/Mark A. Goldsmith         
      Detroit, Michigan             MARK A. GOLDSMITH
                          United States District Judge


## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on May 14, 2015.

               s/Johnetta M. Curry-Williams    
               Case Manager