UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,                       HON. MARK A. GOLDSMITH

v.                                        Case No. 12-CR-20287-1

ALEXANDRA NORWOOD, D-1,

        Defendant.
_____/

## OPINION AND ORDER OVERRULING DEFENDANT'S OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT

A jury returned a verdict against Defendant Alexandra Norwood on July 22, 2014, finding him guilty of the following crimes: (i) Racketeering (RICO) Conspiracy (Count One); and (ii) Murder of Jonathan Parker in Aid of Racketeering (Count Two). The Probation Department prepared a Presentence Investigation Report ("PSIR") for sentencing, to which Norwood prepared objections. The Probation Department and the Government responded to Norwood's objections, see Gov't Resp. (Dkt. 765),[1] and Norwood filed a reply (Dkt. 766). The Court now addresses and overrules Norwood's objections.

**A. OBJECTION 1**

Norwood first objects to two statements contained in Paragraph 9 of the PSIR: (i) that the "'Howard Boys' gang primary source of income was drug sales," and (ii) that "[t]hey also participated in the production of songs and music CD's." With respect to the first sentence, Norwood argues that there was no evidence that "any group of individuals who may have referred to themselves as 'Howard Boys' shared any income. Rather, if anyone who might have been referred to as a 'Howard Boy' engaged in drug sales, he kept his own money." With

---

[1] Neither Norwood's objections to the PSIR, nor the Probation Department's response, is filed publicly on the docket.

1

respect to the second sentence, Norwood argues that the "evidence at trial concerning rap songs and recorded music concerned a time period after 2005 when Alexandra Norwood no longer lived in the area referred to in this paragraph."

The Court rejects these arguments. First, regarding the drug sales, there was extensive testimony at trial that members of the group sold drugs, and that they worked together both to effectuate these drug sales (i.e., by warning one another of police and rival gang member presence, by sharing drugs and customers, and by taking turns selling), and to protect an exclusive territory in which only members and associates could sell. See, e.g., X. Turner Vol. I at 93-96, 106-107, 110-112, 114; D. Scott Vol. I at 24-25; Angus Vol. II at 9; D. Scott Vol. II at 80-82; J. Wilson at 6; R. Dudley Vol. I at 6-7; B. Marshall Vol. II at 14; A. Patrick, 6/3/2014 (Rough Tr.) at 76-77. The fact that the sales proceeds may have been kept by individual member-sellers, rather than shared among the group, is irrelevant; Howard Boys members worked together to increase the individual participants' drug-sale income. Indeed, the PSIR goes on to specifically recognize that, "Each of the members sold drugs on their own, but . . . [s]ome had common sources for the drugs. They also fronted or sold drugs to each other." PSIR ¶ 10. Furthermore, Norwood does not appear to dispute the PSIR's statement that these drug sales were the primary source of income for the group's members. Therefore, the statement will remain as written.

With respect to the production of rap songs and music CDs, the Court notes that Paragraph 9 of the PSIR is an informational overview paragraph describing the activities of the group in general. This paragraph does not mention whether an individual member engaged in a particular activity; that level of detail is contained in subsequent paragraphs. Nor does the paragraph purport to attribute all of these activities to every member, or claim that every member

did everything recited therein. Although there is no evidence that Norwood himself participated in the production of any CDs or music, there was evidence that other members participated in these activities in furtherance of the enterprise. See X. Turner Vol. I at 75; Ex. 73. Accordingly, the Court overrules this objection, and the statement will remain as written.

**B. OBJECTION 2**

Norwood next objects to the statement in Paragraph 11 of the PSIR that he was a member of the Howard Boys. While recognizing that he was found guilty at trial of the offenses listed in Counts One and Two of the indictment, Norwood argues that he left the neighborhood in January 2005, and no longer had any association with the activities described as taking place after that time.

The jury's verdict, as well as the evidence at trial (including Norwood's own statements), established that he was a member of the Howard Boys. See Angus Vol. II at 7-10; X. Turner Vol. I at 31, 42. Furthermore, although Norwood may have moved out of the immediate neighborhood in 2005, he remained near the area thereafter, and he continued to associate with members and associates. See X. Turner Vol. I at 97-98; X. Turner Vol. III at 100-102; C. Orr at 86-88.

Moreover, to the extent Norwood is arguing that he withdrew from the group after 2005, the Court has repeatedly rejected that argument, and does so again here. The Sixth Circuit explained in United States v. Robinson, 390 F.3d 853, 882 (6th Cir. 2004), that, even if a coconspirator is "no longer an active participant in the conspiracy . . ., he is nonetheless presumed to be a continuing member, . . . so long as the conspiracy was ongoing and [the defendant] did not establish his affirmative withdrawal from the conspiracy." "Mere cessation of activity is not sufficient to establish withdrawal from a conspiracy." Id. There is no evidence

that Norwood took affirmative action to defeat or disavow the purpose of the conspiracy after 2005. Furthermore, even if Norwood had withdrawn from the group in or after 2005, that is not inconsistent with the PSIR's statement that he "was a member of the Howard Boys gang," because he would have been a member before his alleged withdrawal. Accordingly, the Court overrules this objection, and this paragraph of the PSIR will remain as written.

### C. OBJECTION 3

Norwood next objects to the inclusion of Paragraphs 12 and 13, which describe drug activities from 2002. Norwood does not dispute the accuracy of these paragraphs, but claims that they refer to his own conduct, and not that of the alleged RICO enterprise.

As described above, there was extensive testimony that the Howard Boys worked together to protect an exclusive territory from which only members and associates could sell drugs. Both of the drug activities described in Paragraphs 12 and 13 occurred near the Howard Estates — the core of the group's exclusive territory. Norwood himself described to Government agents how an individual had to be from the Howard Boys to sell drugs in the area, and that people from outside groups or gangs were not allowed to sell drugs there. See Angus Vol. II at 9. Further, the events described in these paragraphs were listed as overt acts in the governing indictment. See Am. First Superseding Indictment at Count One, ¶¶ 22-23 (Dkt. 191). Accordingly, the Court finds that these drug sales were related to the enterprise, and overrules Norwood's objection.

### D. OBJECTION 4

In his fourth objection, Norwood challenges the statements in Paragraph 14 of the PSIR regarding the murder of Jonathan Parker. Norwood acknowledges the jury's verdict on this

shooting, but continues to dispute that he has responsibility for this event and that it is related to the RICO enterprise.

As Norwood recognizes, the jury found him guilty of Count Two, murder in aid of racketeering for the murder of Jonathan Parker. Furthermore, the evidence at trial supported this finding, as detailed in the Court's Opinion and Order Denying Defendants' Motions for Judgments of Acquittal (Dkt. 785). Accordingly, the Court overrules this objection.

### E. OBJECTION 5

Norwood next disputes the completeness of Paragraph 15 of the PSIR. In particular, Norwood notes that Paragraph 15 "does not include or mention that, as part of the police investigative activity, officers checked various apartment doors with a key taken from Norwood upon his arrest before they entered the apartment where they claimed to have found marijuana and firearms."

The Probation Department responded to this objection by stating, "Information that officers checked various apartment doors with the key, and that correspondence and an identification card belonging to the defendant were located, was added to paragraph 15." The following information was included in the PSIR that was provided to the Court: "NORWOOD had in his possession a key which officers used to try various apartment doors before entering an apartment where they observed 2.19 net grams of marijuana on a coffee table. . . . Correspondence and a personal identification card belonging to NORWOOD were located." Given the inclusion of this additional information in the PSIR, Norwood's objection on this point appears to have been resolved. Indeed, Norwood recognizes as much in his reply. Norwood Reply at 3 ("It appears this has been resolved by the Probation Department.").

### F. OBJECTION 6

Norwood next raises two objections in one. First, with respect to Paragraph 10 of the PSIR (which Norwood mislabeled in his objection as Paragraph 19), Norwood challenges the statement that "status was based on [the] commission of violent acts and drug sales." Norwood argues that because there was no specific hierarchy to the group, there was no "status." Norwood further claims that "status" should not be confused with "reputation" or "respect."

The Court agrees with the Probation Department's response to Norwood's objection: "The term 'status' as used in paragraph 10 refers to the regard or prestige with which Howard Boys members viewed each other, and does not, by definition, necessarily involve a hierarchy of leadership." Norwood cites no case authority in support of his argument that "status" requires some formalized hierarchy. Indeed, as explained in the Court's Opinion and Order Denying Defendants' post-trial motions, "status" does not require a formalized hierarchy (Dkt. 786).

While Norwood cites Webster's Dictionary's definition of "status" as meaning a "position or rank," see Norwood Reply at 3-4, the term "position," as used in the VICAR statute, includes a "social or official rank or status." See United States v. Whitten, 610 F.3d 168, 180 (2d Cir. 2010) (citing Webster's Third New International Dictionary Unabridged 1769 (Phillip B. Gove ed., Merriam-Webster 3d ed. 1986) (1961)). And a social rank or status fits within Webster's Dictionary's definition of "reputation" — "[T]he estimation in which one is generally held." See Webster's Third New International Dictionary Unabridged 1929 (Phillip B. Gove ed., Merriam-Webster 3d ed. 1986) (1961)). This same definition could also encompass "respect." To that end, according to Webster's New World Thesaurus, synonyms for "reputation" include "standing, prestige, stature, . . . respect, . . . [and] social approval." See also Roget's International Thesaurus § 912 (3d ed. 1962) (synonyms for "repute" include "respect" and "rank, standing, position, . . . [and] status").

Indeed, as numerous courts have explained, one can seek to increase his or her "reputation" among a subset of an enterprise and still meet VICAR's "position" motive requirement, regardless of an official hierarchical system. These cases often use both "status" and "reputation" in reaching this conclusion. See, e.g., United States v. Banks, 514 F.3d 959, 970 (9th Cir. 2008) (VICAR motive can be satisfied even if the defendant acted "out of concern for his status in the eyes of his 'little homies' within the gang, or his reputation among other gang members generally"); Whitten, 610 F.3d at 179-180 (highlighting testimony that a reputation for violence enhanced one's status within the group, despite lack of "promot[ion] by grade in a ramified hierarchy"); United States v. Heilman, 377 F. App'x 157, 204-205 (3d Cir. 2010) (noting that acting to enhance one's "reputation generally or in the eyes of a specific faction or individual" is relevant for purposes of satisfying VICAR motive).

Therefore, the Court concludes that "status," "respect," and "reputation" — within the context of a neighborhood street gang like the Howard Boys — are not as distinguishable as Norwood suggests.

Furthermore, the use of the term is appropriate in light of the evidence presented at trial. There was testimony at trial that members would get more respect from other members based on how good they were at selling drugs and how dangerous (i.e., violent) they were. See X. Turner Vol. I at 33. Other former associates testified that Norwood's reputation increased after he killed Jonathan Parker; Norwood became more "respected." C. Orr at 71. In other words, the more violent a reputation one had, the more respect that person earned and the greater status he enjoyed in the group. See R. Dudley Vol. II at 26 (failure to respond to acts of disrespect would result in being viewed as "soft" or "weak"). Accordingly, the Court overrules Norwood's objection based on the PSIR's use of the term "status."

Norwood next objects to the quantity of drugs attributed to him in Paragraph 19. Norwood argues that there "was not a specific finding of a drug quantity at trial or a specific determination that sales by other individuals . . . were reasonably foreseeable to him."

Paragraph 19 of the PSIR notes that "the government estimated that 112 to 196 grams of crack cocaine was involved in the enterprise, and was reasonably foreseeable to the defendant." For guideline purposes, the PSIR holds Norwood accountable for "at least 28, but less than 112 grams of crack cocaine." Agent Sondgeroth testified at trial that Norwood stated that he (Norwood) sold approximately 14 to 112 grams of crack cocaine per week in the exclusive territory between 2001 and 2006. T. Sondgeroth, 6/16/2014 (Rough Tr.) at 107-110. Accordingly, the Court finds that holding Norwood responsible for between 28 and 112 grams of crack cocaine is appropriate — regardless of the amount of drug sales by other members that were reasonably foreseeable to Norwood — and it overrules this objection.[2]

## G.  OBJECTION 7

In light of Objection 6, Norwood disputes the base offense level regarding his drug activities set forth in Paragraphs 31-36 of the PSIR.

Given that the Court overruled Norwood's above objection, the Court also overrules Norwood's objection regarding the base offense level for the distribution of crack cocaine. Moreover, as the Probation Department noted, this base offense level (and the distribution of crack cocaine generally) had no effect on Norwood's total offense level, in light of the calculation of the offense level for the murder of Jonathan Parker. Accordingly, the Court overrules this objection.

## H.  OBJECTION 8

---

[2] The Court also notes that this finding has no effect on Norwood's ultimate guideline range in the PSIR, in light of the base offense level for the murder of Jonathan Parker.

In his eighth objection, Norwood disputes the assessment of two criminal history points in Paragraph 47 of the PSIR under United States Sentencing Guideline § 4A1.1(b). Norwood argues that to qualify for the two points, he must have been in custody for at least 60 days, but the PSIR does not indicate the start date for the boot camp program — the predicate sentence warranting the additional points — that ended on December 27, 2006.

Based on a correspondence from the Records Office of the Special Alternative Incarceration Facility, the Probation Department responds that the Michigan Department of Corrections Special Alternative Incarceration Program ("SAI boot camp") is a 90-day program, which Norwood entered in September 2006. Norwood has not disputed this information in his reply, nor does he dispute that he was in this program for 90 days before successful completion. Further, the Probation Department has provided the correspondence to the Court, which indicates that Norwood entered the SAI boot camp on September 28, 2006, and left on December 27, 2006, with successful completion. Accordingly, the Court overrules this objection.

## I. OBJECTION 9

Lastly, Norwood objects to the inclusion of the information in Paragraphs 53, 55, and 56 of the PSIR, because they describe Norwood's prior contact with law enforcement, which did not result in any convictions. Without citing any authority, Norwood argues that these paragraphs serve none of the purposes of the sentencing statutes and should not be part of his PSIR.

The Court agrees with the Probation Department that this information is properly included in the PSIR. Pursuant to 18 U.S.C. § 3661 and United States Sentencing Guideline § 1B1.4, the Court may consider any information concerning the background, character, and conduct of the Defendant in imposing a sentence, unless otherwise prohibited by law. Indeed, numerous courts — including the Sixth Circuit — have concluded that consideration of

uncharged offenses, dismissed prosecutions, or even acquittals may be relevant for purposes of sentencing. See United States v. Haj-Hamed, 549 F.3d 1020, 1026 (6th Cir. 2008) ("In general, a district court can consider uncharged or dismissed conduct for sentencing purposes."); State v. Thomas, 29 F. App'x 241, 251 (6th Cir. 2002) ("[C]ourts have consistently held that uncharged but relevant criminal conduct may be used in determining a defendant's sentencing guideline range."); United States v. Graves, 785 F.2d 870, 872, 876 (10th Cir. 1986) (both the sentencing court and the post-sentencing administrative agencies are, "of course, limited to a consideration of information that is accurate, but they are not precluded from considering prior charges that were dismissed or alleged offenses from which charges were not filed because of illegally obtained evidence").

Norwood does not dispute the accuracy of Paragraphs 53, 55, and 56, and these paragraphs explicitly state that the case was dismissed (Paragraph 53) or that Norwood was not prosecuted for the conduct at issue (Paragraphs 55 and 56). Nor does Norwood claim that these paragraphs are prohibited from being included in the PSIR by some statute, regulation, or other authority. Further, as the Probation Department highlights, these paragraphs were not used in calculating the sentencing guidelines; they merely serve informational purposes. Accordingly, the Court overrules this objection.

      SO ORDERED.


Dated: May 18, 2015                      s/Mark A. Goldsmith
      Detroit, Michigan             MARK A. GOLDSMITH
                                       United States District Judge

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on May 18, 2015.

                                                s/Johnetta M. Curry-Williams
                                                Case Manager